UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ARTHUR LEE WILLIAMS | § | |
| | § | |
| V. | § | CIVIL NO._____ |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutional Division | § | |

**APPLICATION FOR WRIT OF HABEAS CORPUS
FILED PURSUANT TO 28 U.S.C. 2254**

TO THE HONORABLE JUDGE:

COMES NOW, ARTHUR LEE WILLIAMS, by and through his attorney, Stanley G. Schneider, pursuant to 28 U.S.C. Section 2254, and petitions this Honorable Court to grant this motion, on the grounds that he is being unlawfully incarcerated on death row in Texas by virtue of judgment and conviction and sentence of death entered in violation of the Constitution and laws of the State of Texas and the Constitution of the United States. In support of this, Arthur Lee Williams asserts the following:

**I.
Identification of Parties**

Williams is confined in the Institutional Division of the Texas Department of Criminal justice under a sentence of death.

1

Respondent is the Director of the Institutional Division of the Texas Department of Criminal Justice. He may be served through his attorney, the Attorney General of Texas, Supreme Court Building, Austin, Texas 78711.

## II.
## Statement of Jurisdiction

This is a petition for writ of habeas corpus filed by a person confined pursuant to a state court judgment. This Court has jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254.

## III.
## Prior Proceedings

Arthur Lee Williams is an indigent prisoner on death row in Livingston, Texas.

Williams was convicted in February 1983 of the offense of capital murder. The jury answered the special issues submitted under Article 37.071 of the Texas Code of Criminal Procedure, and the trial court, accordingly, set punishment at death. The Court of Criminal Appeals affirmed Applicant's conviction and sentence on direct appeal. *Williams v. State*, 682 S.W .2d 538 (Tex. Crim. App. 1984). The Supreme Court granted certiorari and vacated the judgment on a voir dire issue. *Williams v. Texas*, 479 U.S. 1074 ( 1987). The Court of Criminal Appeals remanded  the case to the trial court for a hearing in accordance with

*Batson v. Kentucky*, 476 U.S. 79 (1986).  The Court of Criminal Appeals then affirmed applicant's conviction and sentence on appeal after remand.  *Williams v. State*, 804 S.W.2d 95 (Tex. Crim. App.), *cert. denied*, 501 U.S.239 (1991).

Applicant's initial habeas application was filed in the convicting court on December 27, 1993.  His subsequent application was filed in the convicting court on November 11, 2005.  Both applications were received in the Court of Criminal Appeals on January 22, 2009.  The Court of Criminal Appeals denied relief on Applicant's habeas application  requested in his habeas on June 13, 2012.  The Court of Criminal Appeals received Applicant's Motion for Rehearing on July 31, 2012.  The Court of Criminal Appeals denied Applicant's Motion for Rehearing on September 26, 2013.

## IV.
## Standard of Review

Williams understand that this Court must give deference to the state court's decision as required under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C.S. § 2254(d)(2). Pursuant to the AEDPA, the state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C.S. § 2254(e)(1).  Post-

AEDPA, federal courts assessing a petition for writ of habeas corpus from a state prisoner must defer to the state court's resolution of those claims, with few exceptions. 28 U.S.C.S. § 2254(d). Deference is mandated both for questions of law and for mixed questions of law and fact, unless the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. A state court's decision is "contrary to" clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts. A state court's decision involves an "unreasonable application" of clearly established federal law if the state court identifies the correct legal principle but unreasonably applies that principle to the facts of the petitioner's case.  See *Miller-El v. Cockrell*, 537 U.S. 322, 335, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).

## V.
## Opinion by the Texas Court of Criminal Appeals

On June 13, 2012, the Texas Court of Criminal Appeals denied Williams petition for writ of habeas corpus filed pursuant to Tex. Code Crim. Proc. Art 11.071.  The Court in a published opinion addressed seven of the issues raised by Williams.   According to the Court most of the issues involve ineffective claims

filed against Williams' trial attorney James Stafford.  The Court recognized that Mr. Stafford filed an affidavit wherein the noted twenty nine instance in which he claims his performance was deficient.   The Court noted that a conscientious lawyer "may be unduly prone toward second guessing his performance when he fails to obtain the result for which he had hoped."  The Court identified those issues and determine that Mr. Stafford's conduct was not deficient in light of the record.

One issue discussed by the Court was trial counsel's failure to investigate and present mitigating evidence during the punishment phase of the trial.   Trial counsel rested behind the State during the punishment phase of the death penalty trial.  In his affidavit, trial counsel stated that, "Before trial, I spent all of my time preparing for the guilt stage and did not pay any attention to the punishment stage. Accordingly, I did not determine whether there was any mitigating evidence to present." Slip op., at 24.

The Court excused trial counsel's conduct by stating that " Given the Supreme Court's holding in *Jurek,* trial counsel could not have reasonably expected to obtain the kind of mitigation special issue that we not take for granted. In formulating his defense of applicant counsel was limited to the special issues that were submitted.  The Court reasoned that the Supreme Court's decision in

5

*Jurek v, Texas,* 428 U.S. 262 (1976) in which the Texas death penalty scheme was upheld obsolved trial counsel of any responsible to present mitigating evidence notwithstanding the Supreme Court's decisions in *Edding v. Oklahoma,* 455 U.S. 104, 110-12(1982) and *Lockett v. Ohil,* 438 U.S. 586, 605 (1978).   The dissent suggests that Williams conviction because at the time of his trial in 1983, the Texas scheme was unconstitutional because it imposed a mandatory death penalty in violation of *Lockett*.   The dissent also noted that the death penalty in this case is premised on the very statute and procedure held unconstitutional by the Supreme Court in *Penry v. Lynaugh,* 492 U.S. 302, 328 (1989).

The majority found that the mitigating evidence it called "blame-lessening evidence" would constitute two-edged evidence which undermines Applicant's position on the special issues.   Slip op., at 27.   It wrote, "If applicant is a bad person (because of the bad things have happened to him), then he is more likely to be a future danger, his conduct was more likely to have been deliberate, and his conduct was not as likely to have been a reasonable response to provocation from the deceased." *Id.*   It further recognized that such blame lessening evidence would be relevant under the current mitigation issue, *id.,* at 28-29.   It further held that under the then-existing special issue system, "blame-lessening evidence would have done little or nothing to overcome the aggravating evidence, but would have

simply added ammunition to the State's case." Slip op., at 32. The Court's rationale in denying Applicant relief embodies the essence of the very rationale for the multitude of  Supreme Court's decisions since 1989 reversing Texas death penalty convictions based on the failure of the Texas scheme herein upheld to allow for the consideration by the sentencing jury of two-edged evidence or blame lessening evidence.

For that reason, it did not fault trial counsel for failing to investigate or present it.  The majority also did not fault trial counsel for failing to request a mitigation instruction of some sort based on the Court's jurisprudence at the time.[1] Slip op., at 29 and n. 63.  Furthermore, while the majority held the failure to request a mitigation instruction would not prejudice habeas review, Slip op., at 35, it went on to hold it would not consider the newly discovered mitigation evidence because it had not been presented to the jury, *Id.,* at 36.

Judge Cochran's concurring opinion noting the differences between this Court's death penalty sentencing jurisprudence at the time of the trial and the current state of the law does not excuse trial counsel from his duty to investigate and have a firm grasp of the facts and the law.[2]  *Ex parte Duffy,* 607 S.W.2d 507

---

[1] *See e.g. Quiones v. State,* 592 S.W.2d 933, 947 (1980).

[2] Many lawyers viewed *Lockett v. Ohio,* 483 U.S. 586 (1978), as requiring that jury consider "blame lessening evidence" in its life and death decisions. *Quinones* was tried in 1978.

(Tex. Crim. App. 1980), was the state of the law in Texas at the time of Applicant's trial. *Duffy* requires trial counsel to have a "firm command of the facts as well as the governing law" in order to provide effective assistance of counsel. *Id.,* at 516.[3]   This requires counsel to make an independent investigation of the facts and to seek out and interview witnesses. *Id.,* at 517. The *Duffy* Court relied on applicable American Bar Association standards in making this determination. *Id,* at 516-17.

At the time of Applicant's trial in 1983, the Supreme Court had already decided *Lockett v. Ohio,* 438 U.S. 586 (1978); and *Eddings v. Oklahoma,* 455 U.S. 104 (1982), both holding that capital sentencers cannot be prevented from considering *as a mitigating factor* any aspect of the defendant's character or record.  In *Eddings,* the Court held that a trial court erred in holding that it could not consider the defendant's violent background as mitigation.  455 U.S., at 113. Yet, from 1978 through 1989, when the Supreme Court decided *Penry I*, the Court of Criminal Appeals repeatedly suggested that evidence of the defendant's character and record could be considered as part of the Texas special issue scheme. Lawyers throughout the State questioned this Court's rationale and many

---

3   *Strickland v. Washington,* 466 U.S. 668 (1984) has not changed this standard at least as to deficient performance.  An attorney cannot make strategic decisions competently unless he is familiar with the facts of the case and the governing law.

continuously raised the issue of mitigation evidence and instructions. *Lockett* and *Edddings* constituted substantial reason to question this Court's jurisprudence as to mitigation.  As this Judge Alcala noted in her dissenting opinion:

> [The Supreme Court] stated that *Penry I* was premised on "background principles" from cases the Court decided in 1976 and that *Penry I* did not formulate a "new rule".  (citation omitted).  Rather, "*Penry I* was merely an application" of the rule settled in earlier cases including *Lockett*. (Dissenting opinion, p. 5).

Trial counsel gave no strategic reason for not investigating mitigation.  He simply focused on guilt/innocence rather than punishment.  While focusing on guilt/innocence can be a reasonable strategic decision *if he had a full command of the facts and the applicable law,* that is not the case here.  Instead, he simply ignored it, failed to investigate and presented no evidence at punishment even though constitutionally mitigating evidence was available.

In essence, the majority has created a rule that a person sentenced to death pre-*Penry I* cannot as a matter of law obtain habeas relief if his trial counsel followed this Court's settled jurisprudence as to a mitigation instruction and, based on this incorrect constitutional jurisprudence, made the decision not to introduce double-edged evidence at punishment even though now all courts now agree it is mitigating.  Under the majority's holding, if trial counsel had presented the blame lessening evidence at punishment, it would have been deficient performance under

*Strickland v. Washington,* 466 U.S. 668 (1984), because in the majority's words, the evidence "would have simply added ammunition to the State's case." But by not presenting it to the jury, this Court will not consider it on habeas. Yet the Supreme Court has repeatedly reversed convictions based on trial counsel's failure to investigate or present significant mitigating evidence that can be considered in the life or death decision by the jury. *See Williams v. Taylor,* 529 U.S. 362 (2000); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Brewer v. Quarterman,* 550 U.S. 286 (2009); and *Porter v. McCollum,* ___ U.S ___, 130 S. Ct. 447 (2009). As the Supreme Court wrote in *Brewer,* "Under the narrowest possible reading of our opinion in *Penry I,* the Texas special issues do not provide for adequate consideration of a defendant's mitigating evidence when that evidence functions as a 'two edged sword.'" 550 U.S., at 294-95.

In the instant case, the jury did not hear evidence of significant mitigating evidence based on trial counsel's failure to investigate and/or the inability of the jury to give it mitigating effect. Evidence similar to that not discovered by trial counsel and which would have harmed Applicant if it had been presented at trial has been found mitigating by the Supreme Court numerous times. For example, in *Williams,* the Court held that evidence of childhood mistreatment, abuse and

neglect was mitigating and trial counsel was ineffective for not discovering it. Likewise, in *Wiggins,* trial counsel was found ineffective for failing to discover and present evidence that the defendant's mother was an alcoholic.  In *Porter,* the Court found beatings and other abuse by a parent during childhood along with military service were mitigating and counsel was ineffective for failing to present it.  In each of those cases, the Supreme Court considered the omitted evidence on federal habeas review.  The Court should have done likewise on state habeas.

Additionally, the majority opinion conflicts with *Brewer* and *Penry I* in another way.  While the "good-person" evidence presented at trial  has some relevance to the special issues, Slip op., at 26-27, in the absence of a mitigation instruction the jury was unable to give it full effect.  *See Brewer,* 550 U.S., at 295-96, *citing Penry v. Johnson,* 532 U.S. 782 (2001) (*Penry II*).  Like the Fifth Circuit jurisprudence criticized in *Brewer,* the majority opinion fails to  "heed the warnings that have repeatedly issued from this Court regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death."  550 U.S., at 296.

The jury lacked the ability under the issues and instructions presented to it to

give full mitigating effect to the mitigating evidence presented at trial.   The majority's refusal to grant habeas relief is inconsistent with *Penry I* and its progeny.

### The Dissent Is the Proper Analysis

In the dissent, Judge Alcala analyzes trial counsel's performance under *Strickland*.[4]   Relying on the Supreme Court's decisions in *Lockett* and *Eddings*, Judge Alcala also found that the Texas death penalty sentencing scheme as applied to Applicant was unconstitutional in 1983.  Slip op., at 3-11 (Alcala, J., dissenting). Judge Alcala would have held that the mitigating evidence not presented to the jury and some actually presented – such as remorse – was two edged evidence which could have allowed a jury to determine Applicant acted deliberately.  *Id.,* at 8.  In the absence of a mitigation instruction, the jury "was not able to consider and give a reasoned moral response to evidence of Applicant's remorse."  *Id.*

Likewise, Judge Alcala would have found trial counsel's failure to investigate deficient conduct.  *Id.,* at 11, *citing Rompilla v. Beard,* 545 U.S. 374, 390 n. 7 (2005) (holding that complete failure to investigate potential mitigation can never constitute reasonable trial strategy).  The dissent relies and gives credit to trial counsel's affidavit that he spent all of his time preparing for the guilt stage

---

[4]  This is the application of the correct standard.  *Strickland* was decided before this Court affirmed Applicant's conviction on October 10, 1984.

and did not pay any attention to punishment, including mitigating evidence. Slip op., at 12.

Likewise, the dissent – while not faulting trial counsel for failing to seek a mitigation special issue – found that then-existing Supreme Court precedent required trial counsel to ask for "some type of instruction that would enable the jury to consider any evidence with mitigative significance that exceeded the scope of the statutory special issues...." Slip op., at 15-16.

The dissent, comparing this case to *Porter* and *Abdul-Kabir* , would have held that the unpresented mitigating evidence along with a proper instruction on mitigation of punishment would have altered Applicant's sentencing profile. *Id.,* at 21. It would have found *Strickland* prejudice. *Id.,* at 22-23. Clearly, in light of the consistent Supreme Court precedent arising since *Lockett* and continuing to today, prior to *Penry I,* the Texas death penalty scheme was unconstitutional. The Texas death penalty scheme was unconstitutional as applied to Applicant because the jury was unable to give meaningful effect and a reasoned moral response to the evidence that Applicant was remorseful for killing a police officer. And, it was uncontroverted that trial counsel failed to investigate mitigating evidence because he did not understand what it was even though the Supreme Court explained the concept of mitigating evidence in *Lockett* and *Eddings*.

The majority fails to recognize trial counsel's duties to investigate both the facts and applicable law as to punishment as well as the constitutional infirmity of the special issue system used in Texas at the time of Applicant's trial.  It further errs in refusing to consider the mitigation evidence produced on habeas but not at trial.  If also fails to give mitigative weight to evidence as to Applicant's character and remorse presented at trial.

Most importantly, it fails to recognize the dilemma its pre-*Penry I* jurisprudence placed on capital defense counsel, who could see the Supreme Court's holdings requiring the ability to consider *and give effect to* all evidence of mitigation.  Yet, the Texas sentencing scheme failed to provide a forum for the jury's consideration of mitigating evidence.  This Court should reconsider its holding of June 13, 2012, and issue a new opinion vacating Applicant's death sentence and remanding to the trial court for a new sentencing hearing.

The majority's decision is based on circular reasoning:  at the time of Applicant's trial in 1983, Texas used an unconstitutional capital sentencing system and because this Court repeatedly upheld the system even in light of Supreme Court cases calling it into question, trial counsel was not ineffective for failure to investigate and/or present evidence which the Supreme Court has held has mitigative effect and which juries must be able to give full effect.

14

Thus, Williams sentence of death is based on a sentencing scheme that has been determined to be unconstitutional by the Supreme Court of the United States on many occasions. The Court of Criminal Appeals' reliance on the Supreme Court's decision in *Jurek* is clearly misplace and conflicts with the foregoing established Supreme Court precedent.

## VI.
## Statement of Facts

On April 28, at about two o'clock in the afternoon, a bearded, undercover police officer, Daryl Wayne Shirley, was shot on the grounds of an apartment complex at 2929 Rolido, in southwest Houston. Shirley was wearing blue jeans, plaid shirt, cowboy boots, and a cowboy hat. (S.F. Vol. p). Prior to the shooting Shirley had been sitting by the pool at the apartment complex. (S.F. Vol. p.). The pool was located directly in front of the apartment where Arthur Lee Williams was staying with his sister. At about two o'clock Mr. Williams and a friend, Ms. Claudette Guidry, left from his apartment. They were going to Ms. Guidry's car, which was parked in one of the apartment complex's parking lots. (S.F. Vol.p.) Officer Shirley followed Ms. Guidry and Mr. Williams as they walked towards her car.

Arthur Williams had been in Houston for about two months. Before that he was in Minneapolis, Minnesota, where he had been born and raised. He came to

Houston in violation of a parole he had received in Minnesota.  He had been par
led to a halfway house from which he had absconded.  He was living with his sister
Linda Ransome at the Parkstone apartments, 2801 Rolido, apartment number 53.
During his short stay in Houston, Williams attempted to get into college but was
unable to due to finances.

As Mr. Williams and Ms. Guidry walked to her car, officer Shirley followed
them.  When the couple entered the breezeway which led to the parking lot, Shirley
ran up to Williams and with a 9 mm Smith and Wesson automatic pistol in hand
pushed him against a wall and told him that if he moved he would blow his
"motherfucking" head off.   He did not identify himself as a police officer or that
he was on police business.

After officer Shirley put his gun to Mr. Williams' head Mr. Williams shouted
to Ms. Guidry to go and get help.  She ran off to Eddie Paul Lewis' apartment, an
acquaintance who lived in the same apartment complex.

As Claudette Guidry ran to get help Mr. Williams managed to get Shirley
into a struggle over his gun. While they were struggling Shirley managed to get on
top of Williams on the ground.  Robert Dennis Knight, a resident of the apartment
complex came out of his apartment during the struggle after hearing two men
arguing loudly.  When he came out of his apartment he saw Shirley on top of

Williams, and Shirley shouted to Knight to go and call the police.  Mr. Knight testified that the man did not identify himself as a police officer.

Mr. Williams and Shirley continued to struggle over Shirley's gun.  Saiid Davarinejad, a Coca Cola vendor, happened by the two men as they were fighting.  Mr. Davarinejad did not see anything about Shirley that identified him as a police officer.  During the fight Mr. Williams managed to momentarily get on top of Shirley before Shirley threw Williams over his head. As Williams landed he was able to shoot at Shirley with his own gun. When Shirley turned towards him he fired another shot at him.  Shirley then ran and Mr. Williams got up and ran in the opposite direction.

As he was running from the scene Williams saw Shirley's gun, badge, and beeper.  Williams picked up the gun and beeper and ran to Angelia Lewis' apartment.  Ms. Lewis lived in the same apartment complex. (S.F. Vol. p).

None of the four people who saw and heard the confrontation between officer Shirley and Mr. Williams saw or heard anything about Shirley that identified him as a police officer.[5]  There was nothing in his dress, his manner, or

---

[5]     Robert Dennis Knight was called as a state's witness.  He was a resident of the apartment complex, who overheard two people fighting and went to see what was happening. He left his apartment and saw the two men struggling, and at the request of Shirley went and called the police.  When asked on direct whether either of the two men were in uniform he responded, "No, sir".(S.F.Vol. XX p.111).  On cross-examination he testified:

Q.    There was nothing there in your view or presence to indicate to you in any

in what he said that gave notice to any of these four people that he was a police officer.

Officer Shirley's partner testified that Shirley was probably out just checking the apartment for an arrest of Mr. Williams the following morning.   That possibility was supported by Shirley's dressing in western attire and his leaving of his handcuffs and the arrest warrant for Mr. Williams in his car.

On February 9, 1982, less than two months before the incident with officer

---

shape, form or fashion that he was a police officer, is that not true?
A.      That's true.

(S.F. Vol. XX p. 125).

Saaid Davarinejad, was also called as a state's witness, he was delivering "Coke's" to the apartment complex when he saw the two men struggling.      On direct he testified that he did not see Shirley wearing a badge or anything that said police on it. (S.F. Vol.XX p.159). On cross examination he testified to the officer's description:

Q.      He had a beard?
A.      Yes.
Q.      Had kind of long hair?
A.      Yeah.
Q.      And you told Mr. Henderson you didn't see a badge on him, did you?
A.      No, I didn't.
Q.      So there was nothing there to indicate to you that the man was a cop, was there?
A.      No.

(S.F.Vol. XX. p. 173).

Claudette Marie Guidry who was walking with Mr. Williams when Shirley ran up and started the confrontation was called by the defense.   On direct she testified that Shirley did not show a badge,  (S.F. Vol. XXII p.597), did nothing to make her believe that he was a police officer,  (S.F. Vol. XXII p.597), did not look like a police officer, *Ibid*., and that she did not believe that he was a police officer.   *Ibid*.

Finally the only other witness to the confrontation, Arthur Williams, testified that Shirley did not identify himself as a police officer. (S.F. Vol. XXIII p.719).  Mr. Williams thought that Shirley was someone who was trying to rob him.

Daryl Wayne Shirley, Arthur Williams was assaulted in a similar attack by Donald Wayne Chaline.  The attack by Chaline happened in the same apartment complex where the shooting occurred.  Mr. Williams was at home in his sister's apartment when an individual he later identified as Donald Wayne Chaline came to his front door.  Chaline, unlike officer Shirley, identified himself as a law enforcement officer and an FBI agent.  Chaline was also armed with an automatic pistol.  He pulled out his pistol, and ordered Mr. Williams to lie on the floor, Mr. Williams complied.  After Mr. Williams lay down Chaline then began to walk around the apartment.  He kept his gun pointed at Mr. Williams.  As he was walking around the apartment Chaline began locking the doors and pulling the window blinds closed.  Mr. Williams then began to realize that Chaline was not a police officer, and as Chaline attempted to hand cuff him he managed to engage him in a struggle. (S.F. Vol. p).  While they were struggling, Chaline's gun went off, injuring Chaline in his arm. Mr. Williams was able to obtain control of the gun from Chaline and then confirmed his suspicion that Chaline was not a police officer, but was in fact trying to rob him.

Mr. Williams had substantial evidence proving that Chaline had attempted to rob him.  He had the corroborating evidence of his sister, Linda Ransome, who was called immediately after the incident by Williams and returned home to find large

blood stains in her living room and kitchen.  He  had  Chaline's  medical  records

from the Rosewood hospital located a mere six blocks from Williams' apartment.

He also had a receipt for a hotel room where he spent the following two nights in

fear of Chaline or his possible cohorts return.

The  government  also  had  in  its  possession  evidence  which  would  have

supported Mr. Williams' claim. First the Houston Police Department were notified

of Chaline being Shot by Rosewood hospital on February 9th, 1982.  Furthermore,

the government had in its possession at the time of trial information that Chaline

had committed a similar type of "confidence theft".[6] Chaline also had been arrested

by  the  Houston  police  several  times  --  at  least  once  for  impersonating  a  police

officer.  Chaline reportedly had a brother who was a police officer in Houston,

Texas.  Records in the government possession also showed that Chaline lived right

across the street from where he had been shot at 2800 Rolido drive.

The  trial  court  prevented  the  defense  from  presenting  any  of  the

corroborative evidence of the Chaline incident to the jury.        The    trial    court

would only allow oral testimony by Mr. Williams to the incident, and would only

allow defense witnesses to testify about what they heard about the Chaline incident

after  the  Shirley  incident  had  happened.   The  trial  court  would  not  allow  any

_____

[6]  Chaline had stolen $6,000 from an individual after tricking him into giving him the money.

testimony by defense witnesses of what they knew of the Chaline incident before the Shirley incident.  Because of the trial court's refusal to allow the defense to present this evidence the jury was unable to validly measure Williams' credibility, and more importantly, was deprived of necessary evidence for its determination of whether Williams acted reasonably when confronted by officer Shirley.

The state presented no evidence during its case in chief that officer Shirley identified himself as a police officer.  However, they sought and were given permission to impeach their own witness, Angelia Lewis, with police statements taken on April 28th, and 29th, 1982.  These statements were taken by the police from Ms. Lewis even though they knew she was heavily sedated at the time they were given.  Ms. Lewis state that the parts of the statement with which she was impeached were false, stating that she had not said those things and that certain statements she had made repeatedly to the police were absent.   The trial court was not asked to give a limiting instruction with regard to the permissible uses of this evidence, and did not do so *sua sponte*.

The only evidence presented at trial that officer Shirley may have identified himself as a police officer came from [two] a defense witness[es] Howard Russell. The evidence was in the form of hearsay evidence, as Mr. Russell testified to a statement told to him by Mr. Williams on the night of the shooting.  Mr. Russell

testified that Mr. Williams told him that officer Shirley told Mr. Knight that he was a police officer when he told Knight to go and call the police. (S.F. Vol. p.).  This evidence was presented in direct contradiction of the Robert Dennis Knight, the state's own witness, who unequivocally testified that officer Shirley did not identify himself as a police officer to him. (S.F. Vol. p.).

The case was one involving a black defendant accused of killing a white victim.  The jury was all white after the state used six peremptory challenges to remove all of the black venire persons on the panel.

One of the jurors went to church with the decedent's wife.

The defense did not present any witnesses at the punishment phase.

## CLAIMS FOR RELIEF

THE STATE'S COURSE OF MISCONDUCT IN SUPPRESSING AND DESTROYING EXCULPATORY EVIDENCE, HARASSMENT AND INTIMIDATION OF WITNESSES, IMPROPER AND INFLAMMATORY CLOSING ARGUMENT, DELIBERATE EXCLUSION OF ALL BLACKS FROM THE JURY, AND EXPLOITATION OF ERRONEOUS COURT RULING DENIED MR. WILLIAMS A FUNDAMENTALLY FAIR TRIAL AND CAPITAL SENTENCING PROCEEDING IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

The Supreme Court has held that the Due Process clause of the Fourteenth Amendment is violated where the state contrives a conviction through unfair, and

improper investigative procedures, and, where the State contrives a conviction through improper presentation of evidence at trial. See *Foster v. California*, 394 U.S. 440, 442 (1969) (state orchestrated unduly suggestive identification procedures); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (where the state suppressed material information favorable to the accused); *Rogers v. Richmond*, 365 U.S. 534, 544 (1961) ( where the state's conviction is based in part upon the introduction of a coerced confession); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (where the state failed to correct unsolicited perjury); and, *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (state's use of perjured testimony at trial). The Texas Court of Criminal Appeals has applied these principles of fundamental fairness and granted relief when the state's course of misconduct infected the fairness of the proceedings and the reliability of the jury's verdict. *Ex parte Brandley*.

Numerous instances of state misconduct which violated Mr. Williams rights are set forth in this petition. Mr. Williams contends that each of these violations by itself is sufficient to reverse his conviction. Alternately, Petitioner contends that the State's course of misconduct during the investigation and throughout Mr. Williams' trial so undermined the accuracy of the jury's verdict that it denied Mr. Williams his right to a fair and impartial trial, fundamental fairness, and due process in violation of Sixth, Eighth, and Fourteenth Amendments to the

Constitution, and accordingly, his conviction should be reversed.

> The Court of Criminal Appeals emphasized in *Brandley* that
>
> [d]ue process of law is the cornerstone of a civilized system of justice. Our society wins not only when the guilty are convicted but when criminal trials are fair; our system of justice suffers when an accused is treated unfairly.  Brady, 378 U.S. at 87, 83 S.Ct. at 1197.

*Id*.  When the state's course of misconduct results in a trial "lacking the rudiments of fairness[,] [t]he principles of due process, embodied within the United States Constitution , must not, indeed cannot, countenance such blatant unfairness.  *Id*.

Whether the cumulative effect of the State's misconduct in a given case violated a defendant's right to due process is determined by looking at the totality of the circumstances.  *Ex parte Brandley*,  781 S.W.2d 886, 894 (Tex. Crim. App. 1989).  Considering the totality of the circumstance in this case --

> including the weakness of the State's case,[7] the suppressing exculpatory evidence;  the staging of misleading and inflammatory photographic evidence;  harassment and intimidation of witnesses to the offense; destruction of evidence (911 recording); improper interference in the defense investigation; racial bias in the selection of the jury, the prosecutor's improper and inflammatory argument to the jury and the other instances of

---

[7]  The Court of Criminal Appeals virtually acknowledged in its opinion on direct appeal that the State's case standing alone was insufficient to support Mr. Williams' conviction for capital murder.  The Court denied a sufficiency of the evidence solely on the basis of testimony elicited from one defense witness on cross-examination.  __ S.W.2d. at ____.

misconduct recited throughout this petition -

it is clear that Mr. Williams was deprived of fundamental fairness and due process.

> THE STATE DENIED MR. WILLIAMS HIS RIGHT TO A FAIR TRIAL WHEN IT FAILED TO PRODUCE EXCULPATORY EVIDENCE MATERIAL TO THE JURY'S DETERMINATION OF GUILT AND PUNISHMENT.

"It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citing *United States v. Agurs*, 427 U.S. 97 (1976) and *Brady v. Maryland*, 373 83, 87 (1963)). The obligation to disclose favorable evidence is a continuing burden.

> **The State's failure to produce the police dispatch tape recording of witness Dennis Knight's April 28, 1982, telephone call to the police materially altered the outcome of the trial and denied Mr. Williams his right to a fundamentally fair trial.**

On April 28, 1982 Arthur Williams and Daryl Wayne Shirley struggled in the breezeway over the automatic weapon in Detective Shirley's right hand. Dennis Knight, a resident at the Parkstone Apartments, observed the struggle going on and, after Shirley yelled to him to got call the police, Knight ran to his apartment to call. At his apartment, Knight was connected to the police dispatcher whereupon he stated what he had just seen and heard. While speaking to the

dispatcher, he heard two shots in the background.  Upon returning outside, Arthur Williams and Daryl Wayne Shirley were gone.

The calls received by the Houston Police Department dispatcher are tape recorded.  Because the calls are recorded, defense counsel, by Motion to the Court, requested that the State preserve the tape recording of witness Knight as to the reporting of the incident.  (Vol. IV, T-23).  The State, by Assistant District Attorney Henderson, agreed to the request to preserve the tape and indicated that the police department had given assurance that it would be preserved.  *Id.* Similarly, defense counsel indicated that Mr. Williams would like to hear the tape prior to trial.  (Vol. IV, T-24).  When the trial of Arthur Lee Williams, Jr., for the capital murder of a Houston Police officer began, however, the tape was destroyed by the Houston Police Department.  (Vol. XX, T-34).

The State offered no explanation as to why the tape recording of Dennis Knight's reporting of the incident was destroyed.  The State's very first witness, 18-year Houston Police Department homicide veteran Vernon West gave the following account of the tape recording's demise:

Q:   During the course of your investigation did you make a determination of whether any citizen at the apartment complex had reported this incident to the police?

A:   Yes, there was a man who did call the incident in.

Q:      can you tell the members of the jury where that tape recording is?

A:      That has been erased by our Communication Division.

Q:      It is not also true, Officer, that the defense requested you preserve that tape?

A:      Yes, you did.

Q:      That is the only known tape of a citizen calling reporting this offense, is that not true?

A:      Yes.

(Vol. XX, T-34)

The tape recording of Dennis Knight reporting the incident was critical to the self-defense position of Arthur Williams and provided exculpatory evidence of a material nature. Evidence such as whether or not Knight reported that a police officer was in trouble would have been recorded.  The sound of the two gunshots firing would also most likely have been reviewable on the tape.  Notably, the broadcast call to patrol officers Rieks and McCabe, made no mention that a police officer was in trouble.  Indeed, Rieks was unaware Daryl Wayne Shirley was a police officer until he found out later.  (Vol. XX, T-80- 81).  The question of Daryl Wayne Shirley's identity as a police officer was critical to the capital murder case at trial.

Discovery in felony cases is governed by the rule set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) holding that the suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the evidence is material to either quilt or punishment, irrespective of the good faith or bad faith of the prosecution. *See also California v. Trombetta*, 467 U.S. 479 (1984). The Brady Rule is extended to situations where the prosecution is in possession of exculpatory evidence unbeknownst to the defense. *See United States v. Agurs*, 427 U.S. 97 (1976). By failing to produce the tape recording, the State withheld exculpatory and material evidence tending to negate the Defendant's quilt. He was denied due process secured by the Fifth Amendment of the U.S. Constitution.

In considering these questions, this courts may look to the likelihood that the lost evidence was exculpatory, the likelihood of prejudice to the Defendant, and the level of government culpability. *Saldina v. State*, 783 SW 2d 22 (Tex. Cr. App. - Austin 1990); *Gardner v. State*, 745 SW 2d 955 (Tex. App. - Austin 1988); see also *Cody v. Solem*, 755 F. 2d 1323 (5th Cir. 1985). The court may also consider whether the Defendant had other reasonable means of obtaining the evidence. *California v. Trombetta*, 467 U.S. 479 (1984). If the evidence might have affected the outcome or there existed a reasonable probability that the outcome of the trial may be different then due process was violated and the absence of the evidence prejudiced Mr. Williams. *United States v. Bagley*, 473 U.S. 667 (1985); *United*

*States v. Agurs*, *supra*.

The tape recording contained crucial evidence for Arthur Williams' self-defense claim and the identity of Daryl Wayne Shirley as a police officer. The outcome of the self-defense position could easily have been swayed in favor of Arthur Williams by the tape. Furthermore, once the prosecution agreed to preserve the tape, the defense relied upon it in preparation for its case.

The Houston police offered no reasonable explanation for the destruction of the Dennis Knight tape recording. No claims of inadvertency or mistake were alleged. The Houston police were clearly motivated to destroy of the Dennis Knight tape that was capable of assisting Arthur Williams in proving his innocence. Mr. Williams was charged with capital murder of Houston police officer. The same Houston Police Department retained possession of the Dennis Knight tape until it was conveniently "erased" by its Communication Division. The State bears a heavy burden to explain the destruction of evidence. *See United States v. Bryant*, 439 F. 2d 642 (D.C. Cir. 1971). Mr. Williams should not die by lethal injection because the Houston Police Department found a way to dispose of exculpatory evidence favorable to him. By violating the well-established Rules of Criminal Procedure set forth in *Brady*, Arthur Lee Williams was denied a fair trial and deprived of his due process rights secured by the Fifth Amendment of the U.S.

Constitution.

When the prosecution opted not to comport with well-established rules of criminal discovery, Arthur Williams was denied his right to life and liberty without due process of law.  The conviction of capital murder of a peace officer must be vacated and reversed because of the constitutional prejudice to Arthur Williams herein.

### The State failed to disclose exculpatory evidence about Detective Shirley and the policies and practices of the Houston Police Department.

The defense filed a motion for disclosure of exculpatory evidence, and for inspection of evidence.  Defense counsel also subpoenaed the Houston Police Department custodian of personnel files to deliver materials and information on the deceased police officer Daryl Wayne Shirley.   Defense counsel's subpoena instructed that the custodian of the Houston Police Department personnel files bring the following information regarding Daryl Wayne Shirley:

1. Any written, tape-recorded or video taped sworn complaints against Daryl Wayne Shirley filed by
   a) Private citizens and
   b) Other Officers during his employment with the Houston Police Department;

2. Written responses of Daryl Wayne Shirley to such complaints;

3. The final determination of such complaints;

4.      Letters advising of any disciplinary action related thereto; and

5.      Details of any lawsuit filed by or against Daryl Wayne Shirley as a result of such complaints.

(See Subpoena dated January 20, 1983.)

Despite these requests and the State's obligation to produce records material to the defense, the only evidence concerning Detective Shirley that was produced was Detective Shirley's sick day records.

The Houston Police Department maintains personnel records, disciplinary records, internal affairs records, records of complaints concerning police officers, and had in its possession records that pertained to Detective Shirley other than those produced.   On information and belief, the state was in possession of exculpatory information regarding Detective Shirley's previous conduct and the conduct and reputation of Houston Police officers which was material to Mr. Williams defense.   Since the defense in this case was self-defense, any complaints of police misconduct or undue force by Detective Shirley would have corroborated Mr. Williams' defense.   Defense counsel sought review and inspection of this material before trial.   It is believed the prior complaints involving Detective Shirley are contained within the respective files maintained by the Houston Police Department and that other incidents involving abusive, injurious, aggressive, excessive, and inappropriate conduct by Daryl Wayne Shirley exists.

31

At trial, Arthur Williams asserted that he shot Detective Shirley in self-defense after Detective Shirley attacked him. Mr. Williams was battered from behind, threatened and assaulted at gun point, and treated with excessive force by Detective Shirley. He attempted to defend himself from Shirley, believing that Shirley was about to rob him. Detective Shirley wore a cowboy hat, plaid shirt, blue jeans, and boots rather than a traditional Houston Police Department uniform. He intentionally concealed his identity as a police officer from Mr. Williams. The cowboy approached Arthur Williams with his .9 millimeter weapon in plain view. No badge or other police identification was visible. After the scuffle between Arthur Williams and Detective Shirley, Shirley was shot twice from close-range of approximately 2 to 3 feet by Defendant. Shirley was shot in the upper left hip area and left chest area by Defendant's .38 caliber Derringer.

The subpoenaed Houston Police Department information would provide material evidence of the character, conduct and reputation of Detective Shirley in his conduct as a police officer. Files and investigations of complaints on Detective Shirley are useful, relevant, and admissible under Texas Rule of Criminal Evidence 404(a) (2) pertaining to character of the victim (Shirley). As the alleged victim of the capital murder, pertinent traits of the character of the victim of the crime may be admissible. Pertinent traits of Detective Shirley may be found in this

investigation or in other investigations of similar complaints involving Detective Daryl Wayne Shirley conducted by the Houston Police Department Internal Affairs Division or other comparable department.  See Rule 404, Rules of Evidence.

Further, the personnel files, materials, and information requested pursuant to subpoena of the Houston Police Department would provide discoverable materials that are critical for reputation or opinion evidence of Detective Shirley under Rule 405 of the Rules of Evidence.  The Subpoenaed materials could provide names, addresses, and facts leading defense counsel to others capable of testifying and producing evidence of the character and reputation of Detective Shirley as a police officer.  This evidence could produce testimony that Detective Shirley acted in an aggressive and excessive manner in attempting other arrests.  Under Rule 404(a), proof of character or trait of character may be made by testimony as to reputation or by testimony in the form of an opinion.  *See* 404 (a).  Accordingly, the personnel files and Internal Affairs Division files of the Houston Police Department on Detective Daryl Wayne Shirley should have been disclosed to defense counsel or, at a minimum, provided to the Court for an in camera review before trial.  Without this evidence, Mr. Williams was unable to effectively confront the witnesses against him and produce testimony as to the reputation and character of Detective Shirley for aggressive and excessive force in violation of his Fifth and Sixth

33

Amendment rights.

Moreover, under Rule 405 (b), specific instances of aggressive or excessive conduct are admissible for Mr. Williams' self-defense position. The language of Rule 405(b) states:

> In cases in which character or trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

Hence, specific instances of aggressive behavior or excessive force by Detective Shirley during his employment as a police officer are admissible to demonstrate the character or trait of Shirley for aggressiveness in this case. Evidence of the reputation and character of Detective Shirley for aggressiveness and excessive force in other situations is admissible under Rule 405 (b). Others subject to similar aggressive or excessive force by Shirley could testify as to those specific instances in Arthur Williams' trial. By not producing this evidence for discovery by defense counsel, the State prevented effective and full presentation of Defendant's self-defense position in violation of the Fifth and Sixth Amendments.

The personnel files and Internal Affairs Division files of Detective Shirley are also admissible as character evidence under Rule 404(a) (2) to demonstrate the character of the victim as the first aggressor in a homicide case. The self-defense position rests, in part, upon the believability of Arthur Williams' version against

the State's version that Williams was the aggressor.  Therefore, the evidence of an

aggressive or excessive force character trait, and reputation of others, of Detective

Shirley is critical to the self-defense claim.  Defendant is prejudiced without this

information regarding Detective Shirley.

Further, Texas Rule of Criminal Evidence 404(b) permits evidence of other

crimes, wrongs or acts to be admitted for proving motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence of prior wrongs of Detective Shirley as a police officer is relevant to

establishing that Mr. Williams acted in self-defense.  Additionally, this information

contained in police department files is discoverable under the rule of *Brady v.*

*Maryland*, 373 U.S. 83 (1963).  In that case, the United States Court held:

> The suppression by the prosecution of the evidence favorable to the
> accused upon request violates due process where the evidence is
> material either to guilt or to punishment, irrespective of the good
> faith or bad faith of the prosecution.  *Brady*, at 87.

These and similar personnel records of peace officers constitute a potential

gold mine of information valuable to one accused of a crime against a peace

officer, especially where the main issue in the case is who was the initial aggressor.

86 ALR 3rd 1170 at 1174.  Access to this information may very well have enabled

him to call favorable witnesses with no interest in the outcome of the trial.  He was

precluded from discovering any and all potential witnesses who had complained to

35

the Houston Police Department about any of Detective Shirley's aggressive tendencies or other incidents of substantiated or unsubstantiated use of excessive force. Unsustained complaints against police officers are discoverable, as well as are sustained complaints. *People v. Zamora*, 615 P. 2d 1361 (Cal. 1980). The unavailability of such information deprived Mr. Williams of the opportunity to locate witnesses who could testify that on past occasions the officer involved had used excessive or unnecessary force. *See People v. Zamora*, 615 P. 2d at 1363.

The rule in Texas pertaining to testimony regarding the character of the decedent in a homicide prosecution when self-defense was offered by the accused was set forth in *Dempsey v. State*, 266 SW 2d 875 (Tex. Cr. App. 1954). The *Dempsey* rule established by the Texas Court of Criminal Appeals was set forth as follows:

> The defense may offer testimony as to any specific act of violence or misconduct which evidences the violent character of the deceased under the following conditions:
>
> If offered for the purpose of showing the reasonableness of Defendant's claim of apprehension of danger, it must further appear that the acts of violence or misconduct were known to the Defendant at the time of the homicide.
>
> But if offered for the purpose of showing that the deceased was in fact the aggressor (not that the Defendant thought that the deceased was making or about to make an attack) the witness must know but it need not be shown that Appellant had knowledge of the acts of violence of the deceased at the time of the homicide.

36

Before any evidence of deceased's character of violence becomes admissible, however, there must be evidence of some act of aggression by the deceased which the character tends to explain (such as drawing a gun or reaching for a pocket where one is usually carried). *Dempsey v. State*, 266 SW 2d at 877-876.

The *Dempsey* rule has been consistently applied by the Texas Court of Criminal Appeals. See e.g., *Jenkins v. State*, 625 SW 2d 324 (Tex. Cr. App. 1982) (murder prosecution; *Navarro v. State*, 639 SW 2d 945 (Tex. Cr. App. 1982) (en ban) (murder prosecution); *Tutt v. State*, 627 SW 2d 529 (Tex. Cr. App. 1982) (murder prosecution); *Lewis v. State*, 463 SW 2d 186 (Tex. Cr. App. 1971). In the instant case, Defendant Arthur Williams satisfied the requisites of the Dempsey rule to prove that the deceased was the aggressor. It need not be shown that the Defendant had knowledge of the acts of violence of the deceased at the time of the homicide. *Dempsey v. State*, 266 SW 2d 874 (1954).

The defense may offer testimony as to any specific act of violence or misconduct which evidences the violent character of the deceased provided that, if offered for the purpose of showing that the deceased was the aggressor, the witness must know, but it need not be shown that the Defendant had knowledge of the acts of violence of the deceased at the time of the homicide. *Navarro v. State*, 639 SW 2d 945, 946 (Tex. Cr. App. 1982); *Dempsey v. State*, *supra*. Before such evidence is admissible, there must be evidence of some act of aggression by the deceased

which the character tends to explain.  *Navarro v. State*, 639 SW 2d at 646.  Arthur Williams' Fifth Amendment due process rights were violated.

In this case, Defendant Arthur Williams testified that the cowboy (later identified as Daryl Wayne Shirley) came up from behind with his .9 millimeter automatic pistol in his right hand and shoved Williams against the wall in the breezeway at the Parkstone Apartments.  Shirley aggressively wielded a loaded firearm and proceeded to push Williams against the wall and subsequently onto the ground.  Testimony revealed that Shirley put his left forearm into Arthur Williams' chest while retaining the automatic weapon in his right hand.  Shirley was not wearing a police uniform or typical Houston Police Department regalia.

The facts in this case satisfy the requirement of *Dempsey* that before any evidence of the deceased's character for violence becomes admissible, there must be evidence of some act of aggression by the deceased which the character tends to explain.  *Dempsey v. State*, 627 SW 2d at 530.  The confrontation by Shirley of Defendant Williams in the breezeway holding a drawn automatic pistol satisfies the aggression requirement almost exactly as the example set forth by the Court of Criminal Appeals in *Dempsey*.  Hence, the first prong of the *Dempsey* Rule is satisfied.

It is reversible error for the trial court to exclude testimony pertaining to

specific violent acts of the deceased, including character evidence, once some act of aggression by the deceased has been demonstrated. *Jenkins v. State*, 625 SW 2d 324 (Tex. Cr. App. 1982); *Tutt v. State*, *supra*. Such testimony is an integral element in the Defendant's claim of self-defense and its exclusion is reversible error. *Tutt v. State*, 627 SW 2d at 530. Defendant Arthur Williams was entitled to any and all information pertaining to the deceased Daryl Wayne Shirley and his personnel files at the Houston Police Department containing evidence of complaints, disciplinary conduct, prior bad acts, lawsuits, and other material information necessary to the self-defense claim of Arthur Williams and demonstrate the character of Detective Shirley. Defendant Williams was substantially prejudiced and denied his Fifth Amendment right to due process requiring reversal and vacation of the conviction of capital murder.

Evidence showing the decedent had previously engaged in improper practices or had aggressive and violent tendencies would have been material and exculpatory. The failure to produce evidence concerning the background of the decedent violated Mr. Williams' right to due process of law under the Fourteenth Amendments to the U.S. Constitution, and similar Texas law. *Brady v. Maryland*, 373 U.S. 83 (1963).

**The State suppressed exculpatory evidence concerning Donald Chaline and the February**

**attempted robbery of Arthur Williams.**

Mr. Williams' defense was based in part on the fact that a man he believed to be Donald Chaline, while pretending to be a police officer, attempted to rob him at gunpoint a few months before the incident with Detective Shirley.   Any evidence tending to corroborating Mr. Williams' testimony about this incident was exculpatory. If a jury believed the Chaline incident occurred, they would have been more likely to believe that Mr. Williams acted in self-defense.   Likewise, they would have been more likely to believe that Mr. Williams' response to Detective Shirley's actions were reasonable in response to provocation for purposes of answering the third special issue no, avoiding a death sentence.

The State consistently objected to the introduction of any evidence related to Donald Chaline, arguing that the defendant had not provide any connection between Chaline and the alleged February incident.   At the same time, the State stubbornly and deliberately refused to provide available information about Donald Chaline despite a subpoena duces tecum ordering it to do so.   During trial, and after Mr. Williams had testified, the prosecutor reluctantly produced a picture of Chaline.   Previous attempts to obtain a picture of him had been unsuccessful despite information that he had been arrested numerous times by Houston Police Department, on one occasion for impersonating an officer.

At the time of Mr. Williams' trial, the State in fact had substantial information about Donald Chaline.  On information and belief, Donald Chaline is related to a Houston Police Department officer.  Police officer and other State officials were aware that Donald Chaline had worked in the bail bond business. *Duff-Smith v. State*, 685 S.W.2d 26, 31 (Tex. Crim. App. 1985).  In the Duff-Smith trial, Chaline testified for the State that the defendant told Chaline about how he (the defendant) had hired someone to murder his foster mother.  *Id*.

The *Duff-Smith* trial was in Houston, handled by the same District Attorney's office that handled Mr. Williams' case.  In connection with that case, Chaline had provided information as early as 1979.  Clearly, the District Attorney's office knew had exculpatory information about Donald Chaline and his background during 1982 and 1983, and failed to disclose this information to the defense.

The State also had other evidence which corroborated Mr. Williams' testimony about the Chaline robbery attempt.  When Chaline went to the hospital, the hospital reported the shooting to the police.  Thereafter, the Houston Police arrested an acquaintance of Mr. Williams who was in possession of Chaline's gun.

Also, the Houston police traced Arthur Williams to the Parkstone Apartments from Donald Chaline's gun that Williams gave to Johnny Smith after

the Chaline incident in February.  The police, and prosecutor, nevertheless, failed to disclose the information regarding Chaline's gun (and Chaline) contrary to the rule of *Brady*, *supra*; *see also Giglio v. United States*, 405 U.S. 150 (1972) (duty to disclose any inducements or promises made to witness by the government).  The State likewise failed to disclose the role and participation of both Johnny Smith and Donald Chaline in the discovery that Arthur Williams was in Houston in violation of his Minnesota parole.

Revelation of Smith's identify as an informer regarding Arthur Williams' and the circumstances of Smith's arrest and his connection to Williams and to Chaline's gun was exculpatory and should have been revealed.

Under the circumstances, the failure of the District Attorney's office to provide this information about Donald Chaline to Mr. Williams' lawyer was a violation of Mr. Williams' right to due process of law required by the Fifth and Fourteenth Amendments to the U.S. Constitution, and analogous provisions of Texas law.  *Brady v. Maryland*, 373 U.S. 83 (1963).  Accordingly, Mr. Williams' conviction and sentence of death should be vacated.

**The State failed to produce exculpatory information contained in police personnel files, internal affairs files, complaints, disciplinary actions, and any other records within the possession and control of the prosecution for attack on the credibility of the investigating Houston police officers.**

At the guilt-innocence stage of the trial, the prosecution presented numerous Houston Police Officers involved in the investigation of the alleged capital murder. Among those called testify by the State were Jan Marie Cain-Crocker, Houston Police Department (HPD) over eight years, James E. Montero, HPD for 23 years, B.E. Frank, HPD Homicide for 17 years, Detective S.F. Felchek, HPD for 24 years, William W. Owen, HPD for ten years, John Castillo, HPD for 13 years, L.W. Hoffmaster, HPD Homicide Detective for 12 years, Detective L.B. Smith, HPD Homicide for seven years, Howard M. White, HPD Robbery Detective for 15 years, Dan Sacky, HPD Fugitive Criminal Warrant Division Lieutenant for 17 years, Vernon W. West, HPD Homicide Division for 18 years, D. McCabe, HPD for two years, D.E. Rieks, HPD eight years.  Each of these Houston police officers testified relative to their role in the investigation of the shooting death of Detective Daryl Wayne Shirley on April 28, 1982.

In order to have a fair trial for the charge of capital murder of a peace officer for the Houston Police Department, Arthur Williams was entitled to discovery and disclosure of the personnel files, Internal Affairs files, and any records of complaints against the investigating Houston police officers presenting testimony at trial.  Any other Houston Police Department materials within the possession and control of that agency were required to be disclosed to defense counsel through the

Rules of Discovery in a criminal case.  The suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  *Beady v. Maryland*, 373 U.S. 83, 87 (1963).  Information favorable to Defendant was not produced and, consequently, was unavailable to the defense.  *See United States v. Agurs*, 427 U.S. 97 (1976).

The above information and material surrounding the testifying Houston police officers is critical to Defendant Arthur Williams' opportunity to effectively cross examine and confront the witnesses against him.  The credibility of the police officers as witnesses may be attacked in the form of opinion or reputation when the evidence refers to character for truthfulness and untruthfulness.  The Houston Police Department personnel files and other file information of the police officers presumably contained other complaints or investigations that could lead to witnesses and persons capable of testifying as to the character for truthfulness or untruthfulness of the officers.  Character evidence for truthfulness or untruthfulness regarding the believability of the officers is critical to impeachment of their credibility by Defendant.

The character of the numerous Houston police officers is admissible under Rule 404(a) (3) that permits evidence of the character of a witness, as provided in

Rules 607, 608 and 609.   Rule 607 allows the credibility of the witness to be attacked by any party, including the party calling the witness.   Further, under Rule 608(a) the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. Hence, the materials contained within the Houston Police Department personnel and Internal Affairs files on the testifying officers could lead to discoverable evidence and witnesses capable of providing testimony about the character for truthfulness or untruthfulness of the investigating police officers.   In a capital murder case this could be the difference between life and death.   These materials should have been disclosed by the prosecution to the defense counsel for inspection. *See Beady v. Maryland*, *supra*.   At a minimum, the materials should have been turned over to the Court for an <u>in camera</u> review.

Moreover, Rule of Evidence 404(b) permits evidence of other crimes, wrongs or acts to be admitted for proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.   Evidence of prior wrongs of any of the testifying police officers is relevant to a self-defense position

45

of the Defendant.   Seeking to demonstrate untruthfulness by prior wrongs demonstrates character and affects credibility.   Additionally, the issue of bias for testifying in a given manner when the charge is capital murder of a peace officer should also be attackable by evidence of untruthfulness in other situations.

Here, evidence as to the character for truthfulness or untruthfulness of the numerous Houston police officers is material to effective impeachment and confrontation of the officers by Defendant.   The interrogation by Homicide Detectives of defense witnesses Angelia Lewis, Linda Ransome, Howard Russell, Claudette Guidry, and Eddie Lewis is subject to attack because of intimidation of these witnesses by Houston Police homicide detectives.   Angelia Lewis was threatened with capital murder charges by detectives during the initial investigation on April 28, 1982.   Only after intensive interrogation of Lewis by homicide detectives did she provide the damaging statements eventually introduced at trial. During the interrogation of Angelia Lewis Houston police, she advised detectives of information and statements not recorded by police in the written statements. (Vol. XXI, T-238).   Lewis advised police that her state-of-mind was affected by consumption of valiums at the time she made her statements.   (Vol. XXI, T-235). Lewis took 20 milligrams of valium three hours before giving her statements to police (Vol. XXI, T-250).   Lewis indicated that her statements of April 28 and

April 29 (Exhibits No. 32 and 33) contained information and statements not made by her to the police.  (Vol. XXI, T-235).  Angelia Lewis testified that Houston police put things into her statement she did not say herself.  (Vol. XXI, T- 256-258).  Hence, the truthfulness of the statement made by Angelia Lewis and the conditions surrounding its preparation subject the Houston police detectives to impeachment for their credibility and truthfulness.  Lewis' statement was given to Detective C.S. Arrington.  Lewis, however, testified that questions by Houston police came at her from left and right, that two police officers were present and a third would come and go from the interrogation room.  (Vol. XXI, T-249).  These police officers are subject to character impeachment for truthfulness.

Similarly, Linda Ransome was threatened with capital murder charges during the search for Williams.  Police squeezed Howard Russell so that he eventually disclosed Williams' whereabouts.  The investigators must be subject to fair cross- examination.

Additionally, concern was raised by Mr. Williams in a Motion heard by Judge Thomas Routt on July 8, 1982 regarding police harassment of defense witnesses and instructions not to speak with defense counsel.  The Court granted a protective order and required prosecutor Keno M. Henderson, Jr., Assistant District Attorney for Harris County, to write to witnesses favorable to the defense advising

they had the right to talk with anyone about the case including defense attorneys and their investigators.   By this means, the prosecution attempted to remedy defense counsel's concern that the State had instructed witnesses not to speak with defense counsel and investigators.   The Houston Police and prosecution, naturally, denied any wrongdoing.

On August 26, 1982 the Court granted Defendant's Motion for Exculpatory Evidence requiring the District Attorney to disclose to Defendant "all facts of an exculpatory nature and all facts which might be considered in mitigation which are in the possession, custody, or control of the District Attorney or any of his agents, the existence of which is known, or by the exercise of do diligence may become known to the said District Attorney."   The Court's pretrial Order makes clear the prosecution had a duty to produce files and materials within the possession and control of the Houston Police Department on the investigating officers that may lead to discoverable evidence including evidence of reputation for truthfulness and character.   By not disclosing this evidence, the prosecutor violated the well established Rule of *Brady v. Maryland*, 473 U.S. 83 (1963) and Arthur Williams was denied a fair trial.   Accordingly, the judgment must be vacated and remanded for a new trial with all discoverable evidence produced by the State.

**Because the state did not disclose exculpatory evidence material to guilt and punishment, Mr.**

48

**Williams' conviction and death sentence must be vacated.**

"[T]he underlying policy of the *Brady* decision 'rests upon an abhorrence of the concealment of material arguing for innocence by one arguing for guilt.'" *United States v. Anderson*, 574 F.2d 1347, 1353 (5th Cir. 1978) quoting *United States v. Ramirez*, 513 F.2d 72, 78 (5th Cir. 1975).  In a number of capital cases, courts have overturned convictions and sentences where the state withheld material exculpatory that is similar in nature to what the state , upon information and belief, possesses in this case.  *See Lindsey v. King*, 769 F.2d 1934 (5th Cir. 1985) (nondisclosure of police report in which one of two eyewitnesses to crime indicated he did not see killer's face and could not identify him violated *Brady*; new trial ordered); *Brown v. Wainwright*, 785 F.2d 1457 (11th Cir. 1986) (nondisclosure of evidence that a key witness had received immunity in exchange for testimony violated Due Process; new trial ordered); *McDowell v. Dixon*, 858 F.2d 945 (4th Cir. 1988) (nondisclosure of report that indicated that the assailant was white, and the defendant on trial was black, violated Due Process; new trial ordered).

Because information in possession of the State that has not been disclosed likely contains information that is inconsistent with guilt and a sentence of death, the information should be turned over to the petitioner, and the case set for a

49

hearing to determine its materiality.

## THE STATE MISLEAD THE JURY BY INTRODUCING A STAGED PHOTOGRAPH SHOWING THE DECEASED'S POLICE BADGE LYING NEXT TO HIS BODY DESPITE IT HAVING BEEN FOUND FACE DOWN ELSEWHERE BY INVESTIGATORS.

At trial, the State introduced into evidence a photograph of the deceased, Daryl Wayne Shirley, where he had fallen dead in the parking lot at the Parkstone Apartments. Shirley had ran several feet into the parking lot after being shot twice in the breezeway of the apartment complex. There, his body remained while investigators secured the scene, gathered evidence, and interviewed witnesses. At trial, the State introduced photographs of the deceased body at the crime scene in the parking lot of the Parkstone Apartments. These were offered as State's Exhibit 5 and 12 and received into evidence, despite "staging" by placing Detective Shirley's badge, hat, pencil, and glasses next to the body from another location. (Vol. XX, T-18- 21). The State admitted to the staging of the photographs by placement of the badge, pencil, hat, and glasses of Detective Shirley were deposited by his dead body for the staging of the photograph. (Vol. XX, T-20-21). The badge was actually found in the breezeway nearly 100 feet from where

Detective Shirley's body was discovered in the parking lot.  Allowing the State to introduce admittedly "staged" photographs depicting Detective Shirley sprawled on the parking lot with badge, hat, pencil, and glasses carefully placed nearby was a gross abuse of discretion by the trial court Judge.  Admission of a photograph into evidence will constitute an abuse of discretion if its probative value is greatly outweighed by its inflammatory potential.  *Burdine v. State*, 719 SW 2d 309, 316 (Tex. Cr. App. 1986), *cert. denied*, U.S. 107 S.Ct. 1590, 94 L.Ed. ed 779 (1987); *see also Youens v. State*, 742 SW 2d 855 (Tex. App. - Beaumont 1987).  The admissibility of a photograph is discretionary with the trial court.  *Burdine v. State*, 719 SW 2d at 316.  The prejudicial effect of a photograph may be determined by the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or colored, whether they are close-up, whether the body is naked or clothed, and by factors unique to each situation photographed.  *Burdine*, *supra*.

In the instant case, the introduction of the photographs depicting the body of Daryl Wayne Shirley with staged placement of his badge, pencil, glasses, and cowboy hat created an unfair and prejudicial impression in the minds of jurors that those items were in plain view during the confrontation with Defendant.  The State admitted the placement of the badge, in particular, which created a prejudicial

inference to the jury that the identity of Shirley to Arthur Williams was clear by display of the badge.  No other rational purpose was offered by the State for the staging of these critical items identifying Daryl Wayne Shirley as a police officer.

In *Lopez v. State*, 651 SW 2d 413 (Tex. App. 2 Dist. 1983), the court held that the admission of a crime re-enactment by police officers presented to the jury was reversible error. The police in *Lopez*, *supra*, orchestrated a recreation of a marijuana sale at a motel in Fort Worth.  The re-enactment, recorded onto videotape, depicted the crime scene differently than it appeared at the date and time of the offense in question.  The court noted at page 414:

> As pointed out by Wigmore, such portrayal of an event is apt to cause a person to forget that 'it is merely what certain witnesses say was the thing that happened' and may 'impress the jury with the convincing impartiality of Nature herself.'  Wigmore, Evidence [3rd ed.], sec. 798a, p. 203.

Similarly, in this case, the Houston police staged the placing of Detective Shirley's badge, cowboy hat, pencil and sunglasses by his body.  Posed or recreated events involving persons is at best dangerous.  *Lopez v. State*, 651 SW 2d at 414.  The court in *Lopez* cited language from *Eiland v. State*, 203 SE 2d 619 (Ga. Cr. App.- Div. 1-1973) approvingly:

> ...Photographs and especially movies which are posed, which are substantially different from the facts of the case, and which because of the differences might well by prejudicial and misleading to the jury, should not be used, and this is especially true where the

> situation or event sought to be depicted is simple, the testimony
> adequate, and the picture adds nothing except the visual image to
> the mental image already produced.  (Emphasis in Original) at 414.

The court erred in admitting the "staged" photographs of the deceased with significant police-related items placed thereby for the jury's consumption.  No probative value could have been derived by the staging of the photographs.  The effect was to give the jury the unsubstantiated impression the Detective Shirley's police badge was present throughout the incident between Arthur Williams and the deceased.  This was reversible error that denied him a fair trial.

The inflammatory and prejudicial nature of the staged photographs grossly outweighed any legitimate value it possessed for the State's case.  *See Burdine*, *supra*.  At trial, a diagram of the Parkstone Apartments was utilized by many witnesses for demonstrative purposes and identification of the crime scene. Photographs of the body of Detective Shirley, without the staged placement of his badge, hat, pencil, and glasses, could easily have aided the jury in understanding where the deceased body was located.  Given the relatively few photographs of the deceased's body in the parking lot, the staged photograph unnecessarily painted an image that Shirley's identification as a police officer was apparent.  Introduction of evidence manufactured after the event is of no probative value to the jury.

The trial court erred in admitting the manufactured photographs of the

53

deceased body solely to depict the deceased with police identification not present at the time of the shooting on April 28, 1982.  The creation of the tidy crime scene by police had no probative value as to what really happened.  Accordingly, the admission of the photographs contained within State's Exhibits 5 and 12 was an abuse of discretion constituting reversible error.  Additionally, the prejudicial materials therein denied Arthur Williams his right not to be deprived of life and liberty without due process of law secured by the Fifth Amendment of the United States Constitution.  His conviction for capital murder must now be vacated.

### ARTHUR WILLIAMS WAS DENIED HIS FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AND AMENDMENT RIGHTS SECURED BY THE U.S. CONSTITUTION OF THE OPPORTUNITY TO PRESENT HIS DEFENSE.

When the Court rejected Mr. Williams' proffers of evidence which corroborated his testimony about the Chaline robbery attempt and refused to let witnesses testify that Mr. Williams had reported the robbery incident to them before the April 28 shooting, Mr. Williams was denied his right to present evidence material to his defense to capital murder and the appropriateness of the death penalty.  As a result Mr. Williams trial and capital sentencing proceeding was fundamentally unfair and the result inherently unreliable.

### Mr. Williams was not permitted to introduce medical records showing that Donald Chaline was

54

> **treated for gunshot wounds at Rosewood Hospital on February 9, 1982, corroborated Mr. Williams' testimony that on that same date, Mr. Chaline, posing as a police officer, attempted to rob him and was shot during a struggle.**

At trial, Arthur Williams attempted to introduce into evidence the medical records from the Rosewood Hospital in Houston from February 9, 1982 showing Donald Chaline had been treated at the emergency room for a gunshot wound. Mr. Williams contended that Chaline went to Rosewood Hospital after the confrontation with Williams in which Chaline impersonated a law enforcement officer. After Mr. Williams realized he was being robbed, he attempted to wrestle the gun away from Chaline, who was shot in the upper left arm and bled significantly at the apartment where Arthur Williams was staying with his sister, Linda Ransome. Chaline left, going to Rosewood Hospital just a few blocks away. At the hospital, according to the proffered records, he was treated for the gunshot wound to his upper left arm. The medical records from Rosewood Hospital indicated Donald Chaline arrived with a gunshot wound on February 9, 1982 and that Houston police were notified. Chaline transferred to Ben Taub Hospital later that evening.

Mr. Williams offered the medical records from Rosewood Hospital of February 9, 1982 to show that Donald Chaline had been treated at the emergency

room for the gunshot wound he received in his struggle with Mr. Williams.  This was to corroborate Arthur Williams' testimony the Chaline incident accounted for his belief and fear that he was being robbed by associates of Chaline when Detective Shirley accosted him in the breezeway on April 28, 1982.

The Court denied admission of the medical records of Donald Chaline on grounds of relevancy because Donald Chaline identified himself as "Donald Smith" at Williams' apartment on February 9, 1982.  This ruling ignores that fact that Mr. Williams identified a Donald Chaline, from a picture finally produced by the State, as the man who attempted to rob him on April 28, 1991.  The medical records were relevant to Arthur's state of mind on April 28.  The use of the name Donald Smith instead of Donald Chaline would have only gone to the weight of the evidence and not its relevance.  Arthur Williams was denied the opportunity to effectively present a fair defense of the charge of capital murder in violation of the Fifth and Sixth Amendment rights under the U.S. Constitution.  The trial court erred in precluding admission of the Donald Chaline medical records.

Additionally, the medical records of February 9, 1982, indicated the Houston Police Department was notified.  No police investigatory reports or statements were produced by the prosecution in this matter once the February 9 shooting became an issue.  Presumably, the Police Department conducted some type of

investigation into the Donald Chaline shooting on February 9 and those materials could tend to negate the quilt of Arthur Williams in this case.   *See Brady v. Maryland*, *supra*.   All materials should have been disclosed by the State regarding Donald Chaline.

> **Mr. Williams not permitted to introduce hotel receipts which corroborated his and his sister's testimony that after the attempted robbery by Chaline, they spent the night in a hotel because of fear that Chaline and his partner would return.**

Concerned about their safety, Arthur Williams and his sister Linda Ransome left the apartment and spent the next few nights at a hotel.   Chaline never reappeared.   The hotel bill of Williams and his sister was offered but not admitted into evidence.   This evidence was clearly relevant to corroborate Defendant's state-of-mind at the time of the second shooting on April 28, 1982.   Arthur Williams sought to demonstrate he did not know Daryl Wayne Shirley was a police officer at the time of the shooting on April 28, 1982.   This impression becomes more believable in the wake of the February 9, 1982 assault and robbery by Donald Chaline.   Refusal to admit this evidence prevented Arthur Williams from effectively defending against the capital murder charge of a police officer with all available evidence.   The weight accorded the hotel bill should have been decided by the jury in light of all facts between February 9 and April 28, 1982.   The

Court's refusing admission of this evidence violated Williams' Fifth and Sixth Amendment rights.  The verdict should be reversed and a new trial ordered with receipt of all evidence necessary for presentation of a full and fair defense.

The medical records of Donald Chaline and the subsequent hotel bill would have afforded Arthur Williams opportunity to address the testimony offered by State's witness Angelia Lewis. Lewis testified from her statement given to police on April 28 to alleged statements made by Williams about the February 9 and April 28 shooting incidents.     The medical records could have corroborated Williams' account of the two strikingly similar confrontations with Donald Chaline and Daryl Wayne Shirley at the Parkstone Apartments.  When Arthur Williams went to Angelia Lewis' after shooting Shirley, he jumped back and forth between the February 9 and April 28 shooting incidents.  He was visibly shaken and intermingled the two shooting in his wailings to Angelia Lewis.  By denying admission of the Donald Chaline medical records and subsequent hotel bill, the Court prevented the jury from examining for themselves what had happened on February 9, 1982.

> **To combat the State's claim that his testimony about the Chaline incident was a recent fabrication, Mr. Williams attempted, but was not allowed, to show that he had reported and discussed the circumstances of the attempted robbery by Chaline before the encounter with Detective Shirley.**

The State succeeded in persuading the court to limit testimony regarding Mr. Williams' statements about the Chaline robbery to the time period immediately after the shooting of Detective Shirley.  The State and the court's theory was that this evidence was only admissible to show Mr. Williams state of mind when he shot Detective Shirley.   Under this theory, only statements surrounding the shooting of Shirley were relevant.

This ruling ignores the importance of showing that Mr. Williams's first account of the Chaline incident did not occur after the shooting of Shirley. Testimony, which he attempted to introduce, that he had described the Chaline robbery attempt to others in February shortly after it occurred would have refuted the State's argument that Mr. Williams' testimony about the incident was a desperate attempt to defend against a capital murder.  The error was compounded when the State, after opposing the introduction of evidence to the contrary, argued strenuously that the Chaline incident was untrue and was fabricated by Arthur Williams after the shooting of Detective Shirley.

### STATE HARASSMENT AND INTIMIDATION OF WITNESSES INTERFERED WITH THE DEFENSE INVESTIGATION AND PREVENTED THE WITNESSES FROM TESTIFYING FREELY AND ACCURATELY REGARDING EVENTS SURROUNDING THE SHOOTING OF DETECTIVE SHIRLEY.

When the police responded to the scene of the shooting, and found that the victim was a fellow police officer many of them were overly zealous in the ensuing investigation.  The officers who talked to Angelia Lewis badgered her for hours in an effort to persuade her to give them a statement which incriminated Arthur Williams.  The information they sought was information they knew to be critical to a capital murder conviction -- that officer Shirley had identified himself as a police officer, before he was shot.  Only if Mr. Williams knew that Shirley was a police officer would he be death-eligible for the shooting of Shirley.  With this in mind, the officers, when preparing the written version of Ms. Lewis' statement to them, misstated and misrepresented what she had said, repeated statements wholly out of context, and omitted from the written statement material information provided by Ms. Lewis that exculpated Arthur Williams.

Angelia Lewis was arrested shortly after the shooting and questioned by the police throughout most of the rest of the 28th of April.  She was continually in police custody, with two or three detectives around her, in her home and at the police station, from around three o'clock until a quarter to midnight.  Initially she was confronted in her home by two H.P.D detectives who burst into her home, with guns drawn telling her that they were going to kill Arthur Williams, and that she might also be charged with capital murder.  Ms. Lewis was so terrified by the

officers' threats, and shaken by what was happening that she took 20 mg. of valium to control her nerves.  She took the valium less than four hours before the detectives took a statement from her. In this coercive environment, under the influence of sedatives, Ms. Lewis gave her first statement.

Ms. Lewis' second statement was given after she had found the murder weapon in her home.  At trial she categorically denied some of the comments attributed to her in her statements, and complained that the officers had systematically excluded important information from the statements that she had told them repeatedly.  The inaccurate comments included in the statement, and the information left out served the same purpose, making it more likely that the statement could be used to secure the death penalty for Arthur Williams.

The purported statement of Ms. Lewis was a distorted and inaccurate account of her answers to police interrogation.  Nevertheless it was used by the prosecution to impeach her testimony when she was called as a state witness.  The use of Ms. Lewis' purported statement and the State's failure to acknowledge the coercive tactics used in her interrogation, her repeated denials when she was being questioned, and the repeated threats that preceded the resolution of her interrogation denied Mr. Williams a fair trial in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and analogous

provisions of the Texas Constitution.  *Giglio v. United States*, 405 U.S. 150 (1972);

*Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Other witnesses were to receive similar treatment. Linda Ransome, Mr.

Williams' sister, was taken into custody by the police on sight.  She was put in

handcuffs, had the contents of her purse strewn across the ground, was held

incommunicado, was forced to sit in the back of a hot police cruiser for an hour,

was pushed, threatened, and screamed at by Houston Police detectives from just

after three o'clock on April 28, until nearly midnight.

A Houston Police Officer threatened to charge Howard Russell with murder

if he did not provide the police with certain information about Arthur Williams.

During the State's investigation, these and other witnesses were led to

believe that they should not talk with the defense about the case.  State

investigators told them that they were State's witnesses and were expected to act

like them.  Pretrial Motion Hearing, at 37 & 41 (July 8, 1982).  Their jobs were

threatened. *Ibid.*, at 15.  As a direct consequence of this intimidation, when

contacted by defense counsel, the witnesses would not talk and would not return

telephone calls.  *Ibid.*, at 15 & 23.  Dennis Knight, a key witness who had no prior

connection, with Mr. Williams, told defense counsel, "I'd like to help you but I'm

just scared."  He was so upset that he moved to California to escape the pressure.

Howard Russell's employer was persuaded to encourage Mr. Russell not to cooperate with the defense.

The harassment during questioning, threats of prosecution, intimidation, and economic pressure materially altered the testimony of key witnesses. Although the court granted a protective order, the damage had already been done.

Police officer Clampitte was testified at trial to a supposed oral statement that Claudette Guidry made to him on the scene - a statement that contradicts the statement she gave police at the station a short time later. Ms. Guidry has testified that never happened at trial. Eddie Lewis, was ordered out of his apartment at gun point by the Houston Police department, searched and taken into custody. All of the key witnesses to the events of that afternoon, almost immediately left the Houston area, to live in other cities. Robert Dennis Knight moved out of State before trial. Claudette Guidry and Eddie Lewis moved to Louisiana. Linda Ransome left Houston for California. Angelia Lewis left Houston for California. All of the witnesses who could provide favorable evidence for the defense, almost immediately after the incident, either lost their homes, their jobs, or both.

The intimidation of witnesses by the Houston Police Department, the threat of loss of jobs and homes, the suppression of evidence, and the alteration and fabrication of statements were hallmarks of overzealous, highly suspect

investigation which prevented Arthur Williams from obtaining and presenting effectively evidence of his innocence.

The police's eagerness to convict is evidenced by the advice given officer and the prosecutor's suggestion that witnesses should refrain from talking with defense counsel. The loss of the "911 tape", the tape recording of the call made to the police on the emergency phone line, made by Robert Dennis Knight at the request of officer Shirley during the struggle between Shirley and Williams further demonstrate the reluctance of police investigators to turn over all potentially exculpatory material in this case. Generally, all emergency 911 calls are taped and maintained by the Houston Police department for their evidentiary, investigative, and other values. This tape was requested in a timely fashion by defense counsel, but inexplicably was destroyed, and was therefore unavailable for the defense to use in proving Mr. Williams innocence.

The State's misconduct materially affected the outcome of Mr. William's trial and sentencing hearing, depriving him of due process of law in violation of the Sixth, Eighth and Fourteenth Amendment and similar provisions of Texas law. *Cf. Alcorta v. Texas*, 355 U.S. 23 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959).

**THE TRIAL COURT ERRED IN PERMITTING THE PROSECUTION TO IMPEACH THE TESTIMONY OF ITS OWN WITNESS, ANGELIA LEWIS, FROM A WRITTEN STATEMENT THAT**

**WAS IMPROPERLY ADMITTED AT TRIAL.**

Angelia Lewis was called as a witness for the State at Defendant's trial.  She had met Arthur Williams in March of 1982 and had become friends with Williams. Because of concerns as a waitress at a local nightclub, Ms. Lewis purchased the .38 caliber Derringer that was used to shoot Detective Daryl Wayne Shirley on April 28, 1982.  (Vol. XXI, T-231-2).  Lewis lived in the Parkstone Apartment complex in Houston.

Angelia Lewis was called as a witness by the State at trial.  Following questioning regarding her knowledge of bullets, guns, and loading, the State asked Ms. Lewis, "At the time that you got to know the Defendant, did he ever tell anything about himself?"  (Vol. XXI, T-234-235).  At that time, defense counsel objected and the jury was removed from the courtroom.

Angelia Lewis was subpoenaed to testify as a State's witness for the trial. She was placed under house arrest to insure her appearance.  On April 28, 1982, Angelia Lewis made a statement for the Houston Police Department following the murder of Detective Shirley.  The written statement is contained with in Exhibit 32.  Ms. Lewis gave a second statement to the Houston police on April 29, 1982 that was marked as Exhibit 33.  It is the State's improper impeachment of Ms. Lewis with her statement of April 28, 1982 (Exhibits 32) admitted by the Court at

trial that was error.

Ms. Lewis advised the prosecutor before the trial that portions of the two statements were not true.  (Vol. XXI, T-243).  She had spoken with Assistant District Attorney Henderson the day before the trial and advised him of the same. (Vol. XII, T-243).  Ms. Lewis previously testified at the examining trial on May 17, 1982.  She was contacted between the time of the examining trial and the day before court by the prosecutors.  (Vol. XII, T-244).  In fact, Ms. Lewis had not received a copy of the statements or had an opportunity to look at it prior to testifying at trial (Vol. XXI, T-245) or the examining trial.  (Vol. XXI, T-246). After voir dire of Ms. Lewis, defense attorney Stafford, and State's attorney Tobias, the trial court permitted the prosecution to impeach Angelia Lewis with her own statements and ruled that the State demonstrated sufficient surprise at her testimony.  (Vol. XII, T-274).  The Court ruled that Ms. Lewis' written statement was different from anticipated testimony and that it was injurious to that side's cause.  (Vol. XII, T-275).  The defense interposed proper objections to the Court's ruling and usage of the statement of Ms. Lewis for impeachment by the State.

Significantly, Angelia Lewis was under the influence of valium at the time of making the statement to Houston police.  There were two police officers present and a third would come and go during her statement.  The police had threatened to

charge Ms. Lewis with capital murder.  (Vol. XII, T-249).  Ms. Lewis testified

upon voir dire that the Houston police put things into her statement that she did not

say.  (Vol. XXI, T-256-258).  Moreover, she explained to the prosecutor the day

before trial that there were problems with both statements.  (Vol. XXI, p. 264).

Ms. Lewis emphasized that matters contained within the statements were not said

by her.  (Vol. XXI, T-235).  She attempted to clear these up with the prosecutor.

The prosecutor went through Angelia Lewis' statements to the police in the

presence of the jury.  She was asked to read directly from the statements, asked if

she made specific statements to the police, and often read large portions of the

statements to impeach testimony that was never given by her at trial.  Defendant

objected to improper impeachment at trial.  While the State utilized Angelia Lewis'

statements to impeach her, she was not afforded the opportunity to testify as to her

truthful version of evidence that was subject to impeachment.  This series of

improper impeachment unduly prejudiced Defendant and denied him a fair and

impartial trial in violation of the Fifth Amendment of the U.S. Constitution

depriving him of liberty without due process of law.

First, Angelia Lewis testified that following the shooting she met Arthur

Williams at her apartment, that he was very upset and that he related to her what

had happened.  She saw Arthur Williams at her apartment; he had skinned elbows

and hands and was showing blood and he was "just terrified." (Vol. XXI, T- 284). Williams was sobbing and hysterical.  He began telling Ms. Lewis about the immediate shooting incident with Shirley and a previous incident on February 9, 1982 of a similar nature.  On February 9, 1982, Donald Chaline visited unexpectedly Arthur Williams' apartment impersonating a law enforcement officer.  Chaline, who identified himself only as Donald Smith, displayed a police badge to Williams and wielded a .45 caliber automatic pistol.  Chaline entered Defendant's apartment and forced him against a wall and on to the floor.  Williams felt the supposed police officer uncock the pistol in his back.  (Vol. XXIII, T- 704-5).  Williams grabbed the pistol from Chaline and the two struggled.  The pistol went off during the struggle and wounded Chaline in the upper left arm.  (Vol. XXIII, T-705).  Arthur Williams then took Chaline's pistol, searched him and found a false police identification folder.  (Vol. XXIII, T-705).  Williams telephoned his sister, Linda Ransome, rather than the police because he was concerned about his 90 day parole violation from Minnesota.  (Vol XXIII, T-707). He placed a towel around Chaline's wound and put him into the kitchen.  *Id*. Chaline left the apartment before Ms. Ransome got home and went to Rosewood Hospital just a few blocks away.  (Vol. XXIII, T-708).  Williams and Linda Ransom cleaned up the blood and spent the night at a hotel for their safety.  (Vol.

XXIII, T-709).

Arthur Williams told the story of the February 9, 1982 intrusion by Donald Chaline to Angelia Lewis, Larry Hall, Howard Russell, Claudette Guidry, and Eddie Lewis.  (Vol. XXIII, T-710).  Arthur Williams kept Donald Chaline's .45 automatic.

Arthur Williams was permitted to testify about the general facts surrounding the Donald Chaline February 9, 1982 incident.  The Court, however, refused to admit medical records from Rosewood Hospital of February 9, 1982 describing the gunshot wound to Donald Chaline.  Similarly, the hotel receipt of Arthur Williams and Linda Ransome was also not admitted.  Donald Wayne Chaline was a key state's witness later in the Markham Duff-Smith murder trial in Houston arising out of the murder of Gertrude Zabolio.  The facts are set forth in *Duff-Smith v. State*, 685 S.W. 2d (Tex. Cr. App. 1985).  Chaline had previously been charged with impersonating a police officer and apparently had a brother on the Houston Police Department.  His photograph was identified by Defendant Williams at the trial as the same Donald Smith.

The above facts are related to the Angelia Lewis' testimony because they demonstrate the striking similarity between the February 9, 1982 Donald Wayne Chaline incident and the April 28, 1982 Daryl Wayne Shirley incident.  This

provided the backdrop of Arthur William's visit to Angelia Lewis after the shooting on April 28, 1982.

At trial Angelia Lewis testified that Arthur Williams confused the February 9 Donald Chaline incident with the April 28 Daryl Wayne Shirley incident repeatedly.  Williams talked about the first incident and the second incident on April 28 with Angelia Lewis.  (Vol. XXI, T-287).  This became confusing because Arthur Williams was constantly telling Ms. Lewis about the Donald Chaline incident and the Daryl Wayne Shirley incident.  (Vol. XXI, T-290).  From this jumbled set of facts, the police took Ms. Lewis' hearsay statements, (made under the influence of valium), and prepared her April 28 and April 29, 1982 statements. She was required to read from these statements at trial.  She was not permitted to give an explanation.

An example of the confusion created by the two incidents, discussed in Ms. Lewis' statements, was apparently from the improper impeachment of Ms. Lewis by the prosecution.   The problems with impeachment of Ms. Lewis by her statements are indicated as follows:

Q:     Will you read that statement there and see if you can refresh your memory?

A:     What statement do you want me to read?  The same one?

Q:     The same sentence.

70

A:    O.K.

Q:    Do you recall what the Defendant said that white male said that came by behind him?

A:    About the police part?

Q:    Yes, ma'am.

A:    Is that what you are saying?

Q:    Yes, ma'am.

A:    He didn't exactly say the police.  He stated that it could have been the police or whatever. Now we talked about the first incident and the second incident.

Q:    Does the statement say, "he told me that a white male had come up from behind him and pointed a pistol at him and showed him a badge, saying, "Arthur Williams, Houston police, halt?"

Is that what the statements says?

A:    That is what the statement says but that is not what I remember.

(Vol. XXI, T-287)

Other similar examples of improper impeachment read from the statements are rampant throughout her testimony.  A party introducing a witness cannot attack his or her testimony unless the witness has stated facts injurious to such party. *Wall v. State*, 417 SW 2d 59 (Tex. Cr. App. 1967).  The rule established in *Wall*, *supra*, remains valid in Texas criminal cases.  Texas Code of Criminal Procedure,

Article 38.28; *Puckett v. State*, 640 SW 2d 284 (Tex. Cr. App. 1982).  In order to warrant impeachment, the witness's testimony must be injurious to the calling party's case.  *Puckett*, *supra*.  It is not sufficient that the witness merely failed to testify as expected to remember facts favorable to the party calling the witness.  If the State has offered no evidence to prove a relevant fact, it cannot be said that its witness, who denies the existence of that relevant fact, has by such denial stated facts injurious to the State's case.  *Wall*, *supra*; *Williams v. State*, 626 SW 2d 43 (Tex. Cr.

App. 1982).

In the instant case, the state offered no evidence that Detective Shirley had identified himself to Arthur Williams or anyone else at the time.  Dennis Knight, the apartment resident who happened onto the scene, testified that the white man involved in the struggle called to him to '"call the police, this man is trying to shoot me." (Vol. XX, T-110).  Knight asked if they could hold him until they got there, and he didn't answer, so Knight ran to his telephone to call the police.  *Id*.  Knight spoke with the police dispatcher and heard two shots on the telephone during the conversation.  (Vol. XX, T-110-111).  Knight did not hear anyone identify themselves as a police officer.  (Vol. XX, T-118).  The tape recorded police dispatch of Dennis Knight's call on April 28, 1982 was recorded.  Despite the

prosecution's assurance that the Houston Police Department had custody of the tape and that it would be preserved (Vol. IV, T- 23), the recording was inexplicable destroyed.

Significantly, the first police officers on the scene of the shooting were unaware that the deceased was a Houston Police officer.  Testimony by State's witness D.E. Rieks, a Houston patrol officer, indicated Rieks and his partner, Mon McCabe, were first to arrive at the scene of the shooting at 2801 Rolido.  (Vol. XX, T-80).  Officers Rieks and McCabe had received an ambulance call to a shooting.  *Id*.  Notably, the original call did not alarm officers that it was a police officer who had been shot.  Rather, the call indicated only a shooting.  Testimony by officer Rieks indicates he did not know a police officer had been shot upon initial arrival:

Q:     On April 28, 1982, did you have an occasion to be in the vicinity of 2801 Rolido?

A:     Yes, I did.

Q:     For what reason did you go to that location?

A:     We received a call to a shooting, ambulance call.

Q:     When you got to that location, what, if anything, did you find?

A:     We found one deceased person, later found to be a police officer.

Q:     Was that Daryl Wayne Shirley?

73

A:      Yes, it was.

(Vol. XX, T-80-81)

Officer Rieks testified they found "one deceased person, who was later found to be a police officer."  It is clear that officers Rieks and McCabe had not received a call that a police officer had been shot or was in a struggle involving a weapon.  In fact, officers Rieks and McCabe did not know Daryl Wayne Shirley was a police officer until later after they were told.  The police radio call, unidentified deceased body at the scene, cowboy appearance of Daryl Wayne Shirley, and surrounding facts on April 28, 1982 did not put officers Rieks and McCabe on notice that a police officer was in trouble or was shot.  Clearly, Dennis Knight did not indicate the same to the police in his telephone call.

The roles of Dennis Knight, officer Rieks and officer McCabe in this matter on April 28, 1982 show that Daryl Wayne Shirley had not identified himself to Dennis Knight as a police officer.  Such identification would have been broadcast over the radio call to assistance.  This is significant because it demonstrated Arthur Williams did not tell Angelia Lewis that Daryl Wayne Shirley identified himself as a police officer or displayed a badge.   Angelia Lewis confused Williams' description of the Donald Chaline incident of February 9, 1982.  The Houston police investigators taking Ms. Lewis' statements improperly altered them as she

74

attempted to explain.

The impeachment by the State of its own witness was improper because Angelia Lewis had done no more than failed to testify as expected.  She denied the existence of a fact the State had not proved.  The prosecution had only proven Detective Shirley's badge was found on the ground near the location of the struggle between Shirley and Williams.  No evidence had been offered that Shirley exhibited the badge to Arthur Williams.  The State may impeach its own witness when the witness testifies to facts injurious to the State's case, but may not impeach a witness who merely fails to remember facts favorable to the State. *Crandall v. State*, 340 SW 2d 36 (Tex. Cr. App. 1960).  Angelina Lewis testified not remembering Arthur Williams advising her that Shirley displayed a badge.  Despite the prevailing case law, the prosecutor was permitted to introduce orally that part of her prior statement which related to this fact.  (Vol. XXI, T-286).  The introduction of her written statement regarding the badge constituted improper impeachment by the State of its own witness.  No other evidence of a badge or police identification was proven.

The admission of Ms. Lewis' statement about the badge was improper here as the badge became the focal point for the State to prove the intent to murder a police officer necessary for capital murder.  Absent the impeachment testimony by

Angelia Lewis of her statement regarding the badge, no evidence was introduced that Arthur Williams knew Daryl Wayne Shirley was a police officer at that time and place.  Admission of the improper impeachment evidence denied him his Fifth Amendment due process right to a fair trial prior to deprivation of liberty of life. The verdict must, accordingly, be vacated immediately.

**THE TRIAL COURT ERRED IN ADMITTING ANGELIA LEWIS' WRITTEN STATEMENTS FOR IMPEACHMENT BY THE STATE WITHOUT GIVING A LIMITING INSTRUCTION TO THE JURY IN VIOLATION OF DEFENDANT'S FIFTH AMENDMENT DUE PROCESS RIGHTS.**

At trial, as indicated in the preceding section, the Court admitted the State to impeach its own witness (Angelia Lewis) with her written statements of April 28 and April 29, 1982 in the presence of the jury.  The Court ruled the State had demonstrated surprise.  If the facts supporting both surprise and injury are proved to the satisfaction of the Court, then the proper predicate has been established and the attorney should be allowed to impeach the witness in the presence of the jury. *Goodman v. State*, 665 SW 2d 788, 792 (Tex. Cr. App. 1984).  A limiting charge to the jury on the impeachment testimony should then be given.  *Goodman v. State*, 665 SW 2d 792.  Testimony admitted only for impeachment purposes is without probative value and cannot be considered in determining the sufficiency of the

evidence to support the conviction.  *Goodman v. State*, 665 SW 2d at 792, f.n. 2; *Key v. State*, 492 SW 2d 514, 516 (Tex. Cr. App. 1973), the cases cited therein; *see also* Vernon's Ann. Texas C.C.P. Art. 38.28.  The trial court erred by failing to give a limiting charge to the jury that the impeachment testimony by Angelia Lewis was admitted only for impeachment testimony purposes, was without probative value, and could not be considered in determining the sufficiency of the evidence to support the conviction.

The record indicates that after the Court ruled that it would permit impeachment of Angelia Lewis by the State on grounds of surprise, the jury was returned and the prosecutor permitted to proceed forthwith with examination. (Vol. XXI, T- 275).  No limiting or curative instruction indicating the testimony was admitted only for impeachment purposes and was without probative value unable to be considered in determining the sufficiency of the evidence was given. The failure to give the limiting charge to the jury regarding Angelia Lewis' impeached testimony created reversible error.  *Goodman v. State*, *supra*.  Angelia Lewis' impeached testimony provided the critical link for the State to show the identity of Daryl Wayne Shirley as a police officer during the confrontation with Arthur Williams.  The State could not otherwise tie Shirley's identification as a peace officer to that time and place.  The lack of a limiting instruction by the Court

regarding the purpose of Angelia Lewis' impeachment testimony allowed the jury to use her testimony, read from her statement, that a badge was exhibited by Shirley during his confrontation with Arthur Williams.  The jury was free to utilize Angelia Lewis' testimony about the badge, given only in the context of impeachment, as substantive evidence proving identity of Detective Shirley as a peach officer to Arthur Williams.  This created extreme prejudicial error that remained uncorrected by the Court.  Accordingly, the sentence of death must be vacated the judgment of conviction reversed.

### MR. WILLIAMS' TRIAL WAS RENDERED FUNDAMENTALLY UNFAIR WHEN THE PROSECUTOR ARGUED THAT THE JURY SHOULD CONSIDER INADMISSIBLE CHARACTER EVIDENCE IN DETERMINING WHETHER MR. WILLIAMS WAS GUILTY OF CAPITAL MURDER.

The State introduced a Minnesota arrest warrant for Mr. Williams on a parole violation to show that Detective Shirley had authority to arrest him.  When Mr. Williams testified at the guilt stage, he admitted two convictions for robbery and one for injury to property and attempted escape.  On cross-examination, additional information was brought out about his criminal history.

This evidence of prior crimes was admissible only for impeachment and was clearly not admissible to show guilt.  Rule 404, 608, 609, Texas Rules of Criminal

Evidence.   The Court's guilt stage instruction specifically limited the jury's consideration of it accordingly:

> You are instructed that certain evidence was admitted before you in regard to the defendant's having been charged and convicted of offenses other that the one for which he is now on trial.  You are instructed that such evidence cannot be considered by you against the defendant as any evidence of guilt in this case. Such evidence was admitted before you for the purpose of aiding you, if it does aid you, in passing upon the credibility of the defendant as a witness for himself in this case, and to aid you, if it does aid you, in deciding upon the weight you will give him as such witness, and you will not consider the same for any other purpose.

(Transcript Vol. 1 p. 200).

During closing argument, the State argued that Mr. Williams' criminal background, demeanor and appearance should be considered as evidence of his guilt, greatly exceeding the bounds of permissible argument.   The improper argument deliberately focused the jury's attention on Mr. Williams' convictions for robbery, injuring property and attempted escape from jail, his previous prison term, and other irrelevant but prejudicial aspects of his character and background. Repeatedly, the State, through improper and inflammatory remarks, urged the jury to consider this evidence as proof of guilt.

The prosecutor's initial reference to Mr. Williams included a disparaging description of his criminal history:

> This defendant, who had been convicted twice before of aggravated robbery with a deadly weapon, who, while he was on parole committed the offense

79

of attempting to escape from a penal institution and, further, injuring property is now before you for killing a policeman.

(SF Vol. XXIV p. 4).  The prosecutor also interspersed improper and prejudicial remarks about Detective Shirley's sterling character and his immense value to the community. *Id*. 4, 15, 21, 118.  (These remarks are addressed in a separate claim.)

The State's argument went beyond simple references to prior convictions and the fact that Mr. Williams had violated his parole:

And you know the kind of person that the defendant is and why he would have reacted this way.

(Transcript, Vol. 1 p. 74).  This remark is in direct violation of the evidence rule that prohibit the introduction of "[e]vidence of other crimes, wrongs, or acts … to prove the character of a person in order to show that he acted in conformity therewith." Rule 404(b).  The prosecutor's attempt to disguise his argument by suggesting that Mr. Williams' background was relevant to prove motive is unpersuasive.  In later remarks, he abandons the charade and openly tells the jury that it should consider Mr. Williams' character, demeanor and appearance when deciding guilt:

I ask you to look at this defendant, look at and think about what was in his mind in regard to what he said and why he would have the reason to do what he did and say what he said.

(Transcript Vol. 1 p. 89).

The prosecutor's continued to make such improper and inflammatory comments throughout his argument:

> You can look at the defendant's past when you are thinking about his condition of the mind, what has happened to him in the past, where he has been, what he has done.

> You can do that also when you are looking through the eyes of the defendant as to what that would indicate to you.  <u>I suggest to you that evidence shows that the defendant has absolutely no regard for the law.</u>  Just by virtue of what has happened to him since 1977.   He hasn't been out of the confinement but about six months.  Hasn't ever held a job in his life.  I guess he thinks society owes him a living.  When he needed some money back on those conviction times for aggravated robber, what do you think he did?
>     Stuck a gun in somebody's face and took it.  <u>Because that is the kind of person he is</u>.  He is going to do whatever it takes to get his way at the time.  That is the kind of person he is.

> So he goes to the penitentiary.  Gets out of the pen.  What happens?  He is out of the pen for a very short period of time.  Goes right back in jail for some kind of parole violation.  While he is in jail, showing what a law-abiding citizen he is, tries to break out.     <u>That is a great human being so far, but it does show you the state of mind, the kind of person he is, what he would do under situations</u>.  The obvious truth to the statements that he wasn't going back to the pen.  And he wasn't going back to the pen and he didn't want to go back to the pen and nobody was going to put him back in the pen <u>just by virtue of what he has done to that point</u>.

Transcript Vol. 1 p. 90-1.(Emphasis added).  It is harder to imagine a clearer or more deliberate attempt to argue evidence of "other crimes, wrongs, or acts ... to prove the character of a person in order to show that he acted in conformity therewith." Rule 494(b).

The Court of Criminal Appeals has consistently recognized the importance

of convicting an accused only upon proper evidence without inflaming or prejudicing the minds of the jurors. *Stein v. State*, 492 S.W.2d 548 (Tex. Crim. App. 1973). When the prejudice from improper remarks was so great that it could not be cured by an instruction to disregard, the court will grant relief even though the remarks were not objected to at trial. *Boyd v. State*, 513 S.W.2d 588 (Tex. Crim. App. 1974).

The State's inflammatory argument about Mr. Williams' past was tantamount to urging the jury to convict him of capital murder because he had been to prison, was a bad person, and therefore was arguably capable of committing the offense. Under the circumstances of this case, the improper argument was highly prejudicial. The State's case for capital murder was thin. The State's own evidence raised substantial doubt about whether Mr. Williams knew he Detective Shirley was a police officer when Shirley pinned him against the wall in the breezeway of his apartment. At best, the evidence suggested that Mr. Williams may have learned of this fact after he had already engaged in the struggle over the gun. And all of the evidence on which the State relied to show that Mr. Williams' knew that the cowboy in the breezeway was really a Houston police officer was tainted by the State's improper conduct during its investigation --

the harassment and intimidation of witnesses, its manipulation of

photographic evidence, and its attempt to keep from the jury evidence about the Chaline robbery attempt which supported Mr. William's explanation for his behavior.

Under such circumstances, due process demands relief.  *Ex parte Brandley*, 781 S.W.2d 886 (Tex. Crim. App. 1989).

> **THE JURY'S DELIBERATION ON GUILT WAS RENDERED FUNDAMENTALLY UNFAIR BY THE STATE'S ARGUMENT THAT THE JURY SHOULD CONSIDER THE CHARACTER OF THE VICTIM AND THE IMPACT OF HIS DEATH UPON HIS FAMILY IN DECIDING WHETHER MR. WILLIAMS WAS GUILTY OF CAPITAL MURDER.**

At the conclusion of the guilt phase of trial, the prosecutor in this case resorted to a theme in his closing argument that was plainly improper, misleading, and highly prejudicial.   This argument so contaminated the jury's consideration of guilt or innocence that the deliberation process was rendered fundamentally unfair.   What the prosecutor urged the jury to consider was Daryl Shirley's good character, the value of his job to the jury, the impact of his murder upon his survivors. This argument had no possible legitimacy during this stage of trial.

In the opening argument, the prosecutor introduced this topic with the following:

Now, the evidence shows that on April 28, 1982, here in this community,

here in Harris County, Texas, Daryl Wayne Shirley, a detective with the Houston Police Department, was out working the streets as a police officer, as he had done on many times; that he was a dedicated police officer; and because of his dedication, he was gunned down, killed like a dog on the streets by that man sitting right there.

. . . What it gets right down to is, that was a thirty-four-year-old Houston police officer out working on our streets as a Houston police officer to make it safer for all of us.

SF Vol. XXIV p. 4.

Now, we know that Detective Shirley was an experienced, dedicated policeman.  Last year he made between two hundred and two hundred and fifty arrests of felons on our street.  Removed them.  Got them off our streets, put them in jail.

SF Vol. XXIV p. 15.

When a policeman is killed in the line of duty, it is something extremely serious.  They get out and protect each and every one of us each and every day.

SF Vol. XXIV p. 21.

To further assure that the jury would make considerable use of this irrelevant material, the prosecutor in rebuttal returned to this topic and waxed eloquently about its importance in their deliberations.   And to enhance its impact, he juxtaposed the victim's sterling character and the importance of his job with Arthur Williams' criminal record and failure to hold a job.

You know what this man is.  You know what he has done . . . . And you know the kind of person that the defendant is and why he would have reacted that way.

84

SF Vol. XXIV p. 74-75

You can look at the defendant's past when you are thinking about his condition of the mind, what has happened to him in the past, where he has been, what he has done…He hasn't been out of the confinement but about six months.  Hasn't ever held a job in his life.  I guess he thinks society owes him a living.  When he needed some money back on those conviction times for aggravated robbery, what do you think he did?   Stuck a gun in somebody's face and took it.  Because that is the kind of person he is.  He is going to do whatever it takes to get his way at the time.  That is the kind of person he is.

So he goes to the penitentiary.  Gets out of the pen.  What happens?  He is out of the pen for a very short period of time.  Goes right back in jail, showing what a law- abiding citizen he is, tries to break out. That is a great human being so far, but it does show you the state of mind, the kind of person he is, what he would do under situations.

SF Vol. XXIV p. 90-91.

Detective Daryl Wayne Shirley was a good man.  He was a detective.  He was out there on the street.  He was protecting us.

He had taken at least two hundred, 250 felons off the streets.  For us.  To try to make us have a better place to live.  And he got killed for it.  To rely on the pile of garbage that this defendant has put out, to let a police officer's life who is trying to protect us, be flushed down the commode like that is just not right…

You know the kind of person this defendant is.  You know what he is capable of.  You know what he will do.  You know what happens when he, if you turn him loose, when he goes back on the street, what kind of person he is.

Detective Shirley's family doesn't have his love and comfort any more.  He is not going to be able to come home and tell them that he loves them.  He is not going to be around at Christmas...

85

SF Vol. XXIV p. 118.

Victim character and impact evidence has no relevance whatsoever to the question of guilt.   It is hard to imagine more prejudicial argument.   Its repeated and heavy-handed appearance before the jury just prior to commencement of deliberations deprived Mr. Williams of a fundamentally fair process for the determination of his guilt or innocence.

### The Consideration of Victim Character and Impact Evidence During Guilt-Phase Deliberations Rendered This Trial Fundamentally Unfair.

During the past five years, the Supreme Court of the United States engaged in a vigorous debate over the relevance and admissibility of victim character and impact evidence in capital prosecutions.   The Court's initial view was that such evidence was "irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner."[8]   This view was affirmed two years later.[9]   The Court concluded that it mattered not whether these factors came before the jury by way of testimony or argument by the prosecutor; in either case, it's admission injected "factors that are constitutionally irrelevant to the sentencing

---

8  *Booth v. Maryland*, 482 U.S. 496, 503 (1987).
9  *South Carolina v. Gathers*, 490 U.S. 805 (1989).

process."[10]

This past term, the Court reversed itself, and held that such evidence and argument is generally admissible <u>during the punishment phase</u> of a capital trial.[11] The Payne majority concluded that evidence of the victim's character, and the impact or his or her loss upon loved ones, is relevant to the issue of the moral blameworthiness of the defendant.

To be sure, the Court did not create a rule allowing for the unregulated admission of victim impact evidence. Rather it acknowledged that because this type of evidence can inflame the jury and wreck havoc to the fairness of the proceeding, reviewing courts must ensure that admission of such evidence comports with the Due Process Clause of the Fourteenth Amendment.[12]

Throughout this debate, no litigant or Justice ever advanced the view that evidence or argument addressing the victim, and/or the loss felt by his family, is in any way relevant to or admissible during the <u>guilt</u> phase of a capital trial. *Payne* moored the relevancy of victim character and impact evidence to harm and blameworthiness -- issues that present themselves only at sentencing. *Payne* leaves no doubt that while this victim evidence is now admissible at the penalty

---

10  *Zant v. Stephens*, 462 U.S. 862, 879 (1983).
11  *Payne v. Tennessee*, 115 L. Ed.2d 720 (1991).
12  *Payne v. Tennessee*, 115 L.Ed.2d at 740 (O'Connor, J., concurring)

phase, it has no relevance to the issue of whether the defendant is guilty of the charged offense.

While it is plain that the admission of such evidence or argument at the guilt phase of a capital trial is not authorized by any federal authority, it is equally clear that its admission lacks any support in state law.  We are unaware of any jurisdiction that countenances what happened in this case extensive argument about the positive character of the victim, the value of his job as a police officer, and the devastation his death visited upon his family -- at the guilt phase of trial. No state has concluded that this kind of evidence has <u>any</u> relevance whatsoever to the question of whether the State's evidence demonstrates a defendant's guilt beyond a reasonable doubt.  The Texas Court of Criminal Appeals has held unequivocally it is error for the prosecutor to argue that the jury should consider victim impact considerations during guilt phase deliberations in a capital case.[13] Other states have similarly condemned such practices.[14]

In this case, the facts show the prosecutor's remarks to be particularly prejudicial.  First, the prosecutor did not make simply a fleeting reference to the victim.  The record contains repeated references to the victim, the fact that he had

---

13 *Brandley v. State*, 691 S.W.2d 699 (Tex .Cr. App. 1985)
14 See *Arthur v. State*, 575 So.2d 1165, 1184-85 (Ala. Cr. App. 1990) (prosecutor argument that young children of decedent would be deprived of their father's companionship for life held to be "highly inflammatory and …calculated to inflame the mind of the jury").

arrested a lot of people, that he was a good person and that he protected the community, in both the opening and rebuttal arguments.  In addition, the comments were of the type that would be most prejudicial.  The prosecutor told the jury – in pondering whether the State's evidence showed Mr. Williams' guilt -- that the victim was an outstanding person, a good protector of all of the Houston populace, including the jury and the prosecutor.  He said the victim "had taken at least two hundred, 250 felons off the streets.  For us.  To try to make us have a better place to live."  (SF Vol. XXIV p. 118).  He also pointedly called attention to the overwhelming sense of loss resulting from the victim's death by his family. "Detective Shirley's family doesn't have his love and comfort any more.  He is not going to be able to come home and tell them that he loves them.  He is not going to be around at Christmas."  *Id*.  This killing, the prosecutor suggested, was a community-wide tragedy.  Moreover, the prosecutor urged the jury to consider Shirley's fine qualities and his role as a societal protector vis-a-vis Mr. Williams' failings.  The sustaining of the objection to the remarks about the victim not being around for Christmas did nothing to wipe them from the jury's memories or to cloud the clear message the prosecutor was sending.

To leave no doubt about the importance of these factors, the prosecutor explicitly told the jury that they would be devaluing detective Shirley's life and

encouraging Mr. Williams to commit crime if they did not find him guilty.  "[T]o let a police officer's life who is trying to protect us, be flushed down the commode like that is just not right…You know what kind of person this defendant is.  You know what he is capable of.  You know what he will do.  You know what happens when he, if you turn him loose, when he goes back on the street, what kind of person he is."  (SF Vol. XXIV p. 118).

There is little else that the prosecutor could have told the jury that would have been more prejudicial.  What Justice Powell wrote for the Court in Booth concerning the penalty decision continues to apply with full force to the guilt determination.

> Nor is there any justification for permitting [the guilt decision] to turn on the perception that the victim was a sterling member of the community rather than someone of questionable character.

482 U.S. at 506.  This jury, exhorted to consider the admirable qualities of the victim, the value of his services to them and to the community, and the deep loss sustained by his loved ones, in deciding the question of guilt, was misled as to its appropriate mission in a fundamentally important way.   These   remarks   were deeply  prejudicial  because  they  distorted  the  jury's  mission,  and  warrant  the granting of relief.

### This Claim is Properly Before The Court at this Time.

The Texas Court of Criminal Appeals' now well-defined exceptions to the contemporaneous objection rule allow for merits consideration of this claim. Because of the highly prejudicial nature of victim character and impact evidence and argument to the fairness of the adversarial process, the prosecutor's remarks about the victim and the impact of his death are subject to review without regard for the contemporaneous objection rule.  *Boyd v. State*, 513 S.W.2d 588 (Tex. Crim. App. 1974) (when the prejudicial effect is so great it cannot be cured by a instruction for the jury to disregard it, a contemporaneous objection is not required).  *Also see Ex parte Clark*, 597 S.W.2d 760 (Tex. Cr. App. 1980) (fundamental error can be reviewed with a contemporaneous objection); *Nichols v. State*, 754 S.W.2d 185 (Tex. Cr. App. 1988); *Garrett v. State*, 682 S.W.2d 301 (Tex. Cr. App. 1984).  The Court has recognized that error is fundamental if it "create[s] such harm that it deprives [a defendant of] a fair and impartial trial. *Nichols*, at 198.

The role of the prosecutor in closing argument is to assist the jury in analyzing the evidence and to state his contentions as to the conclusions the jury should draw from the evidence.  This record shows that the prosecutor repeatedly abused his power, and injected considerable improper and inflammatory matter before the jury.  The quality and quantity of misconduct in this record shows such

disregard for accepted limits of argument, and was so prejudicial to Petitioner, that the Court should order a new trial.  *Stahl v. State*, 749 S.W.2d 826 (Tex. Cr. App. 1988).

## ARTHUR WILLIAMS IS NOT GUILTY OF CAPITAL MURDER BECAUSE THE DECEDENT, DETECTIVE SHIRLEY, WAS NOT ACTING IN THE LAWFUL PERFORMANCE OF HIS DUTIES.

To prove capital murder by killing a police officer, the State must prove that the police officer was "acting in the lawful discharge of an official duty…" 18 Tex. Jur. III 274 (1982).  This presupposes that the police officer's activities at the time of the offense were lawful.  In this case, Detective Shirley did not have legal authority to effect an arrest of Mr. Williams; his assault against Mr. Williams was therefore unlawful.

The purported "fugitive warrant" on which the State relied to show Detective Shirley was in the lawful performance of his duty was invalid on its face and therefore did not provide legal authority to arrest Mr. Williams.  Without a valid warrant, Detective Shirley did not have legal authority to arrest Mr. Williams, and certainly he did not have lawful authority to physically assault him.

## THE COURT'S REFUSAL TO ORDER RELEASE TO THE DEFENSE OF CRIMINAL RECORDS OF STATE AND DEFENSE WITNESSES VIOLATED MR. WILLIAMS'

## RIGHT TO DUE PROCESS OF LAW.

Well before trial in this case, defense counsel moved for disclosure of evidence, including prior criminal records of State and defense witnesses.  (Tr. p. 54).  The Court refused to require disclosure to the defense of the prior criminal records of witnesses.

If any witness had a criminal record, such record would be material exculpatory evidence to which the defense was entitled under *Brady v. Maryland*, 373 U.S. 83 (1963).

Petitioner requests that this court require the State to disclose the criminal records of all witnesses to the shooting in this trial and all witnesses who appeared at the trial, and to order retrial if any material witness has an admissible criminal record.

## THE STATUTORY LIMITATION ON FUNDS FOR EXPERT AND INVESTIGATIVE ASSISTANCE DEPRIVED MR. WILLIAMS OF THE TOOLS NECESSARY TO PREPARE AN EFFECTIVE DEFENSE.

In this capital murder case, the defense was allotted a total of $500 for investigation and expert witness fees.  (Tr. pp. 51-2).  Mr. Williams was indigent at the time of trial, and was represented by court appointed counsel.

Article 26.05, Tex. Code Crim. Proc., provides for payment in the case of an

indigent criminal defendant of "expenses incurred for purposes of investigation and expert testimony, a reasonable fee to be set by the court but in no event to exceed $500.00." (Emphasis added).  By limiting funds available to Mr. Williams to retain the assistance of an investigator and other experts, including mental health experts, the State violated its constitutional obligation "to assure that the defendant has a fair opportunity to present his defense." *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985).

Adequate investigation and preparation to confront the State's case required extensive investigation that would have cost much more than $500.00.

Furthermore, adequate preparation for the sentencing phase of the trial required extraordinary investigative efforts.  Mr. Williams lived virtually all his life a thousand miles away from Texas.  Thus, much of the investigation would have to be conducted out of state to properly explore and develop potentially exculpatory and mitigating evidence.

In contrast to the defense, the State was able to bring many prosecution witnesses to Texas from Minnesota during the punishment phase of the trial.  Due to lack of funds, the defense's hands were tied.  In addition to being unable to investigate Mr. Williams' background, it was not able to have physical analysis conducted of the carpet in Mr. Williams' apartment.  Such analysis would have

established blood stains from Donald Chaline's attempted robbery of Mr. Williams. The blood stain evidence would have corroborated Mr. Williams' testimony concerning that incident.

There is a substantial probability that had the jury believed Mr. Williams' account of the Donald Chaline incident, the jury would have acquitted him of capital murder.

Had the jury believed Mr. Williams' account of the Donald Chaline incident, but still wanted to convict, they could have convicted him of non-capital murder or found that under all the circumstances Mr. Williams' response to provocation was reasonable, thus resulting in a sentence of life imprisonment rather than a death sentence.

The Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Texas Constitution require that, when an indigent defendant's sanity at the time of the crime is at issue, the State must provide him with the tools necessary to prepare an adequate defense. *Ake v. Oklahoma*, 470 U.S. at 70.

The evidence suggests that Mr. Williams was suffering from a traumatic reaction to Donald Chaline's attempt to rob him at gunpoint that is very similar to post traumatic stress disorder and that his impaired mental condition was

exacerbated when Detective Shirley abruptly accosted him.   This mental impairment would have constituted a defense to capital murder and a mitigating circumstance under the first and third special issues.

The limited resources made available to the defense for investigation and experts violated Mr. Williams' rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Texas Constitution, and the Writ should issue.

## PREJUDICIAL PUBLICITY AND THE INFLAMMATORY ATMOSPHERE SURROUNDING THE TRIAL DEPRIVED MR. WILLIAMS OF A FUNDAMENTALLY FAIR TRIAL IN VIOLATION OF DUE PROCESS OF LAW.

Immediately after the crime and continuing throughout the trial, this case generated prejudicial publicity about Mr. Williams.   Immediately after the shooting, police told the press that Detective Shirley had died trying to arrest "a fugitive.'"

As soon as possible, the media learned from Minnesota authorities about Mr. Williams' criminal record.   The press detailed his three previous convictions frequently, and almost invariably referred to Mr. Williams as "a Minnesota ex-convict."   This lack of discretion included front page articles.

The disclosure of Mr. Williams' previous criminal record was a prejudicial

disclosure of inadmissible evidence, to prospective jurors and the community at large.

As usual, the press sided with the police, and assumed Mr. Williams was guilty.  The media printed essays about the breakdown of law and order, linking this case to other police shootings that had occurred around that time, and quoted Detective Shirley's widow as saying the decedent was "patrolling streets of gold" now.

The presence of the deceased's wife and uniformed colleagues throughout the trial created a coercive atmosphere that was not conducive to fair and impartial determination of Mr. Williams' guilt and sentence.

The atmosphere created by the pretrial publicity and the penetrating and intimidating presence of uniformed police officers deprived Mr. Williams of a fundamentally fair trial and capital sentencing proceeding.  *Sheppard v. Maxwell*, 384 U.S. 333 (1982).  Consequently the conviction should be reversed.

**THE STATE'S RACIALLY DISCRIMINATORY USE OF ITS PEREMPTORY STRIKES TO EXCLUDE ALL BLACK PROSPECTIVE JURORS VIOLATED MR. WILLIAMS' RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.**

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Court held that a State's

"purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." 476 U.S. at 84 (quoting *Swain v. Alabama*, 380 U.S. 202, 203-04 (1965)). The *Batson* court recognized that although state statutes excluding blacks from jury service had long been repealed, state prosecutors could nevertheless effectively ensure that an all-white jury was chosen by using their peremptory challenges to exclude blacks. The Court accordingly held that a prosecutor may only exercise her peremptory challenges to exclude jurors for reasons "related to the particular case to be tried." 476 U.S. at 98.

In the case at hand, the prosecutor used peremptory challenges to exclude six prospective black jurors. Before the jury was seated, defense counsel moved for a mistrial on the basis that the State had consciously and systematically excluded all blacks from the jury. (SF Vol. XXIII, p.14).[15]

In 1987, the Court of criminal Appeals remanded this case to the trial court for a hearing on the *Batson* claim. At that hearing, one of the prosecutors, Keno Henderson, testified that he wanted jurors who "believed in capital punishment"

---

15 "The following prospective jurors for this case were black: Gertrude Jules (Voir Dire, at 82); Arthelious Govan; Mansfield Nelson (Voir Dire, at 810); Doran Ewing (Voir Dire, at 922); Jennie Henley (Voir Dire, at 1359); Pearlie Mae Keller (Voir Dire, at 1804); Gussie Mae Jones (Voir Dire, at 1804); Wilburn Gibson (Voir Dire, at 2070 - 71); Nan Roque (Voir Dire, at 2374). None of these people became jurors in this case.

and who "could give it under the Texas statute and under the evidence…" Batson Hearing, at 52 (testimony of Keno Henderson).

Three of the black jurors who were excluded, however, expressed no opposition to the death penalty. Instead, the prosecutors alleged that all three were excluded because they could not understand his questions.[16] The voir dire of those black jurors does not support a conclusion that Kino Henderson, the prosecutor exercised these peremptory challenges for race neutral reasons. His attempt to rationalize the exclusion of those black jurors fails to meet the standards set forth in *Batson*.

Petitioner asserts that the prosecutors in this case systematically excluded prospective black jurors in his case. He further asserts that all black jurors were excluded pursuant to the practice and policy of the Harris county District Attorney's in general and was the regular practice of the prosecutor in this case.

Petitioner requests an evidentiary hearing in order to present additional evidence not previously considered that the prosecutor's purported race-neutral reasons for exclusion of blacks from this jury are pretextual.

## THE EXCLUSION OF ALL PROSPECTIVE BLACK JURORS FROM A CAPITAL CASE VIOLATED THE EIGHTH AMENDMENT.

---

16   *See* Batson Hearing Tr. regarding the exclusion of Jennie Henley; Nan Roque; and Gussie Jones.

The effect of excluding Blacks from juries is to impair the fact-finding process by excluding the kinds of knowledge and experience unique to Blacks in America.  As Justice Marshall once observed:

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.  It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

*Peters v. Kiff*, 407 U.S. 493 (1972).

Research studies show that racially similar jurors are more readily able to interpret a defendant's demeanor than are jurors of other races.  Other studies show that Black jurors may be able to supply relevant insights into aspects of their subculture that may bear on the facts of a case the jury is to decide.  Colbert, Challenging the Challenge: Thirteenth Amendment As A Prohibition Against The Racial Use Of Peremptory Challenges, 76 Cornell L. Rev. 1, 114 n.561 (1990).  Consequently, racially mixed juries are able to make more accurate findings of facts involving a Black defendant than are all white juries.

The Eighth Amendment to the U.S. Constitution requires heightened reliability in death penalty proceedings.  Since death is a qualitatively different

100

form of punishment from incarceration, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Gardner v. Florida*, 430 U.S. 349, 363 (1977) (White, J., concurring); *Woodson v. North Carolina*, 428 U.S. 280, 304 - 05 (1976).

Since heightened reliability is required in death penalty proceedings, any use of peremptory strikes to create an all white capital jury violates the Eighth Amendment.

The State's use of peremptory strikes to create an all white capital jury in Arthur Williams' case violated the Eighth Amendment to the United States Constitution, and the Writ should issue.

### THE USE OF PEREMPTORY STRIKES TO CREATE AN ALL WHITE CAPITAL JURY VIOLATED THE THIRTEENTH AMENDMENT IN THIS CASE.

As previously alleged, no prospective Black jurors were allowed to sit as jurors in this capital case. Arthur Williams was convicted and sentenced to death by an all white jury.

Prior to passage of the Thirteenth Amendment, Blacks all over the colonies and, later, the United States, as slaves, universally had any of their crimes found and punished by all white finders of fact. Colbert, Challenging The Challenge: Thirteenth Amendment As A Prohibition Against The Racial Use Of Peremptory

Challenges, 76 Cornell L. Rev. 1, 16 - 17 & n. 70 (1990) (hereinafter cited as "Colbert, Challenging The Challenge"); *Ibid*., at 21 - 22 & n.94 (post - revolution) (white capital juries); *Id*., at 26 & 31 (all white northern juries).

For slaves, there were no limitations on punishment. Their invariably white owners could peremptorily administer capital punishment for any infraction they decided the slave had committed. Colbert, Challenging The Challenge, at 23, n.100.

For a Black defendant, facing an all white jury in a capital case is a badge and incident of slavery.

Congressmen debating the Thirteenth Amendment's passage stated that it would entitle Blacks to sit as jurors. Colbert, Challenging The Challenge, at 37 - 38 & n. 168.

Restrictions against serving as jurors have persisted for Blacks in America as badges and incidents of slavery.

In 1866, Texas passed a "Black Code" that forbade Blacks to sit on juries. Colbert, Challenging The Challenge, at 41, n.193 & 43, n. 202.

Between 1865 and 1866, all 500 of the whites in Texas who were indicted for murdering Blacks were acquitted by all white Texas juries. Colbert, Challenging The Challenge, at 41.

Beginning in 1890, the several states began imposing death sentences more frequently, disproportionately against Blacks.  Southern juries accounted for more capital sentences than the North and West combined, a proportion that continued through the 1960s.  Colbert, Challenging The Challenge, at 80, n. 400.

Within months of the Supreme Court's ruling in *Norris v. Alabama*, 294 U.S. 587 (1935), limiting the official exclusion of Blacks from jury duty, the states began using peremptory challenges to achieve the same results: all   white   juries. Colbert, Challenging The Challenge, at 85, n. 424.

The Thirteenth Amendment's prohibition of slavery includes elimination of its badges and incidents.  Colbert, Challenging The Challenge, at 5, n. 11; *Jones v. Alfred H. Meyer Co*., 392 U.S. 409, 439 (1968).

A Black criminal defendant's conviction by an all white jury in a capital case after exclusion of Black prospective jurors by the state's peremptory strikes violates the Thirteenth Amendment to the United States Constitution in that it constitutes a badge and incident of slavery.

Arthur Williams' capital conviction by an all white jury achieved by the prosecution's six peremptory strikes against prospective Black jurors violates the Thirteenth Amendment to the United States Constitution in that it constitutes a badge and incident of slavery. Therefore, his conviction cannot stand.

103

## THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO EXCUSE PROSPECTIVE JUROR PATRICIA HAMILTON.

The trial court in this case erred when it failed to excuse Patricia Hamilton from the venire.  Counsel for Mr. Williams was forced to use a peremptory challenge to remove Hamilton from the venire, and his request for additional peremptory challenges was denied by the trial court.  As a result, he was forced to accept an objectionable juror, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.

Patricia Hamilton attended the same church as the decedent and his family. (Voir Dire, at 2171).  She knew the decedent's wife.  (Voir Dire, at 2177).  The Court prevented counsel from inquiring what effect testimony of the decedent's wife would have had on Ms. Hamilton.  (Voir Dire, at 2206).  Jurors who know the victim or defendant should be excused.  *See Grigsby v. Mabry*, 758 F.2d 226, 246 n.5 (8th Cir. 1985) (Gibson, J. dissenting), *rev. sub. nom. Lockhart v. McCree*, 106 S.Ct. 1758 (1986).  Patricia Hamilton did not believe life imprisonment was a proper punishment for killing a police officer.  (Voir Dire, at 2210).  She was, under all the circumstances, unable to consider the full range of punishment available in this case.

Counsel for Mr. Williams timely challenged Ms. Hamilton as biased against

104

a point of law on which the defense was entitled to rely, and due to her relationship with the decedent's family.  (Voir Dire, at 2212).  The court denied the challenge, forcing defense counsel to exercise a peremptory challenge.  (Voir Dire, at 2213). Later, the Court denied defense counsel's request for additional peremptory challenges.

Because the trial court refused a timely and proper challenge for cause and denied a request for an additional peremptory challenge, Mr. Williams was denied his rights under the Sixth, Eighth and Fourteenth Amendments, as well as similar provisions of the Texas Constitution, to a fair and impartial jury.

### THE TRIAL COURT IMPROPERLY EXCUSED PROSPECTIVE JUROR WALLACE SMITH WHO LACKED SUFFICIENT OBJECTION TO THE DEATH PENALTY.

Prospective juror Wallace Smith told the trial court he did not think the mandatory death penalty available for this case would affect his consideration of the facts.  (Voir Dire, at 1953).  He stated he would answer the special issues based on the facts.  (Voir Dire, at 1953-54).

Under later questioning, Smith admitted he would have a hard time "deciding, 'yes, someone should die.'"  (Voir Dire, at 1962, 11. 7 – 9).  However,

as previously alleged in this petition, under the Texas capital punishment procedures, the jury merely answers special issues, and does not actually the sentence.

Mr. Smith admitted that he would look for loopholes to avoid a death sentence, (Voir Dire, at 1977), but that his views would not influence whether he thought someone was guilty or not guilty. (Voir Dire, at 1962). Under the vague special issues, with no definitions provided, a capital jury would have been required to look for loopholes in order to provide a reasoned moral response to the facts of the case.

Although the State had the burden of demonstrating that Mr. Smith was unfit to serve as a juror, it failed to establish sufficient cause to exclude Mr. Smith from serving as a juror in this particular capital case.

Defense counsel stated cause to excuse was insufficient for this juror. (Voir Dire, at 1987).

After Smith stated under questioning from the State, that he was not sure of his response to answering all three questions yes, the trial court excused Smith without giving the defense any further opportunity to rehabilitate him.

Excluding Mr. Smith for cause because his deliberations might have been affected by the prospect of the death penalty violated Arthur Williams' rights

under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Texas Constitution.

### THE TRIAL COURT IMPROPERLY EXCUSED PROSPECTIVE JUROR DORIN EWING WHO LACKED SUFFICIENT OBJECTION TO THE DEATH PENALTY.

Prospective juror Dorin Ewing told the trial court he did not think the mandatory death penalty available for this case would affect his consideration of the facts. (Voir Dire, at 887). He stated he would answer the special issues based on the facts. (Voir Dire, at 891).

Ewing admitted to the prosecutor he felt the death penalty was immoral. (Voir Dire, at 893). However, he told defense counsel he could follow the law and convict. (Voir Dire, at 911). He told defense counsel he could answer each and every special issue question yes, despite his objection to the death penalty. (Voir Dire, at 915 & 917.)

When defense counsel Carol Carrier attempted to ask Ewing if he could complete a task at work although he disagreed with it, the trial court interrupted her and said to move on. (Voir Dire, at 913). When she asked Ewing about doing his duty, the trial court sustained an objection by the state. By comparison, few defense objections during voir dire were sustained.

Although the state had the burden of demonstrating that Mr. Ewing was unfit

to serve as a juror, it failed to establish sufficient cause to exclude him from serving as a juror in this particular capital case.

The trial court excused Mr. Ewing for cause. (Voir Dire, at 922). Defense counsel took exception to the trial court's ruling excusing this juror. (Voir Dire, at 922).

Excluding Mr. Ewing for cause because his deliberations might have been affected by the prospect of the death penalty violated Arthur Williams' rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Texas Constitution.

## THE TRIAL COURT ERRED BY FAILING TO EXCUSE PROSPECTIVE JUROR CLELL BELCHER FOR INABILITY TO CONSIDER A LIFE SENTENCE.

Prospective juror Clell Belcher had done law enforcement work in that his army unit had interrogated prisoners of war. As a result of that interrogation, some prisoners were court martialled and executed.

Mr. Belcher stated he did not think he could give a life sentence to a defendant convicted of capital murder if that person had shot a police officer. (Voir Dire, at 747).

The trial court denied defense challenge for cause and the defense, subject to

objection, exercised a peremptory challenge against Belcher.  (Voir Dire, at 1747 & 1748).  The trial court later denied a defense request for additional peremptory strikes.

Because the trial court refused a timely and proper challenge for cause and denied a request for an additional peremptory challenge, Mr. Williams was denied his rights under the Sixth, Eighth and Fourteenth Amendments, as well as similar provisions of the Texas Constitution, to a fair and impartial jury.

## THE TRIAL COURT IMPROPERLY FAILED TO EXCUSE PROSPECTIVE JUROR WILLIAM MEADOR.

Prospective juror William Gene Meador stated that he could not acquit a defendant for capital murder if the State failed to prove a required element, such as an underlying burglary, and there was no lesser included offense, Voir Dire, at 1683, although he stated he could follow the Court's instructions, Voir Dire, at 1685.

Meador also stated that, with the sole exception of a mercy killing, he could not consider a sentence of five or even ten years for plain murder.  Voir Dire at

1691 & 1693.

Meador also stated that he thought a person that habitually carries a gun, ma'am is looking for trouble." Voir Dire, at 1699.  He stated that if the defendant was carrying a handgun, it "would have a bearing" on his decision.  Voir Dire, at 1707.   When defense counsel asked Meador if the issue would bias him in rendering his verdict, the trial court sustained objections, twice, preventing Meador from answering the critical question about his bias. Voir Dire, at 1710.

Other questions about Meador's ability to consider a lesser included offense were prevented by State's counsel and the trial court. Voir Dire, at 1713.

Subsequently, the trial court told defense counsel, "Please conclude, counsel. "Voir Dire, at 1714.

Defense counsel challenged Mr. Meador for cause, but the trial court denied the challenges and later denied a defense request for additional peremptory challenges.   The defense used one of its peremptory challenges against Mr. Meador.  Voir Dire, at 1715.

Because the trial court refused timely and proper challenges for cause, prevented complete examination of the prospective juror, and denied a request for an additional peremptory challenge, Mr. Williams was denied his rights under the Sixth, Eighth and Fourteenth Amendments, as well as similar provisions of the

Texas Constitution, to a fair and impartial jury.

### THE TRIAL COURT IMPROPERLY FAILED TO EXCUSE PROSPECTIVE JUROR SHIRLEE MARTIN.

Prospective juror Shirlee Martin stated that she could not acquit a defendant for capital murder if the state failed to prove a required element, such as an underlying burglary, and there was no lesser included offense. Voir Dire, at 1582. Although she broke down under persistent pressure from the State's attorney, the trial court should have prevented counsel from asking essentially the same question six or seven times, as was allowed here.

Ms. Martin was unable to uphold the due process requirement of In re: Winship, 397 U.S. 358 (1970) that the State must prove each element of the crime charged in order to convict.

Defense counsel challenged Ms. Martin for cause, but the trial court denied the challenges and later denied a defense request for additional peremptory challenges. The defense used one of its peremptory challenges against Ms. Martin.

Because the trial court refused timely and proper challenges for cause, prevented complete examination of the prospective juror, and denied a request for an additional peremptory challenge, Mr.     Williams was denied his rights under

the Sixth, Eighth and Fourteenth Amendments, as well as similar provisions of the

Texas Constitution, to a fair and impartial jury.

### THE TRIAL COURT IMPROPERLY FAILED TOEXCUSE PROSPECTIVE JUROR DAVELENE FORE.

Prospective juror Davelene Fore lived for "a few years" with the parents of

Houston Police Department officer Steven Glenn, prior to her marriage.  Voir Dire,

at 2223.

Ms. Fore's sister in law was a patrol officer for a local sheriff's department.

Voir Dire, at 2225.  Ms. Fore also stated she disapproved of anyone carrying a gun

to protect themselves.

The trial court's failure to remove Ms. Fore for cause and denial of a request

for additional peremptory challenges violated Mr. Williams' rights under the Sixth,

Eighth and Fourteenth Amendments, as well as similar provisions of the Texas

Constitution, to a fair and impartial jury.

### THE TRIAL COURT ERRED WHEN IT DENIED MR. WILLIAMS' MOTION FOR ADDITIONAL PEREMPTORY CHALLENGES.

The defense moved after examination of many prospective jurors and the

exhaustion of its 15 peremptory challenges, for the trial court to grant the defense

an additional five peremptory challenges.     Voir Dire, at 2939.

112

The trial court had wrongfully failed to excuse for cause four prospective jurors, Shirlee Martin, Clell Belcher, Patricia Hamilton, and Davelene Fore, causing the defense to use peremptory strikes against those veniremen.

The trial court denied the motion and granted only one additional peremptory strike. Voir Dire, at 2940.

Defense counsel, Mr. Stafford, objected to the jury before they were sworn. Mr. Stafford stated that the last two jurors seated were objectionable to the defense and he would have used additional peremptory strikes against them if he had any. Vol. XXIII, Statement of Facts, at 14.

The trial court clearly had the authority and obligation to ensure a balanced and fair trial jury selection by granting the defense additional peremptory strikes in appropriate circumstances. See Payton v. State, 572 S.W.2d 677 (Tex. Cr. App. 1978).  Its failure to do so here was reversible error and a denial of due process in violation of the United States Constitution and the Texas Constitution.

**ADMISSION OF EVIDENCE OF PETITIONER ARTHUR WILLIAMS' JUVENILE DELINQUENCY RECORD AT THE GUILT PHASE OF THE TRIAL WAS INADMISSIBLE AND IMPROPER IMPEACHMENT DENYING PETITIONER A FAIR TRIAL IN VIOLATION OF ARTICLE 1, SECTION 0, TEXAS CONSTITUTION, AND THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND THESE WITNESSES WERE NOT QUALIFIED.**

At the guilt phase of Petitioner's capital murder trial, the State presented five witnesses who testified about Petitioner's reputation from encounters with the law while he was a juvenile in Minneapolis, Minnesota.   This included Ronald Poeschel, Hennepin county Court Services, Juvenile Division (Vol.  XXIII, T-834), Michael O'Shaughnessy, Red Wing Training School (Vol. XXIII. T-844), Warren Higgins, Red Wing Training School (Vol. XXIII, T-846), William Hannan, Minneapolis Police Department (Vol. XXIII, T-849), and Richard Ohotto, Minneapolis Park Police (Vol. XXIII, T-852).  These State's witnesses testified that Petitioner's reputation was "bad" while he was a juvenile in Minnesota.  All five State's witnesses listed above were employed within Court Services, the State Training School for Juvenile Delinquents, or as police officers.

Ronald Poeschel testified before the jury at the guilt phase he was employed with the Probation Department of Hennepin County in Minnesota.

 (Vol. XXIII, T-863).  At trial, examination of Poeschel went, in part, as follows:

Q.     Do you know the Defendant's general reputation in the community in which he resides and with those with whom he associates for truth and veracity?

A.     Yes, I do.

Q.     Is that reputation good or bad?

A.     Bad.

114

Q.      Is that reputation such as to entitle him to belief under oath?

A.      No.

(Vol. XXIII, T-846).

State's witness Poeschel was Arthur Williams' Juvenile Probation Officer from January 13, 1975 until July 7, 1975.   (Vol. XXIII, T-836). State's          witness Poeschel described Defendant's reputation for activity while he was a juvenile. (Vol. XXIII, T-837).   He had no evidence of Defendant's reputation as an adult. (Vol. XXIII, T-837).

Next came State's witness Michael O'Shaughnessy. O'Shaughnessy was Williams' Juvenile Probation Officer in Minnesota and knew Arthur Williams in 1975 or 1976.  (Vol. XXIII, T-843). He worked at the Red Wing Training School in Red Wing, Minnesota. At the guilt-innocence phase of the trial, O'Shaughnessy testified about Defendant's juvenile reputation as follows:

Q.      Do you know the Defendant's general reputation for truth and veracity in the community in which he resides and with those with whom he associates?

A.      Yes, I do.

Q.      Is that reputation good or bad?

A.      Bad.

Q.      Is that reputation such as to entitle him to belief under oath?

A.     No.

(See Vol. XXIII, T-865-866).

State's witness O'Shaughnessy knew Arthur Williams between 1975 and 1977, while he was a juvenile.   (Vol. XXIII; T- 866.   O'Shaughnessy had no information about Mr. Williams' reputation after 1977 during adulthood. (Vol. XXIII, T-866). The third witness of the State at the guilt phase presenting evidence of  Arthur  Williams'  juvenile  record  and  reputation  was  Warren  Higgins.

Higgins was employed at the Red Wing State Training School for Juvenile Delinquents in Red Wing, Minnesota. (Vol. XXIII, T-847).         Higgins         knew Arthur Williams while Williams spent time at Red Wing for juvenile offenses from 1975 to 1977.   (Vol. XIII, T-847). At the guilt-innocence phase of the trial, State's witness Higgins testified about Williams' juvenile reputation:

Q.     Do you know the Defendant's general reputation in the community in which he resides and with those with whom he associates for truth and veracity.

A.     I do.

Q.     Is that reputation good or bad?

A.     It is bad.

Q.     Is that reputation such as to entitle him to belief under oath?

A.     No.

116

(See Vol. XXIII, T-867-868).

The fourth witness presented by the State to the jury at the guilt-innocence phase of the trial on Defendant's juvenile record and reputation was Richard Paul Ohotto.  Ohotto worked as a police officer for the Minneapolis Park Division. (Vol. XXIII, T-869).  He knew Arthur Williams between 1973 and 1974 (Vol. XXIII, T-870) and had no contact with him after 1974.    At the guilt-innocence phase, Ohotto responded to the Prosecutor's questions about Williams' juvenile reputation before the jury as follows:

> Q.    Do you know the general reputation for truth and veracity of Arthur Lee Williams in the community in which he resides and with those with whom he associates?
>
> A.    Yes, I do.
>
> Q.    Is that reputation good or bad?
>
> A.    Bad.
>
> Q.    Is that reputation such as to entitle him to belief under oath?
>
> A.    No, it isn't.

(See Vol. XXIII, T-869-870).

The fifth law enforcement witness called by the Prosecutor on Arthur Williams' juvenile reputation was Minneapolis Police Officer William James Hannan, Jr. (Vol. XXIII, T-872).  Officer Hannan knew Arthur Williams from

117

1974- 1977. (Vol. XXIII, T-873).  Hannan could not tell the jury anything about Defendant's reputation after 1977.      (Vol. XXIII, T-873).  At the guilt-innocence phase of the trial, Officer Hannan testified about Arthur Williams' juvenile record and reputation before the jury:

> Q.    Do you know the Defendant's general reputation for truth and veracity in the community in which he resides and with those with whom he associates?
>
> A.    Yes.
>
> Q.    Is that good or bad?
>
> A.    Bad.
>
> Q.    Is that reputation such as to entitle him to belief under oath?
>
> A.    Not in my opinion.

(See Vol. XXIII, T-872-873).

All five of the above State's witnesses were employed in law enforcement capacities including juvenile probation officers and police officers.  Their only contacts with Defendant Arthur Williams occurred while he was a juvenile and under the auspices of the Minnesota Juvenile Courts System.  The five State's witnesses testified only in reference to juvenile reputation allegedly obtained by Defendant Williams during commission of juvenile delinquencies or offenses.  There was no clarification whether the five State's witnesses were involved in

offenses involving Arthur Williams as a juvenile that were adjudicated.  It is particularly grievous to present reputation evidence of juvenile bad acts in which Arthur Williams may not have been adjudicated delinquent.

At the guilt-innocence phase, defense counsel objected to the five State's witnesses testifying to a period of Defendant's life implying to the jury that the Defendant had a juvenile record and thus, allowing the State to introduce Defendant's juvenile record through the "back door".  (Vol. XXIII, T-840).  In fact, the Court noted that by identifying the first of the five State's witnesses testifying in this capacity, Ronald Poeschel, as a Juvenile Probation Officer, that "it does indicate that person [William) does have a juvenile record."  (Vol. XXIII, T-842). Identification of Defendants's juvenile record through reputation evidence of his juvenile conduct between 1974 and 1977 created prejudicial error denying due process at the guilt-innocence phase of the trial requiring reversal and an Order vacating the guilty conviction. This Court must issue a Writ accordingly.

It is well established in Texas law that a juvenile delinquency record may not be used for impeachment of witness. *Rivas v. State*, 501 SW 2d 918 (Tex. Cr. App. 1973); *Ruth v. State*, 522 SW 2d 517 (Tex. Cr. App. 1975) (testimony at guilt-innocence stage of juvenile charge).    Disposition under proceedings against juveniles are never convictions for crime.  *Ruth v. State*, *supra*, at 518.

Impeachment of Defendant Williams' reputation by juvenile evidence was improper as it created prejudicial inferences to the jury that Defendant Williams engaged in criminal conduct at that time.  Defendant's conduct as a juvenile cannot be considered criminal.  *Ruth v. State*, supra.

In *Ruth v. State*, the Texas Court of Criminal Appeals quoted from Rivas, supra at 919, as follows:

> An adjudication of juvenile delinquency may be based upon proof of acts which would constitute felonies or misdemeanors involving moral turpitude if committed by an adult, but such adjudication does not constitute conviction for a felony or a misdemeanor involving moral turpitude. *Ruth*, *supra*, at 518.

The Court in *Ruth*, *supra*, referred to Article 51.13(b) of the V.T.C.A Family Code which states:

> The adjudication or disposition of a child or evidence adduced in a hearing under this title may be used only in subsequent proceedings under this title in which the child is a party or in subsequent sentencing proceedings in criminal court against the child to the extent permitted by the Texas Code of Criminal Procedure, 1965.  Ruth, supra, at 518-519.  (Emphasis added).

The terms of Article 51.13 were intended to protect the accused from the odium and stigma attached to any act of youthful indiscretion which had eventuated in a prosecution.  *Ruth v. State*, 522 SW 2d at 519; *Smith v. State*, 113 Tex. Cr. R. 124, 18 SW 2d 1070.  *Ruth v. State*, the Defendant was convicted of murder.  At the guilt-innocence stage of the trial, the  prosecutor elicited testimony

that the Defendant had been charged as a juvenile at age 14 with assault on a police officer. The evidence of this charge was weak and it presented a string of inferences to the jury that since the defendant was charged with assault on a police officer, he was violent person and probably shot the deceased in the immediate case with malice aforethought. *See Ruth, supra*, at 517-518. The prosecutor continued discussing juvenile offenses and dispositions at the punishment stage.

In reversing the conviction of murder, the Texas Criminal Court of Appeals at page 519 noted:

> The prosecutor's presentation of the Appellant's juvenile offenses and the dispositions of those cases to the jury was serious error designed to prejudice the jury to deny the Appellant a fair and impartial trial. Although there were not proper objections in some instances, this egregious action by the prosecutor was highly inflammatory and calculated to prejudice the Defendant.

Similarly, in the instant case the presentation of five law enforcement witnesses by the prosecutor at the guilt- innocence stage of the trial testifying about Defendant Arthur Williams as a juvenile in the juvenile system in Minnesota created inferences of bad character, moral turpitude, and prejudiced the Defendant. Introduction of Defendant Arthur Williams' juvenile record and reputation there from was highly inflammatory and improperly admitted at the guilt-innocence of the trial to his severe prejudice.  If the juvenile adjudication cannot be admitted, it is grossly prejudicial t the guilt- innocence stage to admit underlying facts of

juvenile adjudications or juvenile conduct without adjudication of delinquency.

Under well established case law, the trial court erred in admitting the prejudicial juvenile testimony by law enforcement persons from Minnesota. *See Ruth*, *supra*.

Prejudicial admission of Defendant's juvenile record and conduct at the guilt-innocence phase is distinguishable from admission of similar evidence at the punishment stage for sentencing purposes. Generally, trial courts are given more discretion in admitting evidence at the punishment sentencing stage. In the instant case, however, guilt or innocence had not been determined by the jury and the juvenile evidence served to create unfavorable and prejudicial inferences of Defendant's conduct based upon inadmissible evidence. Arthur Williams' Fifth Amendment due process rights were violated by admission of this evidence. Language by the Texas Criminal Court of Appeals in *Ruth v. State*, *supra*, at page 519 is instructive:

> If there exists in the mind of this court any doubt as to the fairness or impartiality of the trial, it becomes our duty to award a new trial, it becomes our duty to award a new trial. Without singularizing any one particular fact, but considering all the facts and circumstances shown by this record, there does exist that doubt. Citing *Williams v. State*, 145 Tex. Cr. R. 536, 170 SW 2d 482, 489 (1943).

In the instant case, Arthur Williams was denied a fair trial by introduction at the guilt-innocence stage prejudicial evidence of his reputation and character as a

juvenile in Minnesota.  A juvenile delinquency record may not be used to impeach. *Ruth v. State*, 522 SW 2d at 518.  Arthur Williams' juvenile record, and conduct providing foundation, are not criminal convictions.  Ruth v. State, 522 SW 20 at 518.  Admitting evidence of Arthur Williams' juvenile reputation and character from five law enforcement related witnesses created unduly prejudicial inferences that Arthur Williams' had a juvenile record.  He is entitle to a new trial.

As indicated, the trial court admitted evidence at the guilt-innocence stage of Arthur Williams' reputation and character as a juvenile in Minnesota.  Testimony was introduced by prosecution witness William James Hannan.  Hannan, a Minneapolis police officer, was not qualified to present general reputation and character evidence.  Accordingly, the trial court committed prejudicial error in admitting the same in violation of his Fifth Amendment due process rights.  Evidence of the Defendant's general reputation for truth and veracity based upon personal views, conclusions, and knowledge of the witness is improper and the court erred in admitting the same.  *Coleman v. State*, 199 SW 473, 474 (Tex. Cr. App., 1917); *Griffin v. State*, 12 SW 459 (Tex. Ct. App. 1888); *see also Amthor v. State*, 265 SW 896 (Tex. Cr. App. 1924).  It is error to permit opinion testimony about the Defendant by witnesses based upon their individual ideas of the Defendant in regard to their dealings and contact with him.  *Coleman v. State*,

*supra*, at 475.  The inquiry must be restricted to the general reputation, and not from his own private opinion.  *Griffin v. State*, 12 SW 459, 460 (Tex. Ct. App. 1888) (emphasis added) (murder conviction reversed).  It is well established in Texas law that the general reputation of an accused with respect to the trait of character in issue is admissible if not predicated upon the personal opinion of the impeaching witness.  In the instant case, the trial court erred in admitting the personal opinion of the impeaching witness of the State, Officer Hannan.

State's witness Hannan testified that in his opinion Arthur Williams' reputation was not such as to entitle him to belief under oath.  (Vol.  XXIII,  T-872-873).  The testimony by State's witness Hannan as to his personal opinion of Defendant's reputation went as follows:

Q:     Is that reputation good or bad?

A:     Bad.
Q:     Is that reputation such as to entitle him to belief under oath?

A:     Not in my opinion.

(Vol. XXIII, T-872-873).

Prosecution witness William Hannan testified specifically that it was his "opinion" that Arthur Williams was not entitled to belief under oath.  Hannan made the point of qualifying his testimony to emphasize it was his own opinion and not based upon the general reputation in the community.  Hannan's testimony that

124

Arthur Williams was not entitled to belief under oath did not reflect the general reputation of the Defendant but was, instead, Officer Hannan's personal opinion. The personal opinion of prosecution witness Hannan as to Defendant reputation as "bad" and not entitled to belief under oath constituted prejudicial error. *Coleman v. State*, 199 SW 473 (Tex. Cr. App. 1917); *Amthor v. State*, 265 SW 896 (Tex. Cr. App. 1924); *Griffin v State*, *supra*. *See also Crawford v. State*, 480 SW 2d 724 (Tex. Cr. App. 1972). The trial court committed reversible error by permitting testimony by State's witness Hannan of Defendant's reputation based upon Hannan's own personal opinion. The Court should grant Arthur Williams a new trial.

Significantly, the state did not call Officer Hannan to testify later at the punishment stage of the trial as to Arthur Williams reputation and character in general in the community. The State called the other reputation witnesses offered at the guilt-innocence stage, including Ronald Poeschel, Warren Higgins and Richard Ohotto, but not Hannan. It is clear the State realized Hannan had improperly testified about the Defendant reputation from his own personal knowledge and opinion rather than that of the general community. Hannan was not called at the penalty phase to testify about Defendant's reputation the community because he could not do so. Defendant was prejudiced by Officer

William Hannan's testimony at the guilt-innocence stage about hi "bad" reputation and character not entitled to belief under oath based solely on Hannan's own personal opinion. The judgment of guilty should be vacated and a new trial granted.

**THE TRIAL COURT ERRED AT THE PUNISHMENT STAGE BY PERMITTING REPUTATION TESTIMONY BY STATE'S WITNESS ROBBIN LUKE WAY AND DALE ALLEN SMEDBERG WITHOUT LAYING A PREDICATE FOR THEIR QUALIFICATIONS TO TESTIFY ABOUT DEFENDANT'S REPUTATION IN THE COMMUNITY IN VIOLATION OF DEFENDANT'S FIFTH AMENDMENT RIGHTS.**

At the punishment stage the State offered testimony as to Defendant's reputation by Brent Larson, Joseph Pelton, Daryl Schuster, Ronald Poeschel, Richard Ohotto, Robbin Luke Way, and Dale Allen Smedberg.  The State also incorporated the guilt- innocence testimony of William James Hannan, Jr.  (Vol. XXV, T- 34).  Prior to testimony by witnesses Way and Smedberg, no predicate for their qualification to testify as to the reputation of Arthur Williams was laid. This violated the Defendant's Fifth Amendment right not to be deprived of liberty without due process of law.

Defendant's counsel is permitted to test the qualifications of the character witness to express their opinion as to the Defendant's reputation before testifying.

*Crawford v. State*, 480 SW 2d 724, 726 (Tex. Cr. App. 1972).  The Court should permit cross examination as to witness qualifications before the witness is permitted to give the impeaching testimony.  *Coleman v. State*, 199 SW 473 (1917).  The procedure to be followed is to permit the opposing party to test the qualification of the witness before he testifies as to the Defendant's reputation. *Crawford v. State*, 480 SW 2d at 426.  If the witness is permitted to first give his opinion and it is then determined that he was not qualified to give such opinion, harm which cannot be cured may be done.  *Crawford v. State*, 480 SW 2d at 726. In the instant case, reputation witnesses Way and Smedberg gave their opinions as to the Defendant's reputation without voir dire examination by defense counsel. This error has been classified as "grievous error".  *See Jones v. State*, 641 SW 2d 545, 551 (Tex. Cr. App. 1982).  Defendant Arthur Williams had no opportunity to test the qualifications of reputation witnesses Way and Smedberg at the punishment stage resulting in extreme prejudice to him.

Significantly, defense counsel noted a "running objection" to the reputation witnesses offered by the State at punishment stage to avoid making objection in the presence of the jury.  (Vol. XXV, T-33).  Hence, objection to the qualifications of witnesses Robbin Luke Way and Dale Allen Smedberg were properly made to the Court.  These objections were overruled. (Vol. XXV, T-32).

At the punishment stage, Robbin Luke Way testified about the reputation of Defendant Arthur Williams to jury:

> Q:     Do you know the Defendant's general reputation in the community in which he resides and with those whom he associates for being a peaceable law abiding citizen?
>
> A:     Yes, I do.
>
> Q:     Is that reputation good or bad?
>
> A:     Bad.

(Vol. XXV, T-86-87).

Way's testimony was not subject to voir dire examination.  His sole contact with Williams was investigating an offense in Minnesota several years before. Once he testified that Arthur Williams' reputation was "bad", the damage had been done, *Crawford v. State*, *supra*, and could not be rehabilitated by cross examination.

Prosecution witness Dale Allen Smedberg also testified at the punishment stage as to Arthur Williams' reputation without voir dire examination. Smedberg's reputation testimony to the jury went as follows:

> Q:     Do you know the Defendant's general reputation in the community in which he resides and with those with whom he associates for being a peaceable and law abiding citizen?
>
> A:     I  do, and it is not.

128

Q:      Is his reputation god or bad.

A:      His reputation is bad.

(Vol. XXV, T-89).

Likewise, State's witness Smedberg testified Arthur Williams had a "bad" reputation without affording Defendant the benefit of voir dire examination as to his qualification. Defendant should not be placed in the predicament of fishing for testimony that could very well demonstrate lack of qualification before the jury. By making prior objection, Defendant preserved the issue of prejudice.  Trial court erred by not conducting voir dire examination of state's witness Smedberg prior to him testifying to Defendant's "bad" reputation.  *See Crawford v. State*, *supra*; *Coleman v. State*, *supra*.  Significant damage was done to Defendant that could not be corrected. Accordingly, the sentence of death must be set aside.

**THE TEXAS SPECIAL ISSUE QUESTIONS PRECLUDED MR. WILLIAMS' JURY FROM CONSIDERING AND GIVING MITIGATING EFFECT TO EVIDENCE PROFFERED IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.**

The jury that sentenced Mr. Williams to die heard significant mitigating evidence about his background and character and the circumstances of the offense which could not be given mitigating effect under the Texas statutory special issues.

129

As a result, Mr. Williams was denied his right to an individualized sentencing determination in violation of Eighth and Fourteenth Amendments of United States Constitution. *Penry v. Lynaugh*, 492 U.S. 302, 106 L.Ed.2d 256, 282 (1989).

      A.    *Penry and Franklin*.

The jury in the sentencing phase of a capital trial may not be precluded "from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). In *Penry v. Lynaugh*, 492 U.S. 302, 106 L.Ed.2d 256 (1989), the Supreme Court reaffirmed these principles, and held that the Texas sentencing scheme, because of its inherent limitations, unconstitutionally prevents full jury consideration of certain types of mitigating evidence. *Penry*, 106 L.Ed.2d., at 280.

The Supreme Court first considered the facial constitutionality of the Texas death penalty statute, Tex. Code Crim. Proc. Art. 37.071, in *Jurek v. Texas*, 428 U.S. 262 (1976). The court conditionally approved the scheme, noting that the Texas Court of Criminal Appeals had interpreted the statute broadly to permit the presentation of a large array of evidence at the sentencing phase of the trial. *Id*., at 272 - 73. Subsequent decisions of both federal and state courts uniformly accepted this holding as foreclosing any challenge to the Texas statute based on the inability

of the sentencer to consider mitigating evidence.    See *Penry v. Lynaugh*, 832 F.2d

915 (5th Cir. 1987), reversed, 492 U.S. 302 (1989); *O'Bryan v. Estelle*, 714 F.2d

365 (5th Cir. 1983), cert. denied,  465 U.S. 1013 (1984), *Lackey v.  State*, 638

S.W.2d 439 (Tex. Crim. App. 1982).

In *Franklin v. Lynaugh*, 487 U.S. 164 (1988), the court revisited the

constitutionality of the Texas statute, this time as applied in particular cases.

Franklin held that a bare stipulation of a clean prison disciplinary record could be

given full mitigating effect under the second special issue question of the Texas

death penalty statute.  *Franklin*, 487 U.S. at 185-86. The concurring opinion of

Justice O'Connor (later adopted in *Penry*) observed that such evidence had "no

relevance to any other aspect of [Franklin's] character" apart from his propensity

for future dangerousness, so the second special issue provided an adequate vehicle

for the jury to consider and give effect to such evidence.  *Id*.

The Court then contrasted Franklin's mitigating evidence to other types of

general "background or character" evidence that would cause constitutional

problems under the Texas statute.  For example, "[e]vidence of voluntary service,

kindness to others, or of religious devotion" could "demonstrate positive character

traits" that would make the death penalty inappropriate in a particular case."  *Id*.  In

such a case, the Court recognized, "the jury's inability to give effect to such

evidence" could amount to a violation of the rule of *Lockett* and *Eddings*. As the concurrence explained, "the Constitution guarantees a defendant facing a possible death sentence not only the right to introduce evidence mitigating against death penalty, but also the right to consideration of that evidence by the sentencing authority," adding, "the right to have the sentencer consider the relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration." *Franklin*, 487 U.S. at 184 - 85.    The absence of a vehicle for the jury to express its "reasoned moral response" to that evidence would deprive the defendant of his right to have the sentencer consider and give effect to his mitigating evidence.

The next Term, the Court confirmed that in particular cases the Texas capital special issues preclude juries from considering and giving effect to constitutionally protected mitigating evidence. *Penry v. Lynaugh*, 492 U.S. 302 (1989).  In *Penry* the Court held that the Texas statute was inadequate to permit the consideration as mitigating, of evidence of mental retardation and childhood abuse.  *Penry*, 106 L.Ed.2d at 279.

With respect to the first special issue question, the Court explained that Penry's mental retardation was relevant to "whether he was capable of acting 'deliberately' (as the Texas statute comprehends the term]," but that it also "had

relevance to [his] moral culpability beyond the scope of the [first question]." 106 L.Ed.2d at 280 (citation omitted). That is, although "personal culpability is not solely a function of a defendant's capacity to act 'deliberately,'" the Texas statute precluded a juror from giving effect to the conclusion that a mentally retarded defendant, although he acted "deliberately," was nevertheless not as culpable as other defendants who had no such excuse, and accordingly d8served not to be put to death. *Id.*, 106 L.Ed.2d at 278, 280. As the Court described this preclusive effect,

> a juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime "deliberately."    Thus, we cannot be sure that the jury's answer to the first special issue reflected a "reasoned moral response" to Penry's mitigating evidence.

*Id.*

With respect to the second special issue, the Court observed that Penry's intuitively and constitutionally mitigating evidence of mental retardation and an abused childhood was "relevant only as an aggravating factor," because it compelled "a 'yes' answer to the question of future dangerousness." *Id.*, 106 L.Ed.2d at 281 (emphasis in original). As the Court put it,

> Penry's mental retardation and history of abuse is thus a two edged sword:  it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future .... The second

133

special issue, therefore, did not provide a vehicle for the jury to give mitigating effect to Penry's evidence of mental retardation and child abuse.

*Id*.

In sum, *Penry* held that the Texas capital sentencing statute is unconstitutional as applied in cases in which the special verdict questions provide the jury no vehicle for expressing its reasoned moral response to the defendant's mitigating evidence. As the following discussion makes evident, Mr. Williams' mitigating evidence, like Penry's, could not be considered or given full effect under the Texas statute and so his death sentence, like Penry's cannot stand.

> **The Texas sentencing scheme precluded Mr. Williams' jury from giving full mitigating effect to relevant evidence about his background, character, and the circumstances of the offense.**

The Texas sentencing scheme, as it operated in Mr. Williams's trial, was aptly explained by the prosecutor during jury voir dire:

> So you can see that what you think might ought to happen might not necessarily happen at the punishment stage.
>
> For instance, you might listen to the evidence and say: "Well, this is capital murder, no doubt about it, but this is not one where the person ought to be sentenced to death."
>
> But you get down to here to the questions, and the evidence proves everything, that those questions ought to be answered "yes, beyond a reasonable doubt"; and so you know if you do that the Judge is going to

sentence the person to death.  Maybe you didn't think it out to be a death penalty case.  But by virtue of your answers, the  Judge is going to sentence the person to death.

Statement of The Case, at 1674 (Voir Dire Section, hereinafter referred to as "Voir Dire, at ____").

In this case, Mr. Williams introduced mitigating evidence about his character and background and the circumstances of the offense that was either irrelevant to, or relevant beyond the scope of, the special verdict questions.  Under the instructions, the jurors could not consider and give effect to that evidence without violating their oaths.   Because of the narrowness of the Texas capital statute, the jury was provided no vehicle for expressing its reasoned moral response to that evidence.

### Evidence Was Presented to the Jury about Mr. Williams' Background and Character and the Circumstances of the Offense Which Had Mitigating Value Beyond the Scope of the Special Issues.

Uncontradicted testimony showed that Arthur Williams was extremely shaken and distraught following the shooting of Detective Shirley.  A few hours after the incident, Mr. Williams was stilling crying uncontrollable.  (SF Vol. XXII at 634).  When Mr. Williams testified at his trial, he expressed remorse.  He told the jury that he was sorry about all that had happened and not just that he was caught.  He said he was sorry that Detective Shirley had been shot.  (Vol. XXIII at

135

792-3).  Although remorse is clearly a mitigating circumstance, it could not be fully considered or given mitigating effect within the scope of the statutory special issues.

The jury also had before it relevant information about Mr. Williams' background which could not be given full mitigating effect by the jury when answering the special issues. Although he had been in prison before, Mr. Williams was only twenty-two years old when the capital offense occurred.  Arthur's young age at the time of the crime, standing alone, is a factor entitled to consideration in mitigating of punishment beyond the scope of the special issues.  In addition, the jury heard evidence demonstrating Arthur's interest in furthering his education. Arthur earned a G.E.D. before he was sent to prison at the age of while he was in prison, Arthur attended school at St. Cloud State University and earned 18 college credits.  When he arrived in Houston in February, 1982, he attempted to enroll in college but could not because he did not have his certification records with him.

This evidence reveals redeeming character traits which have mitigating value beyond the narrow confines of the "continuing threat" aggravating circumstance.

While Arthur's early criminal record tended to support an affirmative answer to the second special issue, it also had potential mitigating value. The harshness of

prison life and its effect on the immature and impressionable mind of an nineteen year old is a circumstances that may ·call for a life sentence rather than a death sentence.  However, in Mr. Williams' case, because of the restrictions on the jury's role imposed by the special issues, that information would only be given aggravating effect.

These circumstances combined with events occurring during the months immediately preceding the offense provide another basis for a life sentence which could not be given full mitigating effect in the answers to the special issues.  Mr. Williams testified that a few months before the incident with Detective Shirley, he was accosted by a man with a gun who forced his way into Mr. Williams' apartment by identifying himself as a police officer.  The man then attempted to rob Mr. Williams and was shot in an ensuing struggle.  These circumstances made Mr. Williams much more wary of strangers and caused him to react more defensively to any perceived danger.

It is quite true that these circumstances were, in part, of Mr. Williams' own doing and do not provide a legal excuse or justification for unlawful conduct. However, they have a direct bearing on his mental state, his perception of danger, and the level of his fear, all of which are factors that are related to his individual culpability and entitled to consideration in mitigation of punishment.  Under the

second special issue these circumstances, which supported an argument that Mr. Williams was prone to overreact and unreasonably quick to resort to violence, could only be given aggravating effect. Neither could the circumstances be given full mitigating effect under the third special issue.  His jury could have concluded that Mr. Williams' experiences heightened his fear of strangers and of the police and limited the range of his reactions to aggressive, confrontive behavior.  A juror could easily have concluded that these circumstances mitigated Mr. Williams' individual culpability without concluding that his response to Detective Shirley's behavior was reasonable.   In other words, the jury could have believed Mr. Williams' reaction to Detective Shirley was unreasonable but, that Mr. Williams' behavior, considering his individual experiences, was not deserving of the death penalty.

The question under *Penry* is not merely whether the evidence is relevant to some special issue, but whether all mitigating qualities of the evidence can be considered and given effect within the special issues.  *Penry*, 106 L.Ed.2d at 281. Because Mr. Williams's mitigating evidence could not be completely considered within the special issues, the sentence cannot stand under Penry.

No contemporaneous objection is required for Penry claims.   *Selvage v. Collins*, No . 71024 (Tex. Cr. App. May 29, 1991).

Because the jury could not give mitigating effect to the evidence in the record, Mr. Williams's sentence violates the Eighth and Fourteenth Amendments to the United States Constitution, as well as similar provisions of the Texas Constitution.       Accordingly, the Writ Of Habeas Corpus should issue.

**BECAUSE TEXAS CAPITAL SENTENCING SCHEME PRECLUDED JURY CONSIDERATION OF CERTAIN KINDS OF MITIGATING EVIDENCE IT DEPRIVED MR. WILLIAMS OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE INDIVIDUALIZED SENTENCING DETERMINATION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

A substantial amount of material mitigating evidence was not investigated and presented at Arthur Williams' trial because of the preclusive, chilling effect of the Texas special issues.

**Substantial mitigating evidence was available.**

Mr. Williams had an extremely impoverished childhood during which he was deprived him of the parental guidance and support necessary for healthy development.  He grew up without a male role model to help him cope with the tribulations of adolescence and teach him how to meet the responsibilities of adulthood.

Arthur Williams' parents, Joyce and Arthur E. Williams, were divorced

139

before he was born.  His mother never remarried, and raised him alone.  Arthur's father was an alcoholic who battered his wife and showed no regard for the welfare of his family.  He had been to prison and served numerous jail sentences.  After his parents were divorced, Arthur's father would periodically move in with the family only to be kicked out by Arthur's mother after another, abusive alcoholic episode.

Arthur's father was frequently and extremely violent. In addition to physical assaults, he regularly frightened Mrs. Williams with his handling of handguns, which she would throw in the river as soon as he passed out.  He lack of respect for his family was demonstrated by his repeated attacks on Arthur's mother and by his bringing his girlfriends into her home.

As a young child, Arthur participated in numerous activities which demonstrated motivation and an ability to get along with others.  He  was  in  the Boy Scouts when he was ten years old.  The same year and the following year he played baseball and basketball and received Certificates for both.  In Agassiz Grade School he was given an award for his performance in softball.

Although he showed abilities and promise as a young child despite his disadvantages, the effects of his impoverished background and violent home life became evidence in his early teens.  This deprivation and abuse left him with repressed feelings of anger and resentment.  Without adequate parental supervision

140

and support, Arthur could not find adequate and appropriate outlets for these emotions.    Instead, he turned to older teens who led him into trouble.  His role in his previous criminal offenses was that of a follower of older boys or men.

As a teenager, Arthur also turned to drugs.  His drug use included alcohol, marijuana, cocaine, and a near overdose of "angel dust."  Although psychological evaluations showed that Arthur had a proclivity for chemical dependency -- which is frequently a consequence of having alcoholic parents -- he was never given treated for his drug use.

Throughout his later teens, Arthur demonstrated an interest in improving himself.  When he was 17 years old, he received a Certificate of Achievement from the Walter H. Maginnis High School, a pre-vocational school at Red Wing, Minnesota, from the printing department.  Before he was 18, he obtained a G.E.D., or high school equivalency, and after he went to prison -- at age 18 -- he pursued his college education.  In 1982, after his release, he applied for financial aid to continue his education.  Mr. Williams' also pursued creative interests like crafts and poetry.

This relevant, mitigating information about Mr. Williams' background was readily available to his trial lawyers upon a reasonable inquiry and investigation. If this evidence could have been presented and considered in mitigation of

punishment, it would have provided a basis for a sentence less than death. However, the investigation was never conducted and the evidence was never presented.

Because of the narrow scope of the Texas special issues, even if the evidence had been presented, the jury would not have been allowed to consider it except in aggravation.  Unquestionably, the court would have denied a special instruction and defense counsel would have provided the prosecutor with a substantially stronger case in aggravation of punishment.

Defense counsel's failure to discover and present this evidence and the jury's inability to consider it in mitigation because of the nature and scope of the special issues are matters which are inextricably entwined. These  factors  denied  Mr. Williams  his  right  to  effective  assistance  of  counsel  and  an  individualized determination of his sentence in violation of the Sixth, Eighth, and Fourteenth Amendment.

> **Under the Texas capital sentencing scheme as it was interpreted in 1982, request for a special instruction was futile; and proffers of "double edged" mitigating evidence without such an instruction could be harmful to the defendant.**

Under the Texas statute, Mr. Williams' impoverished and violent background could not have given mitigating effect.  An impoverished childhood

and a history of drug use are relevant to individual culpability, but are not "circumstances of crime" and thus cannot be given effect under the first or third special issues. As in *Penry*, under the second special issue much of this evidence is a two edged sword: "it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." 106 L.Ed.2d 256, 281 (1989).

Before the Supreme Court's holding in *Penry*, the Court of Criminal Appeals consistently and repeatedly rejected claims that a defendant was entitled to an instruction explaining to the jury how it was to consider and give effect to the mitigating evidence presented by the defendant. See, e.g., *Cordova v. State*, 733 S.W.2d 175, 189 - 90 (Tex. Cr. App. 1987); *King v. State*, 553 S.W.2d 105, 107 (1977); *Granviel v. State*, 552 S.W.2d 107, 117 - 18 {Tex. Cr. App. 1976).

Without such an instruction, a great deal of evidence that should have mitigated punishment was rendered irrelevant or even prejudicial to the defendant when the jury answered the statutory special issues. *Penry*, 109 S.Ct. at 2947 - 52.

The Texas statute, as it was being applied, materially interfered with trial counsel's ability to represent his client with regard to sentencing. This state interference prevented relevant and probative mitigating evidence from being presented to the jury. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984)

(acknowledging that state interference with counsel's ability to make independent decisions can deprive a defendant of effective assistance of counsel, citing *Brooks v. Tennessee*, 406 U.S. 605 (1972)).   The Supreme Court's analysis in *Brooks* demonstrates that the kind of governmental interference which violates the right to effective assistance of counsel encompasses the kind of governmental interference complained of by Mr. Williams.

In *Brooks*, a Tennessee statute required the defendant in a criminal case to testify as the first witness in the defense case if she were going to testify at all. Failure to testify as the first witness barred the defendant from testifying.   The rule had been criticized in other jurisdictions for interfering with the tactical decision which the defense was entitled to make concerning whether, and when, the defendant would testify.   This complex tactical decision, guided by the expert advice of counsel, was described by the Court in the following terms:

> 'It must often be a very serious question with the accused and his counsel whether he shall be placed upon the stand as a witness, and subjected to the hazard of cross-examination, a question that he is not required to decide until, upon a proper survey of all the case as developed by the state, and met by witnesses on his own behalf, he may intelligently weigh the advantages and disadvantages of his situation, and, thus advised, determine how to act.   Whether he shall testify or not; if so, at what stage in the progress of his defense, are equally submitted to the free and unrestricted choice of one accused of crime, and are in the very nature of things beyond the control or direction of the presiding judge.'

406 U.S. at 608 (quoting *Bell v. State*, 66 Miss. 192, 194, 5 So. 389 (1889)).

The Supreme Court held that the Tennessee statute violated the defendant's right to effective assistance of counsel in choosing whether and when to testify.  *Id.* at 612-613.  As the Court explained, "By requiring the accused and his lawyer to make that choice without an opportunity to evaluate the actual worth of their evidence, the statute restricts the defense -- particularly counsel -- in the planning of its case."

What emerges from Brooks is the following principle: when a matter of constitutional right is committed "'to the free and unrestricted choice of one accused of crime,'" 406 U.S. at 608, the state cannot interfere with the exercise of that choice or force it to be exercised in a particular way or at a particular time.  If the state does so, it impermissibly "interferes ... with the ability of counsel to make independent decisions about how to conduct the defense."  *Strickland v. Washington*.   It is plain that the constitutional defect in the Texas capital sentencing procedure that was identified in *Penry* operated in violation of this principle in Mr. Williams' case and for that reason, violated his right to effective assistance of counsel as well as his right to an individualized sentencing determination.

The right to present relevant mitigating evidence in a death penalty case is,

like the right to testify or not, a constitutionally-based right entrusted to the free and unrestricted choice of one accused of crime.  Like the choice about whether and when to testify, the choice about what mitigating evidence to present and how to present it is a complex tactical matter.   The Texas sentencing procedure interferes dramatically with the defendant's choice of whether and how to present mitigating evidence about the "diverse frailties" of humankind -- factors which are constitutionally relevant to a reliable determination of individual culpability.

As the Court recognized in *Penry*, evidence which seeks mitigate punishment in a capital murder prosecution by explaining that his previous criminal acts and violent behavior were the result of a mental or emotional disability, drug or alcohol abuse and an abusive and impoverished childhood cannot be given mitigating effect under Texas' sentencing procedure.   This evidence invariably "suggests a 'yes' answer to the question of future dangerousness," *Penry v. Lynaugh*, 492 U.S. at 106 L.Ed.2d at 281, because such conditions frequently create a vulnerability to violent behavior which may "diminish [the defendant's] blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Id*.

With respect to such mitigating evidence the "guiding hand of counsel," *Powell v. Alabama*, 287 U.S. 45, 69 (1932), is thus handcuffed in Texas.  Under

the pre-*Penry* sentencing statute, counsel could seldom dare to put on a full-blown background or mental health-based defense.  Rather than the myriad considerations that would ordinarily guide counsel's choices concerning such defenses, counsel was severely constrained.  It is hard to imagine a clearer example of the state "interfer[ing] ... with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland*, 466 U.S. at 686.  *See Meeks v. Dugger*, 576 So.2d 713 (Fla. 1991) (defense counsel's failure to introduce nonstatutory mitigating evidence, which he thought was inadmissible under *Hitchcock v. Dugger*, 481 U.S. 393 (1987) was error).[17]

The operation of the Texas capital sentencing scheme thus denied Mr. Williams effective assistance of counsel and an individualized sentencing determination in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Texas Constitution. *See*, e.g., *Hall v. State*, 541 So.2d 1125, 1127 (Fla. 1989).

Mr. Williams has stated a valid claim for relief and should be allowed to prove his factual allegations in an evidentiary hearing.

---

17   Unlike the form of ineffective assistance due to the deficient performance of counsel, prejudice does not have to be established when the state violates the right to effective assistance. "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.  So are various kinds of state interference with counsel's assistance." *Strickland*, 466 U.S. at 692.

## THE TEXAS CAPITAL SENTENCING STATUTE UNCONSTITUTIONALLY PROHIBITS THE COURT FROM INSTRUCTING THE JURY AT THE PENALTY PHASE REGARDING THE EFFECT OF A "NO" VOTE BY ONE JUROR.

The trial court failed to inform the jury that the consequence of a single "no" vote by any one juror on one of the special issue questions would be a life sentence, in violation of Mr. Williams' right to a fair and reliable sentencing determination as guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and similar provisions of the laws and constitution of the state of Texas.

Tex. Code Crim. Proc. Art. 37.071 (2) (e) was amended by Acts 1981, 67th leg., p. 2637, ch. 275, p. 1.  his amendment went into effect August 31, 1981, before Mr. Williams was tried.  The amendment precluded the imposition of a death sentence if even one "no" vote was cast, and required, in such a case, the automatic imposition of a life sentence.

The instruction was thus incorrect as a matter of state law.   More importantly, by creating a false need for near unanimity in an answer to the special issues, it violated the Constitution.  Under the Eighth Amendment, each juror must be allowed to consider and give effect to his or her conclusion that the evidence does not warrant a sentence of death.  *Mills v. Maryland*, 486 U.S. 367 (1988).

When even a single juror wishes to voice the view that the evidence does not support a sentence of death, the Eighth Amendment requires the court to listen.

In this case the instructions required the agreement of ten jurors before Mr. Williams could be given a life sentence. By instructing the jury that ten votes were required before dissenting jurors could register their convictions, the instructions effectively removed those jurors from the deliberative process at sentencing.

At best, the instructions in this case informed any juror inclined to vote for a life sentence that by continuing to vote their conscience they would force the entire case to be retried; at worst, the instructions forced such jurors to conclude their view of the evidence was irrelevant unless they persuaded nine other jurors. Jurors in the majority were not only free to pressure any dissenter with these arguments, but were encouraged to do so by the instructions. This impermissibly denied the petitioner a fair sentencing phase as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and similar provisions of Texas law.

In addition, the Texas capital sentencing scheme violates the principles articulated in *Mills v. Maryland*, 486 U.S. 367 (1986) and *McKoy v. North Carolina*, 110 S.Ct. (1990). In both cases, as in Texas, the state statute, when reasonably interpreted, appeared to require unanimity on the existence of

mitigating factors before the grand jury could vote for life.  As a matter of law in both states, the jury could vote for life even in the absence of unanimous agreement as to the existence of mitigating factors; the constitutional violation, however, arose from the instructions given to the jury, which improperly appeared to require unanimity.

Similarly, as a matter of law in Texas, a single "no" vote requires a life sentence; the constitutional violation, however, arises from the instructions given to the jury, which improperly misinform the jury that ten votes are needed before it can answer a question "no."

The statutory prohibition against instructing the jury of the effect of a single "no" vote denied Mr. Williams a fair sentencing phase guaranteed by the Eighth and Fourteenth Amendments to the U. s. Constitution and similar Texas law and require that his sentence be reversed.

**THE TEXAS SENTENCING SCHEME IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED BECAUSE THE JURY IS NOT INSTRUCTED ON THE PAROLE IMPLICATION OF A LIFE SENTENCE IN A CAPITAL CASE, BUT IS SO INSTRUCTED IN A NON-CAPITAL CASE.**

Because the trial court failed to give the jury accurate information about Mr. Williams' eligibility for parole if convicted and given a sentence of life rather than death, the sentencing verdict was inherently unreliable and violated the equal

protection guaranteed him under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and similar provisions of the laws and constitution of the State of Texas.

Texas law in capital cases, V.A.C.C.P. Art. 37.07l (g), forbids a trial court to inform the jury about parole issues. By contrast, in non-capital cases Texas has statutorily mandated that juries be instructed regarding a defendant's eligibility for parole and certain calculations relevant to parole guidelines.   V.A.C.C.P. Art. 37.07 (4).

The trial court's failure to instruct Mr. Williams' jury on the parole implications of a life sentence created a risk that his sentence was determined by jurors with inaccurate preconceptions of the meaning of a life sentence. Predictably, jurors concerned with the possibility of parole for someone convicted of capital murder and sentenced to life imprisonment would be substantially biased against Mr. Williams.  Further, the court's failure to instruct on parole deprived Mr. Williams' jurors of significant information about the consequences of their verdict at the penalty phase.

It is well settled that capital cases demand "heightened reliability" in the determination of a sentence. This need arises from the unique finality of the death penalty.  As a result, jurors in a capital case should be at least as informed about

the consequences of their verdict as jurors in non-capital cases -- yet Texas law provides exactly the opposite regarding knowledge of parole eligibility. There is no rational reason for the classification Texas has drawn between capital and non-capital cases in the context of providing information about a defendant's parole eligibility. The Texas sentencing statute on its face, as applied, violates Mr. Williams' rights under the sixth, Eighth, and Fourteenth Amendments and similar provisions of the law and constitution of the State of Texas.

### THE COURT FAILED TO INSTRUCT THE JURY THAT TO CONSIDER MITIGATING EVIDENCE IN DETERMINING PETITIONER'S PUNISHMENT.

The trial court's charge to the jury did not define mitigating circumstances or explain their proper use as required by constitutional law.

As a result, Mr. Williams was deprived of an individualized sentence, in violation of his Sixth, Eighth, and Fourteenth Amendment rights under the U.S. Constitution and similar provisions of the Texas Constitution. *See Lockett v. Ohio*, 438 U.S. 586 (1978).

In *Spivey v. Zant*, 661 F.2d 464 (5th Cir. 1981), the Fifth Circuit held that the Eighth and Fourteenth Amendments require that the trial court give the jury clear and explicit instructions on mitigating circumstances. *Id*., at 471. Without specific and detailed guidance to channel a sentencer's discretion, the

sentencing procedure is unconstitutionally arbitrary and capricious. *Gregg v Georgia*, 428 U.S. 153, 188 (1976). Specific instructions on mitigating circumstances are necessary to "guide and focus the jury's objective consideration of the particularized circumstances of the individual offence and the individual offender." *Spivey*, 661 F.2d at 471, quoting *Jurek v. Texas*, 428 U.S. 262, 274 (1976).

Respectfully, the refusal of the Texas Court of Criminal Appeals to require explicit instructions on mitigating circumstances in *Anderson v. State*, 701 S.W.2d 868, 874 (Tex. Ct. Crim. App. 1985), can no longer stand in light of recent U.S. Supreme Court authority to the contrary. *See Penry v. Lynaugh*, 106 L.Ed.2d 256 (contrary to Jurek, Texas statute prevents consideration of mitigating evidence).

The instructions given at Mr. Williams' trial failed to inform the jury how it must consider mitigating evidence in its deliberations. Because the trial court failed to guide and focus the jury's consideration of mitigating evidence, the Court violated Mr. Williams' Sixth, Eighth, and Fourteenth. Amendment rights under the U.S. Constitution and similar provisions of Texas law and the Writ should issue.

**AS APPLIED TO MR. WILLIAMS, THE TEXAS CAPITAL STATUTE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT CALLS FOR A MANDATORY SENTENCE OF**

## DEATH WITHOUT THE CONSIDERATION OF MITIGATING CIRCUMSTANCES.

A capital statute that establishes a mandatory death sentence without allowing for the consideration of mitigating circumstances is unconstitutional. Without exception, the United States Supreme court has struck down every such capital statute. *See Sumner v. Shuman*, 483 U.S. 66, .85 (1987) (mandatory death sentence for prison inmate convicted of murder while serving a life sentence without possibility of parole unconstitutional) and *Roberts (Harry) v. Louisiana*, 431 U.S. 633 (1977) (mandatory death sentence for killing police officer unconstitutional).

In *Blystone v. Pennsylvania*, the Supreme Court considered and rejected a challenge to the mandatory aspect of the Pennsylvania capital statute. The Pennsylvania statute provided in relevant part that "[t]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstances or if the jury finds one or more aggravating circumstances which outweigh any mitigating circumstances." 108 L.Ed.2d 255 (1990), quoting 42 Pa. Cons. stat. Sec. 9711 (c) (1) (iv). Blystone argued that this statute constituted an unconstitutionally mandatory death penalty, but the Court disagreed, holding that, unlike *Woodson*, *Roberts*, and *Shuman*, the Pennsylvania statute allowed for the consideration of mitigating circumstances, and therefore did

not run afoul of the requirement of individualized sentencing in a capital case.  *Id*.

The saving feature in the Pennsylvania statute, therefore, and the feature that distinguished it from the other mandatory statutes, was the opportunity for the jury to consider and give effect to the mitigating evidence.  If the Pennsylvania statute had operated to deprive capital defendants of that opportunity, then the statute would be unconstitutional, since it would represent a mandatory death penalty without consideration of mitigating circumstances.   Yet that is precisely the situation presented in Mr. Williams' case.

Both the Texas Court of Criminal Appeals and the Supreme Court acknowledge that the Texas capital statute establishes a mandatory death penalty. *Blystone*, 108 L.Ed.2d at 260; *Jurek v. Texas*, 428 U.S. 262 (1976); *Hernandez v. State*, 757 S.W.2d 744, 751 (Tex. Crim. App. 1988); ("The law has predetermined what the punishment will be depending only on certain conditions.  The jury ... only determines whether those conditions exist.   The judge then pronounces sentence as the law requires.  Neither is vested with any discretion in this regard."); V.A.C.C.P. Art. 37.071 (3) ("If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death.")

Furthermore, in *Penry*, the Supreme Court recognized that in certain circumstances, the Texas statute, as applied, fails to provide jurors a vehicle to

consider and give effect to mitigating evidence. When the statute, as applied, mandates the death penalty based upon the jury's resolution of issues regarding guilt, it constitutes and unconstitutional mandatory death penalty statute.  This was precisely the effect of the statute as it was applied in Mr. Williams' case.

In Mr. Williams case, when the jury concluded that he was guilty of the elements of capital murder of a police officer, it also necessarily determined the answers to the special issues presented in the punishment stage.  This is because the special issues, as interpreted and applied in this case, did not present any unresolved issues for the jury to consider in the punishment stage.  Mr. Williams was thereby deprived of a determination of his punishment separate and apart from the determination of his guilt for capital murder.  As applied to Mr. Williams, the Texas capital statute establishes a mandatory sentence of death without allowing for the consideration of mitigating circumstances.   His sentence of death is therefore unconstitutional under the Eighth, and Fourteenth Amendments to the United States Constitution.

### BECAUSE THE TEXAS COURTS DO NOT APPLY A CONSTITUTIONALLY MANDATED LIMITING CONSTRUCTION TO THE INHERENTLY VAGUE SPECIAL ISSUES, MR. WILLIAMS' SENTENCE OF DEATH CANNOT STAND.

The Texas special issues, both as written and as applied in Mr. Williams'

case, and as interpreted by the Court of Criminal appeals, function as aggravating circumstances.   An aggravating circumstance is any finding by a capital sentencer that "circumscribe[s] the class of persons eligible for the death penalty."   *Zant v. Stephens*, 462 U.S. 862, 878 (1982).   When an aggravating circumstance is vague, it fails to serve its constitutionally mandated narrowing function.   A sentence of death may not be imposed using such an aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope.   *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

Because the Texas special issues contain terms which are unconstitutionally vague, and to which neither the sentencing jury nor the reviewing court applies any limiting construction, the special issues are unconstitutional as applied to Mr. Williams.    His death sentence therefore must be reversed. *See Walton v. Arizona*, ___ U.S. ___ (1990); *Lewis v. Jeffers*, (1990).

### The Special Issues Act As Aggravating Circumstances Because Their Function Under Texas Law Is To Narrow The Class Of Persons Eligible For The Death Penalty.

Choosing those who may be sentenced to death entails two processes: (1) the narrowing of a class of those eligible for the death penalty, and (2) a selection from that class of those who shall be sentenced to death. *Zant v. Stephens*, 462

U.S., at 876 - 79.  Aggravating circumstances preform the first of those functions by narrowing the class of death-eligible defendants.  "[A]t the stage of legislative definition [an aggravating circumstance] circumscribe[s] the class of persons eligible for the death penalty."  *Id.*, at 878.

The manner in which a state statute narrows the class of death eligible persons is purely a matter of state law.  *Lowenfield v. Phillips*, 484 U.S. 231, 246 (1988) (state legislature defines the narrowing function performed by its capital sentencing statute); *Zant v. Stephens*, 462 U.S. at 878, In Texas, the Court of Criminal Appeals has clearly held the special issues provide this narrowing function and are therefore aggravating circumstances under the Constitution:

> [T]he function of Article 37.071 [is] to further narrow the class of death-eligible offenders to less than all those who have been found guilty of [(capital murder] as defined under § 19.03 [Texas' capital murder statute].

*Smith v. State*, 779 S.W.2d 417, 419 (Tex. Crim. App. 1989);  *Roney v. State*, 632 U.S. 598, 603 (Tex. Crim. App. 1982) (facts of crime do not provide death-eligibility; otherwise, every capital murder in the course of a robbery would warrant death and destroy the purpose of punishment stage in Texas capital cases: to provide reasonable and controlled decision concerning imposition of death penalty and to prevent capricious and arbitrary imposition of sanction).

However, the mere articulation of aggravating circumstances will not suffice

as a framework for the imposition of the death penalty if the circumstances contain

terms which are inherently vague and standardless.  In such a case, it is imperative

that the state court apply a limiting construction.  As the Supreme Court stated in

*Walton v. Arizona*,

> When a jury is the final sentencer, it is essential that the
> jurors be properly instructed regarding all facets of the
> sentencing process.      It is not enough to instruct the jury
> in the bare terms of an aggravating circumstance that is
> unconstitutionally vague on its face.

*Id.*, slip op., at 12.  On the same day, the Supreme Court emphasized this principle

in *Lewis v. Jeffers*:

> Our decision in Walton thus makes clear that if a State has adopted
> a constitutionally narrow construction of a facially vague
> aggravating circumstance, and if the State [court] has applied that
> construction to the facts of the particular case, then the
> "fundamental constitutional requirement" of "channeling and
> limiting... the sentencer's discretion in imposing the death penalty,
> *Cartwright*, 486 U.S., at 362, has been satisfied.

*Id.*, at 14.

The flaw in the Texas statute is that, unlike Arizona, the Texas court has

refused to apply a limiting construction to the unconstitutionally vague terms in the

special issues.

### Walton And Jeffers As Applied To The First Special Issue.

The first Texas special issue is unconstitutionally vague in requiring a

finding that "The conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation the death of the deceased or another would result." Tex. Code Crim. Proc.Art. 37.071 (b) (1).   The term "deliberately" deprived Mr.     Williams' jury of clear and objective standards that provide specific guidance regarding the limited meaning and application of the first special issue. *Godfrey*, 446 U.S. at 428; *Penry v. Lynaugh*, 492 U.S. 302 (1989).  Moreover, as with the second special issue, the Texas court neither created nor applied here a constitutional limiting construction to the issue. Mr. Williams' death sentence must be reversed on this ground.

The trial court did not define the term "deliberately" for the jury that sentenced Mr. Williams to death.  The term lacks any clear and objective meaning. There is no difference in common usage between "deliberate" and "intentional."

The Court of Criminal Appeals, however, has repeatedly held that the word "deliberate," as employed in the Texas death penalty statute, has a meaning that is different from the meaning of "intentional."  *See*, e.g., *Lane v. State*, 743 S.W.2d 617, 628-29 (Tex. Crim. App. 1987); *Heckert v. State*, 612 S.W.2d 549, 552-53 (Tex. Crim. App. 1981).  Yet the Court of Criminal Appeals has consistently refused to require trial courts to instruct a capital sentencing jury on the meaning of "deliberate" in the first special issue.

Despite the lack of clarity in the word "deliberately," Mr. Williams' jury received a bare, standardless charge requiring it to make a determination about the vague term of "deliberateness."  Given the diverse meanings of "deliberately," the determination of the first special issue was left to the "uncontrolled discretion of a basically uninstructed jury."  *Godfrey*, 446 U.S., at 429.  Because the jury received no clarifying limiting instruction, there is no way to determine whether Mr. Williams' jury defined "deliberately" in a manner consistent with any other capital sentencing jury in the history of Texas.  Having received no "specific and detailed guidance" as to the meaning of this vague aggravator, the jury's finding of "deliberateness" is, in effect, not "rationally reviewable" and therefore unconstitutional.  Godfrey, 446 U.S. at 428.

The Court of Criminal Appeals has failed to apply a limiting construction to the first special issue, as required by *Walton v. Arizona* and *Lewis v. Jeffers*.  The Court has defined what "deliberately" is not, but it has never defined what "deliberately" is by providing a limiting construction for the phrase.

The Court has indicated that one need not act with premeditation to act "deliberately."  *Granviel v. State*, 552 S.W.2d 107, 123 (Tex. Crim. App. 1985).  Nevertheless, by merely stating that the phrase "embraces more than" a will to act, the Court fails to provide any limiting principle to the term.

Furthermore, the Court has stated that a finding of "deliberateness" requires "the moment of deliberation and the determination on the part of the actor to kill." *Goodman v. State*, 701 S.W.2d 850 (Tex. Crim. App. 1985). Such tautological definition of "deliberateness," (using the word "deliberation") provides no meaningful guidance concerning the nature of the first special issue. The Court has used the vague term to define that vague term. Clearly, such "definition" is not constitutionally sufficient. Moreover, the "determination on the part of the actor to kill" reflects nothing more than the formation of intent to kill. Unlike the limiting instruction the Arizona Supreme Court applies to the "especially cruel, heinous, and depraved" aggravating factor, see *Walton v. Arizona*, the Texas Court of Criminal Appeals does not provide a narrowing construction in its appellate review.

Moreover, the court's lack of a limiting principle is further evidenced by the fact that the Court relies upon a non-exclusive list of possible factors which underlie any determination of deliberateness. *See e.g.*, *Livingston v. State*, 739 S.W.2d 311, 339 (Tex. Crim. App. 1987) (considering various factors in its determination of sufficiency of evidence for affirmative answer to special issue one). The first special issue aggravator is thus unconstitutionally vague because it fails to fulfill its requirement of narrowing the class of death-eligible persons and

thereby channeling the jury's discretion.  Truly, a "person of ordinary sensibility could fairly characterize almost every" intentional murder as being "deliberate." *Godfrey*, 446 U.S. at 428-29.

Like the second special issue, the first special issue is unconstitutionally vague, because of its reliance upon the undefined term "deliberately" failing to narrow the class of those eligible for the death penalty and thus failing to channel the jury's discretion.  This inherent vagueness has not been cured because the Texas courts have consistently refused to apply any limiting construction.  The application of this special issue question in Mr. Williams' case, without a constitutionally mandated limiting instruction violates his rights under the Eighth and Fourteenth Amendments and similar provisions of Texas law.

### Walton And Jeffers As Applied To The Second Special Issue.

That the terms in the second special issue are vague is indisputable.  The word "probability" has no common or uniform meaning.  A reasonable juror was left to apply any of the many plausible definitions including: fifty percent plus one, a substantially greater than fifty percent possibility, or, any chance, including one in a million.  In fact, the prosecutor in this case told the jury that a one in a million chance was a "probability." *E.g.*, Voir Dire, at 851; 961; 992; 1010; 1129 (Juror #4); 1597; 1676; 1894 (Juror #7).

Similarly, there is no clear and objective meaning to the phrases "criminal acts of violence" or "continuing threat to society."

The various words and phrases in the second special issue, when viewed individually and considered as a whole, do not give the sentencer "'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing the sentence of death." *Lewis v. Jeffers*. They do not limit the sentencer's discretion because "[a] person of ordinary sensibility could fairly characterize almost every [person]" convicted of capital murder as having some "probability" of "commit[ting] criminal acts of violence that would constitute a continuing threat to society." *Godfrey*, 446 U.S. at 428-29.

Given that the terms of the second special issues are unconstitutionally vague, the next inquiry under Walton and Jeffers is whether the Texas courts apply a valid limiting construction that could cure the lack of clear and objective standards in the second special issue. They do not. In fact, the Texas Court of Criminal Appeals has in no uncertain terms disclaimed any limiting construction for the second special issue.

In *Holland v. State*, 761 S.W.2d 308, 328 (Tex. Crim. App. 1988), the Court of Criminal Appeals specifically acknowledged that its standard of review for

sufficiency of the evidence under the second special issue is unbridled, with the Court simply considering the individual facts of each case

without applying any limiting construction.  As the Court stated, "[We] observ[e] the rule stated in *Cannon v. State*, 691 S.W.2d 664 (Tex. Crim. App. 1985) that each case must be decided on its own merit ... [and] hold that the evidence adduced at trial supports the affirmative response to the second interrogatory."  761 S.W.2d at 328.

Cannon*, from which the Texas rule derives, is particularly instructive on the absence of a limiting construction in Texas' interpretation of the second special issue.   In *Cannon*, the court of Criminal Appeals merely recited the facts surrounding the crime, and then characterized them as showing,

> on the part of the appellant, a total lack of regard for the ownership of property, sanctity of life and respect for the personal dignity of individuals who had gone out of their way to help him.

691 S.W.2d at 678.  The Court acknowledged that Cannon was only 17 years old and illiterate, but then simply stated its conclusion concerning the sufficiency of the evidence: "There was sufficient evidence to support the jury's affirmative finding... Each of these cases must be decided on its own merit."  *Id*., at 678-79.

Texas' construction of the second issue, as stated in Holland and Cannon, is no construction at all; the decision whether the evidence supports the second issue

in any given case is governed by no precise, objective standard, but instead rests on the Court's independent judgment when it views the facts. *See, e.g.*, *Williams v. State*, 773 S.W.2d 525, 538 (Tex. Crim. App. 1988) (simply reciting facts of case and then finding evidence sufficient to support second special issue); *Livingston v. State*, 739 S.W.2d 311, 341 (Tex. Crim. App. 1987); *Gardner v. State*, 730 S.W.2d 675, 679 (Tex. Crim. App. 1987).

Such standardless appellate consideration of vague and aggravating circumstances was expressly condemned in both Godfrey and Maynard. This condemnation was then reaffirmed in *Walton v. Arizona*, and *Lewis v. Jeffers*. The Supreme Court in Godfrey "plainly rejected that the submission that a particular set of facts surrounding a murder...were enough themselves, and without some narrowing principle to apply to those facts, to warrant the imposition of the death penalty." *Maynard*, 486 U.S. at 363. A state court conclusion that "on the [ ] facts the jury's verdict that the [aggravating circumstances] was supportable [does] not cure the constitutional infirmity of the aggravating circumstances." *Id.*, 100 L.Ed.2d at 382; *Godfrey*, 446 U.S. at 432 (unconstitutional aggravating circumstances were not cured by appellate court's assertion that the circumstance was "factually substantiated")

Precisely as in *Godfrey and Maynard*, Texas' unconstitutionally vague

special issue has not been cured by the Texas courts.  The Texas Court of Criminal Appeals, like the Georgia court in Godfrey and the Oklahoma court in Maynard, adheres to the standardless practice of simply considering the facts of the case to assess the propriety of an affirmative answer to the special issue.  This is constitutionally unacceptable.  *See Walton v. Arizona* and *Lewis v. Jeffers*.

The lack of a limiting construction in Texas is highlighted by the consistent proffer that "[t]he circumstances of the offense itself can sustain a 'yes' answer if they are severe enough . . . or can fail to support it if they are not and  are unsupplemented by other evidence." S.W.2d 792, 795 (Tex. Crim. App. 1978) *Muniz v. State*, 573 (citations omitted).  By stating that an affirmative answer is justified if the circumstances are "severe enough," however, the Court has simply substituted one vague term for another, once again impermissibly relying on the invalid principle that "a particular set of facts surrounding a murder" can themselves support the death penalty.  *Maynard*, 486 U.S. at 363.

In fact, neither in *Muniz* nor in any other case has the Court employed any limiting construction for determining when the facts of a crime are "severe enough" to warrant an affirmative answer.  The arbitrariness inherent in the Texas courts' practice is evident from the fact that the "brutal" murder in *Muniz* supported an affirmative finding, while the "brutal" murder in *Garcia v. State*, 626 S.W.2d 46

(Tex. Crim. App. 1981) did not. *Cf.*, *Keeton v. State*, 724 S.W.2d 58 (Tex. Crim. App. 1987) (no limitations on sufficiency of evidence factors for second special issue). Simply put, *Muniz* was "struck by lightning" while Garcia was not. *Furman v. Georgia*, 408 U.S. 238, 309 (1972) (Stewart, J., concurring).

The standardless review typified in *Muniz* and *Garcia* is borne out over and over again in a cursory examination of cases involving the sufficiency of the evidence     supporting the second special issue.

For instance, the Court of Criminal Appeals held in *Smith v. State*, 779 S.W.2d 417 (Tex. Crim. App. 1989), that the evidence did not support an affirmative answer to the second special issue, even though Mr. Smith raped and killed a woman by entering her home and then repeatedly stabbing her with scissors. The evidence also suggested that, for several weeks, Smith had been plotting to commit a rape. The offense was described by the State's forensic pathologist as "overkill."

On the other hand, the court of criminal Appeals in *Hawkins v. State* held that precisely such forethought is "probative of (a defendant's) propensity to commit future acts of violence." 660 S.W.2d 65, 82 (Tex. Crim. App. 1983). In *Hawkins* the Court of Criminal Appeals found that the defendant had been "looking around ... 'for somebody to rape'" and that eventually he walked into the

168

victim's home, raped her, and stabbed her repeatedly.  *Id.*   Nearly identical evidence was sufficient to support an affirmative finding of future dangerousness in Hawkins' case, but not in Smith's.

In contrast to Smith, the Court of Criminal Appeals held in *Earvin v. State*, 582 S.W.2d 794 (Tex. Crim. App. 1979), that the evidence of the crime alone supported an affirmative answer to the second special issue, even though Mr. Earvin shot a man at a gas station who made a sudden movement as if to reach for a gun.  Mr. Earvin threw down his gun in terror and fled. When he was arraigned he cried before the magistrate, and admitted he shot the man but said he didn't intend to kill him. He was 18 at the time of the offense, and had no prior criminal history.

Yet in *Huffman v. State*, 746 S.W.2d 212 (Tex. Crim. App. 1987), the appellant killed his neighbor by applying pressure to her heart, beating her about the face, kicking her repeatedly and strangling her.  After killing her he stole her car and led the police on a high speed chase in which he rammed two police cars.

He attacked two officers before being taken to court.  At the hospital, he became uncontrollable and had to be restrained by leather cuffs.  He had two prior convictions for burglary, the latter while on parole for the former.   He had repeatedly beaten his girlfriend and had bragged to both his girlfriend and a

neighbor that he knew how to kill a person by pushing the nose bone up into the brain or hitting them hard enough in the chest to flood the heart.  Incredibly, and in stark contrast to Mr. Earvin's case, the Court found the evidence in Huffman insufficient to support an affirmative answer to the second special issue.

In *Green v. State*, 682 S.W.2d 271 (Tex. Crim. App. 1984), the Court of Criminal Appeals found the evidence sufficient to support an affirmative answer to the second special issue even though appellant was not the triggerman, there was no evidence he helped plan the burglary that led to the killing, there was no evidence any of the perpetrators expected a murder to be committed, and the State produced no evidence of either prior felony convictions or prior unadjudicated violent conduct on the appellant's part.  In addition, appellant introduced the testimony of four work associates, each of whom testified that he had known the appellant for many years, had never heard of him being in trouble, and each of whom opined that he was a professional, reliable cement mason.  Two witnesses testified that, notwithstanding his conviction for capital murder, they would rehire the appellant if he were released.

If any distinguishing principle exists that explains these cases, it would be that the evidence in *Green* and *Earvin* does not appear to support an affirmative answer to the second special issue, and that the evidence in *Smith* and *Huffman*

does.  Yet the Court of Criminal Appeals decided them in exactly the opposite fashion.  Further, the Court of Criminal Appeals has stated that precisely the same evidence -- i.e., forethought and planning in connection with a rape/murder -- supported a finding of future dangerousness in *Hawkins*, while not supporting such a finding in *Smith*.

The above cases show that the review of an affirmative answer to the second special issue has become nearly meaningless.  Instead of being based on principled standards, decisions whether particular defendants should be punished by death are being arbitrarily made.  With no rational evidentiary explanation, Mr. Williams, Mr. Earvin and Mr. Hawkins were sentenced to death, while Mr. Smith and Mr. Huffman were not.  The Constitution cannot tolerate decisions as unpredictable as these, particularly when death is the penalty.

The Court's construction of the second special issue violates the U.S. Constitution.  It refuses to provide principled guidance to the jury, it fails to provide a constitutional basis to distinguish the few who will receive the death penalty from the many who will not, and it does not provide a rational review of a jury's decision to impose death.  Accordingly, the second special issue, as written and as interpreted by the Court of Criminal Appeals, violates the Eighth and Fourteenth Amendments to the Constitution.

Mr. Williams' jury was instructed in the bare terms of this vague special issue and thus did not receive the constitutionally required 'specific and detailed guidance' concerning the meaning and application of the aggravating second special issue. *See Godfrey v. Georgia*. Moreover, as in *Godfrey* and *Maynard*, the Texas Court of Criminal Appeals has provided absolutely no limiting construction to save the second special issue from its constitutional infirmity. Mr. Williams' death sentence is therefore unconstitutional.

### BECAUSE THE SENTENCE OF DEATH WAS PREDICATED ON AN INVALID AGGRAVATING CIRCUMSTANCE, WHICH WAS NECESSARY TO SUPPOR1' THE SENTENCE, MR. WILLIAMS'S DEATH SENTENCE CANNOT STAND.

As set forth above, the special issues in the Texas statute are aggravating circumstances as a matter of federal constitutional law:

> [T]he function of Article 37.071 [is] to further narrow the class of death-eligible offenders to less than all those who have been found guilty of (capital murder] as defined under ^U19.03 [Texas' capital murder statute.]

*Smith v. State*, 779 S.W.2d 417, 419 (Tex. Crim. App. 1989); *Roney v. State*, 632 S.W.2d 598 (Tex. Crim. App. 1982) (facts of crime themselves do not provide death eligibility, or every robbery-murder would warrant death and destroy the purpose of punishment stage: to provide reasonable and controlled decision on imposition of death and prevent capricious and arbitrary imposition of sanction).

172

The third aggravating factors in this case is invalid because the evidence does not support affirmative findings to the third special issues.  Since the Texas statute requires the jury to find the existence of all three aggravating factors before it can impose a sentence of death, Tex. Code Crim. Pro. 37.071 (e), these invalid aggravating factors vitiate the sentence of death as a matter of federal constitutional law.  *Clemons v. Mississippi*, 110 S.Ct. 1441 (1990); *Zant v. Stephens*, 462 U.S. 862 (1983).

To justify a sentence of death, the state must prove beyond a reasonable doubt that the defendant's conduct in killing the deceased was unreasonable in response to the provocation.  Article 37.071 (b)(3)(c), V.A.C.C.P.  A review of the evidence in this case, even in the light most favorable to the verdict, demonstrates that the affirmative answer to the third special issue is insupportable.  The aggravating factor is thus invalid and the sentence cannot stand.

The evidence was not sufficient to support an affirmative finding of unreasonableness on the third special issue.  Because the evidence does not support an affirmative answer to the third special issue, that aggravating factor is invalid. And because the statute requires affirmative findings on all three aggravating factors before the jury can sentence an accused to die, this Court must, under the Eighth and Fourteenth Amendments to the United States Constitution, vacate the

sentence of death.

### ARTHUR WILLIAMS' EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE JURY NOT CONSIDERING AS MITIGATING FACTORS THE DONALD CHALINE EVIDENCE AT THE PUNISHMENT STAGE.

As indicated in preceding sections, Arthur Williams was precluded from presenting evidence relating to the Donald Chaline assault, struggle, and shooting of Chaline on February 9, 1982 at the Parkstone Apartments.  Chaline identified himself as a police officer to Arthur Williams despite his dress in plain clothes on February 9, 1982.  Chaline threatened Williams with a .45 automatic which eventually wounded Chaline in the upper left arm.  Chaline, in fact, was not a police officer and, apparently, had been previously charged with impersonating a police officer.  Significant evidence relating to Donald Chaline including the February 9, 1982 Rosewood Hospital medical records, police reports of the February 9 Chaline shooting, Donald Chaline's role as a key State's witness in the Markham Duff-Smith murder trial less than two years earlier, and the hotel receipt generated when Williams and his sister left the apartment on February 9 for their safety after the Chaline shooting were not presented to the jury at the punishment stage.

The above evidence relating to Donald Chaline could have been considered

by the jury as a mitigating factor at the punishment stage under art. 37.071 (b) (3)

for the jury to consider as follows:

> (3) If raised by the evidence, whether the conduct of the Defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Under special issue number 3, the conduct of Arthur Williams in killing

Daryl Wayne Shirley on April 28 became more reasonable in light of the Donald

Chaline February 9, 1982 incident whereby Chaline falsely identified himself as a

police officer, confronted him at gun point, struggled, and was wounded. The state

of mind of Arthur Williams on April 28 recounted the confrontation with Chaline

approximately two months earlier at the same apartment complex.  Presentation of

the mitigating Chaline evidence to the jury would have raised the question whether

the conduct of Arthur Williams in killing Shirley was unreasonable in response to

the provocation by Shirley.  Having recently been confronted by Chaline wielding

a .45 automatic attempting to rob him, Arthur Williams could have reasonably

believed a similar incident was under way when Daryl Wayne Shirley approached

on April 28, 1982.  The Eighth and Fourteenth Amendments required that the jury,

in all but the rarest kind of capital case, not be precluded from considering, <u>as a</u>

<u>mitigating factor</u>, and aspect of the Defendant's character or record and any of the

circumstances of the offense that the Defendant proffers as a basis for a sentence

less than death.   *Lockett v. Ohio*, 438 U.S. 586, 604 (1977) (emphasis in original).   Consideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death.   *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *see also Penry v. Lynaugh*, 492 U.S. 302 (1989).   By not being able to consider the medical records of Donald Chaline from Rosewood Hospital on February 9, 1982, the hotel bill of Williams and his sister, and the State's failing to produce exculpatory evidence relating to Donald Chaline (such as police reports from February 9, 1982, testimony as key state's witness, criminal record, whereabouts, etc.,), the sentencer, the jury, was precluded from considering this evidence as mitigating to special question number 3 under art. 37.071(b) (3).   Because the jury was precluded from considering mitigating factors on special issue number 3 in violation of the Eighth and Fourteenth Amendments, the sentence of death must be vacated.   *See Lockett v. Ohio*, 438 U.S. 586, (1977).

### THE TRIAL COURT ERRED IN ADMITTING PROOF OF ARTHUR WILLIAMS' PAROLE REVOCATION, WITHOUT A HEARING OR FINDING OF GUILT, AT TRIAL.

The trial court permitted inquiry by the prosecutor regarding Arthur Williams' parole violation as evidence of his guilt for the crime of capital murder of a peace officer.  (Vol. XXIII, T-745-746).  The prosecutor asked Mr. Williams

176

"What's going to happen when you go back to the penitentiary on a parole revocation: and also "when you hit the pen on a parole violation, the first time you went in, didn't your parole officer recommend the maximum for you?"   (Vol. XXIII, T-746).  This statement was tremendously damaging to Mr. Williams and was highly improper.

Revocation of probation is not a conviction.  *Cross v. State*, 586 S.W.2d 478 (Tex. Ct. App. 1979).  Proof of prior acts of misconduct is not admissible as evidence of a Defendant's guilt, but it may be admissible to impeach the credibility of a Defendant who testifies.  *Cross v. State*, 586 S.W. 2d at 481.  Even when their use is limited to impeachment, not all acts may be proved; a conviction must have resulted.  *Cross v. State*, 586 S.W. 2d at 481;  *Thrash v. State*, 482 S.W. 2d 213 (Tex. Ct. App. 1972). It is error to admit proof of the misconduct for which a Defendant's probation was revoked.   *Cross v. State*, 586 S.W. 2d at 481.   A probation revocation proceeding is administrative in nature.  *Cross*.  A violation of probation conditions need be proved only be a preponderance of the evidence, not beyond a reasonable doubt.  *Cross*.  *See also* Texas Code of Criminal Procedure, Art. 38.29.  The trial court erred in permitting the prosecutor to prove the prior act of Defendant's probation revocation.

Similar to *Cross*, *supra*, there was no need in the instant case to offer such

proof in order to impeach Arthur Williams' credibility.  Mr. Williams had already testified that he was convicted of the felonies of two aggravated robberies in Minnesota.  Proof of the fact of probation revocation was unnecessary.  *See Cross*, *supra*.

Furthermore, Arthur Williams had not received a hearing on the parole revocation.  Due process mandates that the same types of hearing in probation revocation cases as in parole revocation cases are required.  *Gagnon v. Scarpelli*, 411 U.S. 778 (1973);  *Morrissey v. Brewer*, 408 U.S. 471 (1972); *see also Johnson v. Mississippi*, 108 S.Ct. 1981 (1988).  Defendant Arthur Williams had not received any hearing on the probation revocation in Minnesota at the time of the trial.  He was denied due process secured by the Fourteenth Amendment of the U.S. Constitution and similar provisions of the Texas Constitution.  When the State used the very fact of the probation revocation to prove his guilt at the capital murder trial in Texas.      The instruction by the Court was insufficient to cure the grievous damage done by the prosecutor's prejudicial comment in the presence of the jury.  The conviction must be reversed because of this error.

### THE SPECIAL QUESTIONS IN SENTENCING FOR A CAPITAL MURDER IN ART. 37.071 VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE OF VAGUENESS RESULTING IN YES ANSWERS BASED UPON LESS THAN UNANIMOUS JURIES.

The special questions submitted to the jury under art. 37.071(b) following conviction for capital murder violated the Eighth and Fourteenth Amendments of the U.S. Constitution by permitting the jury to answer "yes" with less than unanimous agreement among the panel.  Art. 37.071(b) submits three questions to the jury following conviction for capital murder.  The second special question submitted is as follows:

> (2) Whether there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

The State must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted. V.T.C.A. art. 37.071(c). The Court shall instruct the jury that it may not answer any issue "no" unless ten or more jurors agree.  Art. 37.071(d) (1)(2).  Upon an affirmative finding on each of the issues, the Court shall sentence the Defendant to death.  Art. 37.071(e).

The construct of special issue number 2 under 37.017(b) (2) permits the State to introduce evidence of aggravating factors to support a "yes" answer and for the Defendant to submit mitigating factors to support a "no" answer.  *See Jurek v. Texas*, 428 U.S. 262 (1976); *See also Penry v. Lynaugh*, 492 U.S. 302 (1989); *See also*, *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v. Georgia*, 446

179

U.S. 420 (1980); *Lockett v. Ohio*, 438 U.S. 586 (1978).

The special issues of art. 37.071 must be proven beyond a reasonable doubt in order for the jury to return a "yes" verdict. Art. 37.07l(c).    The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.  *Francis v. Franklin*, 471 U.S. 307 (1985);  *In re Winship*, 397 U.S. 358, 364 (1970).  The Texas statute requires that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed.  *Jurek v. Texas*, 428 U.S. at 270. The sentencing authority is required to focus on the particularized nature of the crime in consideration of aggravating circumstance.  *Jurek v. Texas*, 428 U.S. at 271.  A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.  *Jurek v. Texas*, 428 U.S. at These are basic requirements for comporting with the Eighth and Fourteenth Amendments.

To attain the degree .of reliability required for death sentences by the United States Constitution and to comport with Art. 37.071(d) (a), all twelve jurors must agree on the reasons for answering the second special issue "yes." Art. 37.07l(b) (2) contains no means of determining jury unanimity.  Under the statute, jurors are

180

not required to isolate aggravating evidence supporting an affirmative answer to special issue number 2. *See* art. 37.071. The failure to safeguard proof beyond a reasonable doubt guaranteeing a unanimous jury on the special issues contained within art. 37.071(b) deems the statute unconstitutional in violation of the Eighth and Fourteenth Amendments and similar provisions of the Texas Constitution. *See Francis v. Franklin*, *supra*; *In re Winship*, *supra*.

For example, in Arthur Williams' case some jurors may have considered the two prior convictions for aggravated robbery in Minnesota as aggravating factors. Other jurors, however, may not have considered the two aggravated robbery convictions as aggravating factors but believed Williams' foiled attempt to escape from jail in Minnesota and jumping of parole as aggravating factors, but not the aggravated robberies. Hence, there would be not unanimous agreement among jurors as to the particular aggravating factors beyond a reasonable doubt that satisfies special issue number 2 in 37.071(b) (2).

Because the jury may answer "yes" to special issue number 2 without agreement that the "yes" answer is based upon unanimous agreement of particular aggravating factors in support thereof. the Defendant can be sentenced to death with less than an unanimous jury. No safeguards exist within special issue number 2 to demonstrate agreement among all jurors beyond a reasonable doubt on the

same aggravating factors to support a "yes" answer.  This statutory scheme violates the Defendant's Eighth and Fourteenth Amendment due process rights.  The Court should not permit such a generic application for proof beyond a reasonable doubt under the statute.

Respectfully Submitted,

SCHNEIDER & McKINNEY, P.C.

    /s/ Stanley G. Schneider

Stanley G. Schneider
Texas Bar No. 17790500
440 Louisiana Suite 800
Houston, Texas 77002
OFFICE: (713) 951-9994
FAX: (713) 226-6008
EMAIL: stans3112@aol.com

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the attached and foregoing document has been served on the Respondent by Electronic Filing and by mailing a copy to Respondent's attorney, the Office of the Attorney General, PO Box 12548, Austin, TX 78711-2548 on this 12th day of June, 2013

    /s/ Stanley G. Schneider

STANLEY G. SCHNEIDER

## AFFIDAVIT

THE STATE OF TEXAS          §

COUNTY OF HARRIS            §

BEFORE ME, the undersigned authority, on this day personally appeared, STANLEY G. SCHNEIDER, after being by me duly sworn, under oath, stated as follows:

"My name is STANLEY G. SCHNEIDER and I am an attorney licensed to practice law in the State of Texas. My office address is 440 Louisiana, Suite 800, Houston, Texas 77002. My telephone number is (713) 951-9994."

"I am the attorney of record for Arthur Lee Williams and swear that all the allegations contained in the foregoing are true and correct to the best of my knowledge and belief."

SIGNED on this the 12th day of June, 2013.

/s/ Stanley G. Schneider
STANLEY G. SCHNEIDER

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the 12th day of June 2013.

/s/ Belen Vara
BELEN VARA
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS