United States District Court
Southern District of Texas
**ENTERED**
June 28, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| ARTHUR LEE WILLIAMS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  H-13-1714 |
| | § | |
| LORIE DAVIS,[1] | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

In 1983, a jury convicted Arthur Lee Williams of the capital murder of a police officer.  The jury answered Texas's special issue questions in a manner requiring the imposition of a death sentence.  After unsuccessfully availing himself of Texas's appellate and post-conviction remedies, Williams seeks federal habeas relief from his conviction and sentence pursuant to 28 U.S.C. § 2254 [Doc. # 7].

Respondent Lorie Davis has answered the petition [Doc. # 20].  The Court has thoroughly examined the record in this case, including the state court pretrial, trial, appellate, and habeas proceedings.  Based on this review and the application of governing legal authorities – giving due consideration to the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") – the Court finds that constitutional

---

[1]     Effective May 1, 2016, Lorie Davis replaced William Stephens as the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.  Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Davis "is automatically substituted as a party."  FED.R.CIV.P. 25(d).

error in the punishment phase jury instructions requires that Texas either (1) commute Williams' sentence to one of life imprisonment or (2) hold a new sentencing hearing. The Court concludes, however, that habeas relief is unavailable on all grounds relating to Williams' conviction. The Court will discuss the reasons for these rulings at length below.

## BACKGROUND

In 1982, the State of Texas charged twenty-three-year-old Williams with capital murder for "intentionally and knowingly caus[ing] the death of Daryl Wayne Shirley . . ., a peace officer in the lawful discharge of an official duty, by shooting [him] with a gun, knowing at the time that [he] was a peace officer." Clerk's Record at 6.[2] Williams stood trial in the 208th District Court of Harris County, Texas in 1983. Trial testimony showed the following: Williams, a convicted felon from Minnesota, had absconded to Texas after his parole to a half-way house. While in Texas, Williams lived with his sister and began using the name Marvin Dean Hogues.

Authorities in Minnesota issued a warrant for his arrest. The Harris County Police Department assigned Shirley, an officer in the Fugitive Criminal Warrant Division, to find and arrest Williams.

In the afternoon of April 28, 1982, Williams shot Detective Shirley during a scuffle at an apartment building where he was staying. Detective Shirley, who was wearing plain clothes and a cowboy hat, approached Williams as he left an apartment

---

[2]     The state court records consist of a transcript that contains pretrial motions, trial court orders, jury instructions, and other pleadings, cited as "Clerk's Record , p. __"; a Statement of Facts including hearings on pretrial motions, jury voir dire, the guilt/innocence phase, and the penalty phase, cited as "Tr. Vol. __, at __"; and a transcript of the state habeas proceedings, cited as "S.H.R. at __." The Court will refer to the papers from Williams' successive state habeas record as "S.S.H.R. at ___." The Reporter's Record in this case contains two different designations for volume numbers – one on the cover sheet and a different one on the internal transcript. The Court will refer to the designation on the cover sheet throughout this Order.

with a friend.  Detective Shirley called Williams by his real name, drew his weapon, placed it against Williams' head, and pushed Williams up against a wall.  Williams yelled for his friend to get help.  A struggle ensued and the men fought for Detective Shirley's gun.  As the two men wrestled on the ground, Detective Shirley shouted for an onlooker to call the police.  Williams shot Detective Shirley twice with his own gun.  Williams picked up Detective Shirley's gun and fled.

The police soon arrested Williams.  Williams was tried in 1983.  The trial focused on the indictment's allegation that Williams killed during the "lawful discharge of [Officer Shirley's] official duty . . . knowing at the time that [he] was a peace officer."  The State argued that the trial testimony and evidence showed that Detective Shirley had unquestionably identified himself as a police officer, with the intent of arresting Williams.  Williams' trial attorneys[3] argued that Williams did not know that the victim was a police officer.  The defense disputed whether Detective Shirley had actually identified himself as such and argued that Williams fought with Detective Shirley because Williams had previously been assaulted by a man pretending to be a police officer.  Williams's federal petition explains:

> a few months before the incident with Detective Shirley, he was accosted by a man with a gun who forced his way into his apartment by identifying himself as a police officer.  The man then attempted to rob Williams and was shot in an ensuing struggle.  These circumstances made Williams much more wary of strangers and caused him to react more defensively to any perceived danger.

Doc. # 7, p. 28.  The defense asked jurors to find that Williams did not know that he was shooting a police officer.

The jury found Williams guilty of capital murder.  Texas law required the jury to determine Williams' sentence by answering three special issue questions:

---

[3]      James Stafford, Harrison Gregg Jr., Carroll Carrie represented Williams at trial.  The Court will refer to Williams' attorneys collectively as "trial counsel."

Special Issue No. 1

Was the conduct of the defendant, Arthur Lee Williams, Jr., AKA Marvin Dean Hogues, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

Special Issue No. 2

Is there a probability that the defendant, Arthur Lee Williams Jr., AKA Marvin Dean Hogues, would commit criminal acts of violence that would constitute a continuing threat to society?

Special Issue No. 3

Was the conduct of the defendant, Arthur Lee Williams Jr., AKA Marvin Dean Hogues, in killing Daryl Wayne Shirley, the deceased, unreasonable in response to the provocation, if any, by the deceased?

Clerk's Record at 209-10. At the time of trial, Texas law did not include a specific instruction for jurors to consider mitigating evidence.

In the penalty phase, the prosecution presented testimony and evidence of Williams' lawlessness. Williams had previously committed armed robbery and had carried weapons. The police suspected that Williams had committed burglary. Eight people from Williams' home state of Minnesota testified that he had a bad reputation for not being peaceful or law abiding. The defense did not call any witnesses or present any testimony in the punishment phase.

The jury answered Texas' special issue questions in a manner requiring imposition of a death sentence. Williams appealed his conviction and sentence. Among other issues, Williams complained that the prosecution unconstitutionally used its peremptory strikes to remove African-Americans from the jury panel. The Texas Court of Criminal Appeals affirmed Williams' conviction and sentence. *Williams v. State*, 682 S.W.2d 538 (Tex. Crim. App. 1984). Williams filed a petition for a writ of certiorari in the United States Supreme Court. While Williams' petition was pending review, the Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79 (1986). The Supreme Court subsequently held that *Batson* applied retroactively. *Griffith v.*

*Kentucky*, 476 U.S. 314 (1987).  The Supreme Court vacated the Court of Criminal Appeals' judgment against Williams and remanded the case for renewed consideration in light of *Batson*.  *Williams v. Texas*, 479 U.S. 1074 (1987).  In turn, the Court of Criminal Appeals remanded the case to the trial court for a *Batson* hearing.  *Williams v. State*, 731 S.W.2d 563 (Tex. Crim. App. 1987).

The trial court held a *Batson* hearing in 1988.  The trial prosecutors provided race-neutral justifications for their peremptory strikes.  The trial court issued findings of fact and conclusions of law rejecting Williams' *Batson* claim.  Supplemental Clerk's Record at 29-40.  The Court of Criminal Appeals again affirmed Williams' conviction on appeal.  *Williams v. State*, 804 S.W.2d 95 (Tex. Crim. App. 1991).  The Supreme Court denied certiorari review.  *Williams v. Texas*, 501 U.S. 1239 (1991).

State habeas review spanned the next two decades, with long periods where Williams' case languished in inactivity.  On September 24, 1991, volunteer attorneys filed a petition for a writ of habeas corpus ("1991 application") on Williams' behalf raising thirty-nine grounds for relief.  S.H.R. 6-155.  Williams moved for discovery and for an evidentiary hearing on his claims.  S.H.R. at 171-78, 187-88.  In 1993, the State of Texas filed a lengthy answer.  S.H.R. at 201-323.  The State also requested that the trial court designate issues for resolution in the case.  S.H.R. at 198-99.

At some point in 1991, Randy Schaffer, Esq., began representing Williams.  On December 27, 1993, Mr. Schaffer filed an Amended Application for Writ of Habeas Corpus ("1993 application").  S.H.R. at 354-482.  The 1993 application raised sixteen allegations, with numerous subsections.  The 1993 application contained numerous issues asserted in the 1991 application, and raised several other issues for the first time.  The State filed a supplemental answer four years later.  S.H.R. at 555-628.

On June 5, 2001, Mr. Schaffer sent the trial court a letter abandoning several claims in the 1993 application "in view of intervening caselaw."  Also, Mr. Schaffer told the trial court that it "need not consider the grounds raised in the initial

application filed by volunteer lawyers from Minnesota [the 1991 application]." Supplemental S.H.R. at 2.

On the State's motion in 2002, the trial court found that "no controverted previously unresolved factual issues material to the legality of [Williams'] confinement exist" and ordered the parties to submit proposed findings of fact and conclusions of law.  S.H.R. at 634.

Williams filed proposed findings and conclusions in 2004.  Before the trial court acted on parties' filings, Williams filed a "Supplement to Amended Application for a Writ of Habeas Corpus" in 2005.   S.H.R. at 653-65 ("Supplemental Application").  Relying on new Supreme Court precedent from *Miller-El v. Dretke*, 545 U.S. 231 (2005), Williams again urged a *Batson* claim.  Williams' supplemental application, however, only argued that the State had unconstitutionally exercised a peremptory strike on one prospective juror because of her race.

In 2008, the State filed proposed findings and conclusions.  With the exception of adding two conclusions of law, the trial court signed the State's proposed order *verbatim* on November 19, 2008.  S.H.R. at 746-82.  The trial court found that Williams "abandoned his habeas claims" raised in the 1991 application. S.H.R. at 757, 769.  Also, the trial-level habeas court found that Williams' state habeas arguments lacked merit.  The trial court sent the findings and conclusions to the Court of Criminal Appeals.  The trial court's recommendation did not adjudicate the issue raised by Williams' 2005 Supplemental Application, but forwarded that document to the Court of Criminal Appeals.

On January 29, 2009, Mr. Schaffer sent a letter to the Court of Criminal Appeals clarifying that he had abandoned several claims from the 1993 application. Mr. Schaffer explained: "I filed an amended application in 1993 with 16 grounds for relief. I abandoned all or part of ten of those grounds in 2001 because of intervening caselaw."

Observing that the trial court failed to make findings of fact and conclusions of law on one claim, the Court of Criminal Appeals remanded for the development of that issue. *Ex parte Williams*, 2009 WL 1165504, at *1 (Tex. Crim. App. 2009). Also, the Court of Criminal Appeals found that the issues raised by Williams' supplemental application satisfied the abuse-of-the-writ provisions of Texas Code of Criminal Procedure article 11.071, § 5, and remanded the *Batson* issue for consideration by the trial court.

The trial-level habeas court held a hearing regarding the issues on remand. The trial court orally denied the remanded issues. Supp. S.H.R., Transcription of Writ Hearing of June 7, 2010. On June 30, 2010, the trial-level habeas court signed the State's proposed findings and conclusions denying relief on the remanded issues. Supp. S.H.R. at 68-78. After briefing and oral argument, the Court of Criminal Appeals denied habeas relief. *Ex Parte Williams*, No. AP-76455, 2012 WL 2130951 (Tex. Crim. App. 2012).

Federal review followed. This Court appointed counsel. Williams filed a federal habeas petition that tracks many of the issues raised in the 1991 application, reurging several claims that Mr. Schaffer had abandoned. Williams' federal petition raises the following grounds for relief:

1.   The State denied Williams a fundamentally fair trial.
     A.   The State suppressed police dispatch tapes relating to a witnesses' telephone call.
     B.   The State refused to disclose police personnel records concerning Detective Shirley and evidence relating to the policies and practices of the Houston Police Department.
     C.   The State suppressed exculpatory evidence concerning an earlier attempted robbery of Williams.[4]
     D.   The State failed to produce exculpatory evidence from Houston Police Department records relating to the

---

[4]     Williams raised a somewhat similar claim on direct appeal but based his arguments solely on state, not federal, law.

investigating police officers.

E.     The State put into evidence photographs of the crime scene that police officers had allegedly staged.

2.     The trial court violated Williams' right to present a meaningful defense.

A.     The trial court did not allow into evidence medical records for the man who had allegedly tried to rob him.

B.     The trial court did not allow into evidence hotel receipts which corroborated trial testimony about the alleged previous robbery attempt.

C.     The trial court erred by not allowing Williams to present other evidence relating to his trial defense.

3.     Various alleged trial errors violated Williams' constitutional rights.[5]

A.     The State allegedly harassed and intimidated witnesses.

B.     The trial court improperly allowed the prosecution to impeach one of its own witnesses with a prior written statement.

C.     The trial court should have given the jury a limiting instruction regarding a witness' prior inconsistent statement.

D.     The prosecutor violated Williams' constitutional rights by telling jurors to consider character evidence in the guilt/innocence phase.

E.     The prosecutor violated Williams' constitutional rights by telling jurors to consider the character of the victim and the impact of his death on his family in deciding whether Williams was guilty of capital murder.

F.     The trial court erred by allowing the consideration of victim character and impact evidence during guilt-phase deliberations.

G.     Williams is not guilty of capital murder because the victim was not acting in the lawful performance of his duties at the time of the murder.

---

[5]     Immediately following the heading for section three in the petition, Williams includes a discussion that apparently amounts to a ground for relief.  Accordingly, the Court has renumbered the subsequent subsections to include that claim.

       H.     The trial court refused to order the release of criminal records of state and defense witnesses.

       I.      The trial court limited the funds available for expert and investigative assistance.

       J.      Prejudicial publicity and the inflammatory atmosphere surrounding the trial deprived Williams of a fundamentally fair trial.

4.     Various circumstances during jury selection violated Williams' rights.

       A.     The State violated the Sixth, Eighth, and Fourteenth Amendments by removing all black prospective jurors.

       B.     The State's use of peremptory strikes to create an all-white jury violated the Thirteenth Amendment.

       C.     The trial court erred by failing to excuse prospective juror Patricia Hamilton.

       D.     The trial court erred by excusing prospective juror Wallace Smith.

       E.     The trial court erred by excusing prospective juror Dorin Ewing.

       F.      The trial court erred by failing to excuse prospective juror Clell Belcher.

       G.     The trial court erred by failing to excuse prospective juror William Meador.

       H.     The trial court erred by failing to excuse prospective juror Shirlee Martin.

       I.      The trial court erred by failing to excuse prospective juror Davalene Fore.

       J.      The trial court erred when it denied Williams' motion for additional peremptory challenges.

5.     The trial court improperly allowed into evidence Williams' history of juvenile delinquency during the guilt/innocence phase.

6.     The trial court erred at the punishment stage by allowing State's witnesses to testify about Williams' reputation in the community.

7.     Texas' special issue questions did not give jurors an adequate vehicle to consider and give effect to mitigating evidence under *Penry v. Lynaugh*, 492 U.S. 302 (1989).

8. Structural deficiencies in Texas' capital-sentencing scheme deprived Williams of his constitutional rights.

    A. The absence of a specific special issue relating to mitigating evidence prevented trial counsel from providing effective assistance and denied Williams an individual determination of his sentence.

    B. The absence of a mitigation special issue chilled counsel's presentation of mitigating evidence.

    C. The Texas capital sentencing statute unconstitutionally prohibited the trial court from instructing jurors at the penalty phase regarding the effect of a "No" vote by one juror.

    D. The trial court should have instructed the jurors to consider mitigating evidence.

    E. The Texas capital statute called for a mandatory sentence of death without the consideration of mitigating circumstances.

    F. The special issue questions are unconstitutionally vague.

    G. The special issues impermissibly act as aggravating circumstances.

    H. Williams' death sentence was predicated on an invalid aggravating circumstance

    I. The jury could not consider mitigating evidence relating to a prior attempted robbery.

    J. The trial court erred in admitting proof of Williams' parole revocation.

    K. Texas' special issue questions are unconstitutionally vague.

Respondent has moved for summary judgment [Doc. # 20].[6] The Court denied summary judgment and ordered the parties to provide briefing on several issues [Doc. # 26]. The parties have provided the additional briefing [Docs. ## 33, 34]. This case is ripe for adjudication.

---

[6] Respondent's summary judgment motion renumbered Williams' claims. For the purposes of clarity, the Court will refer to the claims by the designation Williams set forth in his amended federal petition [Doc. # 7], with minor alterations.

## PROCEDURAL STATUS OF WILLIAMS' CLAIMS

The Court's first task is to determine which claims Williams presents in a manner that allows for federal review.  Respondent argues that, even though Williams raised his federal claims in state court, he did not litigate all of them in a manner consistent with the federal exhaustion doctrine.  Federal courts have long required inmates to give state courts the first chance to rectify constitutional violations.  *See Ex parte Royall*, 117 U.S. 241, 251-52 (1886).  Exhaustion "give[s] the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . ."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Cullen v. Pinholster*, 563 U.S. 170, 208 (2011) ("The exhaustion requirement thus reserves to state courts the first opportunity to resolve factual disputes relevant to a state prisoner's claim.").  Federal courts "rigorously enforce[] *total* exhaustion" and require inmates to purse "*full* relief first from the state courts . . . ."  *Rose v. Lundy*, 455 U.S. 509, 518-19 (1982) (italics added).  Inmates have fully exhausted claims after "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845; *see also Duncan v. Walker*, 533 U.S. 167, 179 (2001); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  AEDPA codifies the exhaustion doctrine and requires inmates to avail themselves of remedies "available in the courts of the State."  28 U.S.C. § 2254(b)(1).

### A.    Williams' Litigation in State Court

Respondent argues that, while Williams may have presented most of his federal claims in state court, he did not exhaust them as understood by federal law.  Serious and difficult questions particularly arise concerning the manner in which Williams litigated issues on state habeas review.  Williams filed three separate habeas applications, but not all the issues therein proceeded to adjudication.  To summarize, the state habeas record contains: (1) a 1991 state habeas application filed by Williams'

*pro bono* attorneys; (2) a 1993 application by appointed counsel Mr. Schaffer which renewed some claims from the 1991 application, limited others, and raised new issues; and (3) a 2005 subsequent habeas application advancing a modified *Batson* claim. Williams's federal petition closely tracks his 1991 application, but also includes claims contained in the two later state habeas applications.  This convoluted state litigation history results in four categories of claims.  Each category of claims presents different questions regarding whether Williams sufficiently exhausted his federal grounds for relief.

First, Williams' federal petition includes claims from the 1991 petition that Mr. Schaffer *did not renew* in the 1993 application.[7]  In 2002, Mr. Schaffer informed the state courts that Williams had waived all claims advanced in the 1991 application. Respondent argues that Mr. Schaffer's abandonment of those claims means that Williams did not fully and fairly present them to the state courts for adjudication.

For the purposes of the exhaustion doctrine, "a state habeas petitioner's disclaimer of an argument has the same effect as his failure to raise it in the first place." *Johnson v. Cain*, 712 F.3d 227, 233 (5th Cir. 2013); *see also Daniel v. Cockrell*, 283 F.3d 697, 701 (5th Cir. 2002).  By waiving the claims in the 1991 application, Williams "signal[ed] to the state courts that they need not pass judgment upon" those issues. *Johnson*, 712 F.3d at 233.  Williams' waiver forfeited his state court remedies and prevented the highest state court from considering those grounds for relief.  Proceeding to federal adjudication of the claims from the 1991 application "would be inconsistent with comity interests and would subvert the primary purpose of the exhaustion requirement." *Id*. at  233-34.[8]  Williams has not exhausted the

---

[7]     Federal claims 1, 2, and 3(a), (b), (c), (f), (g), (h), (i), (j); 4(b), (d), (h), (i), (j); 5; and 8(a), (c), (f), (g), (h), (i), (j).

[8]     Williams has not responded to Respondent's exhaustion argument with regard to this
(continued...)

claims that he raised in the 1991 application but did not later renew.

Second, the 1993 application contained several claims that Mr. Schaffer later abandoned. The 1993 application renewed some claims from the 1991 application[9] and also advanced several new grounds for relief.[10] In 2002, Mr. Schaffer advised the state courts that Williams abandoned some claims from the 1993 application.[11] Because the abandonment prevented the Court of Criminal Appeals from ruling on Williams' constitutional arguments, those claims are unexhausted.

Third, Williams' federal petition includes at least one claim (claim 7) that Williams raised in the 1991 application, and Mr. Schaffer included with a narrower focus in the 1993 application, yet the Court of Criminal Appeals still gave expansive review. As the Court will discuss at greater length below, the Court of Criminal Appeals' adjudication of Williams' *Penry* claim defines the extent to which Williams has exhausted state court remedies. This Court's review of the *Penry* claim should be co-extensive with that which the Court of Criminal Appeals adjudicated. *See Jones v. Dretke*, 375 F.3d 352, 355 (5th Cir. 2004) (finding that exhaustion was satisfied, despite the fact that the inmate had argued a different theory, when the Court of Criminal Appeals "undertook to decide it on the merits *sua sponte*" under the same theory advanced in federal court). The extent of the Court of Criminal Appeals' review defines the *Penry* issues available for federal review.

Fourth, Williams' federal petition raises several issues that he either exhausted

---

[8]      (...continued)
category of claims, nor has he shown that any exception to the exhaustion doctrine would allow federal consideration of those issues.

[9]      Including federal claim 3(d) and part of federal claims 3(e) and 4(g).

[10]      Including federal claims 4(f) and 6.

[11]      The state habeas court's findings and conclusions acknowledged Mr. Schaffer's abandonment of those arguments. S.H.R. at 757.

on direct appeal or advanced in his 1993 application that Mr. Schaffer did not later abandon (claims 3(e); 4(a), (c), (e), (f), (g); and part of 8). The merits of those claims are fully before this Court.

Accordingly, the Court finds that Williams only raised claims 3(e); 4(a), (c), (e), (f), (g); 7; and 8(b), (d), (e) in a manner consistent with the federal exhaustion doctrine. The merits of those claims are fully available for federal review.

## B.    Procedural Bar

Respondent argues that this Court cannot consider the merits of any claims that Williams did not fully exhaust in state court. Federal precedent generally favors the dismissal of "mixed petitions"–those raising both exhausted and unexhausted claims–to allow state court review. *See Rose v. Lundy*, 455 U.S. 509, 510 (1982). However, Texas' abuse-of-the-writ doctrine (codified at Texas Code of Criminal Procedure article 11.071, § 5) generally precludes inmates from filing successive state habeas applications, preventing inmates from returning to state court in order to exhaust their claims. Thus, a procedural default results when an inmate advances for the first time in federal court a claim that the state courts would bar on procedural grounds. *See Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).

A procedural bar is not insuperable. The Supreme Court has noted:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a *fundamental miscarriage of justice*.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (emphasis added). Williams' most recent briefing seems to suggest that state habeas counsel's litigation strategy should forgive the procedural bar.

The Supreme Court in *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1318 (2012), and *Trevino v. Thaler*, ___ U.S. ___, 133 S. Ct. 1911 (2013), held that state

habeas counsel's representation may forgive federal impediments to review under limited circumstances.[12] Here, Mr. Schaffer's decision not to adopt various arguments from the 1991 application, and then to abandon issues from the 1993 application, provides a potential basis for Williams' ineffective-assistance-of-habeas-counsel argument. Limitations on the *Martinez* exception, however, preclude deficiencies in habeas representation from opening the door to federal review in this case. *Martinez* and *Trevino* only created only "a narrow exception" for the "procedural default of a claim of ineffective assistance at trial." *Martinez*, 132 S. Ct. at 1315; *see Reed v. Stephens*, 739 F.3d 753, 778 nn.16 & 20 (5th Cir. 2014) (declining to extend *Martinez* beyond ineffective-assistance claims). Williams' federal petition does not appear to raise any ineffective-assistance-of-trial-counsel claim.[13]

---

[12]    Williams particularly emphasizes that state habeas counsel's abandonment of the 1991 application should forgive any exhaustion problems with his *Penry* claim. Williams contends that, "[g]iven all of the litigation over mitigation instruction and the numerous Supreme Court decisions, there can be no legitimate basis for the abandonment of any issue relating to mitigating instructions or the investigation and presentation of mitigating evidence at trial" [Doc. # 34, p. 14]. The Court has already found that Williams sufficiently exhausted his *Penry* claim.

[13]    While somewhat unclear, Williams may raise one ineffective-assistance-of-trial-counsel claim. Williams raises an issue similar to a claim under *Strickland v. Washington*, 466 U.S. 668 (1984), by arguing that alleged defects in Texas' capital sentencing scheme impeded counsel's ability to raise certain arguments [Doc. # 7, p. 149]. Williams argued on state habeas review that trial counsel was deficient under *Strickland* for not presenting mitigating evidence.

In his federal petition, Williams does not list a claim that counsel failed to present mitigating evidence as a separate ground for relief. Williams does not include any significant discussion of *Strickland*'s deficient performance and prejudice prongs regarding the lack of mitigating evidence, nor does he present evidence that trial counsel should have found and introduced before the jury. Instead, Williams' federal claim appears to center on a structural argument that the lack of a mitigation instruction caused counsel to perform ineffectively in the penalty phase. Courts have treated similar "chilling effect" arguments as a variation of *Penry*, not *Strickland*, claims. *See Mann v. Scott*, 41 F.3d 968, 980 (5th Cir. 1994); *May v. Collins*, 948 F.2d 162, 168 (5th Cir. 1991); *Buxton v. Collins*, 925 F.2d 816, 822 (5th Cir.
(continued...)

As Williams does not make any other argument to overcome the procedural hurdles, the Court cannot consider the claims he defaulted in state court. Only claims 3(e); 4(a), (c), (e), (f), (g); 7; and 8(b), (d), (e) from Williams' federal habeas petition are fully available for federal review.

### ANALYSIS OF CLAIMS AVAILABLE FOR FEDERAL REVIEW

Before turning to the merits of Williams' exhausted claims, the Court discusses the deferential review afforded state court decisions. The Court then addresses the procedurally available claims relating to the guilt/innocence and penalty phase in turn.

## I.      STANDARD OF REVIEW

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined"). The States, therefore, "possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Federal habeas law "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 15 (2013); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing AEDPA's "presumption that state courts know and follow the

---

[13]       (...continued)

1991). At any rate, if Williams intended to raise a separate *Strickland* claim based on the paucity of mitigating evidence presented in the punishment phase, this Court's finding of constitutional error relating to the *Penry* claim renders other punishment-phase claims moot.

law").  Given this required deference to the state court system, several principles circumscribe both the nature of federal habeas review and the availability of federal habeas relief.

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review.  "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief."  *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).  "[T]ime and again," the Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'"  *White v. Wheeler*, ___ U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting *Titlow*, 134 S. Ct. at  16).  Under AEDPA's rigorous showing, an inmate may only secure relief after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

Inmates arguing legal error in state court decisions must comply with § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  A petitioner does not merit relief by merely showing legal error in the state court's decision.  *See White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1702 (2014) (stating being "merely wrong" or in "clear error" will not suffice for federal relief under AEDPA).  In contrast to "ordinary error correction through appeal," AEDPA review exist only to "guard against extreme malfunctions in the state criminal justice systems . . . ."  *Woods v. Donald*, ___ U.S. ___, 135 S. Ct. 1372, 1376 (2015) (quotation omitted).  "[F]ocus[ing] on what a state court knew and

did," *Pinholster*, 563 U.S. at 182, AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court must also presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

An inmate's compliance with 28 U.S.C. § 2254(d) does not guarantee habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (observing that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). A habeas petitioner meeting his AEDPA burden generally must still comply with weighty jurisprudential tenets, such as the harmless error doctrine and the non-retroactivity principle, that bridle federal habeas relief. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). Thus, any error cannot

require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict,'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)), or would not require the creation of new constitutional law, *see Banks*, 536 U.S. at 272 (relying on *Teague v. Lane*, 489 U.S. 288 (1989)).

With those standards in mind, the Court turns to the exhausted issues presented in Williams' federal petition.

## II.    GUILT/INNOCENCE PHASE CLAIMS

Claims 1 through 5 from Williams' federal petition raise issues from the guilt/innocence phase of trial.  As discussed previously, only trial phase claims 3(e); 4(a), (c), (e), (f) and (g) are properly before this Court.  Williams has not shown that those claims merit federal habeas relief.

### A.    The Prosecutor Improperly Told Jurors to Consider the Victim's Family in the Guilt/Innocence Phase (Claim 3(e))

Williams argues that the prosecution's plea for sympathy toward the victim's family in the guilt/innocence phase summation violated his constitutional rights [Doc. # 7, pp. 94-96].  The prosecutor closed the guilt/innocence arguments by reminding jurors that: "Detective Shirley's family doesn't have his love and comfort any more. He is not going to be able to come home and tell them that he loves them. He is not going to be around at Christmas." Tr. Vol. 24 at 118.  Trial counsel objected, and the trial court instructed the jury to "disregard [that] line of argument." Tr. Vol. 28 at 119.  The trial court denied trial counsel's request for a mistrial.  Tr. Vol. 28 at 119.

In Williams' 1993 habeas application he argued that the State's summation violated his rights to due process and a fair trial.  S.H.R. at 414.  The state habeas court provided two reasons for denying this claim.  First, the state habeas court found that trial counsel "objected to the State's argument concerning the complainant and his family, and that the trial court instructed the jury to disregard such argument . . . ."

S.H.R. at 757.  The state habeas court concluded that "harm, if any, in the State's guilt-innocence argument . . . was cured by the trial court's instruction to disregard." S.H.R. at 776.[14]  Second, the state habeas court found no constitutional error in what was essentially victim-impact argument.  Citing Texas law, the state habeas court found that "the result of the proceeding would [not] have been different based on the overwhelming evidence of defendant's guilt" and held that Williams "fail[ed] to show that the State's jury argument that the complainant's family no longer had his love, comfort, and presence at Christmas deprived [him] of due process and a fair trial." S.H.R. at 776.

_____

[14]     On state habeas review, Williams raised two grounds for relief based on the prosecutor's arguments. Claim 3(e) in Williams' federal petition renews his tenth ground for state habeas relief.  Williams' ninth state habeas claim contended that the prosecutor's argument violated his constitutional rights through an emotional appeal that posed a juxtaposition between Williams' character and that of the victim. Tr. Vol. 28 at 90-91, Tr. Vol. 28 at 118.  At other points in guilt/innocence closing arguments, the prosecutor referred to Detective Shirley's experience, dedication, and success as a police officer. Tr. Vol. 28 at 15. The prosecutor closed his arguments by reminding jurors generally: "When a policeman is killed in the line of duty it is something extremely serious.  They get out and protect each and every one of us each and every day." Tr. Vol. 28 at 20-21.  The prosecutor also referred to Detective Shirley as "a dedicated police officer; and because of his dedication he was gunned down, killed like dog on the streets by that man sitting right here." Tr. Vol. 28 at 4. The prosecutor's use of the phrase "like a dog" harkened back to testimony that, after seeing reports about the murder on television, Williams told a witness that "he didn't want to be shot down like a dog." Tr. Vol. 26 at 651, 664; Tr. Vol. 27 at 737-38. Mr. Schaffer renewed, but then abandoned, that claim.  The state habeas court recognized that Mr. Schaffer abandoned the ninth ground for habeas relief, S.H.R. at 757, and thus only considered Williams' complaint about the prosecution's plea for sympathy for the victim's family.  The Court, therefore, will only consider the arguments made in the tenth ground from his 1993 application.  In any event, the allegations contained in Williams' ninth ground for relief do not present a basis for federal relief.  The Supreme Court has never held that testimony about a victim's character is completely irrelevant to a jury's evaluation of guilt.  Even when identifying the potential for error in some cases, the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 823 (1991), assumed that testimony about a victim's good character often has "relevance at the guilt phase of the trial." *See also Bennett v. Angelone*, 92 F.3d 1336, 1348 (4th Cir.1996) ("*Payne* suggests that limited background evidence may be admitted—indeed, may have to be admitted—at the guilt phase of trial.").

Williams' federal petition again argues that "[v]ictim character and impact evidence has no relevance whatsoever to the question of guilt." [Doc. # 7, p. 96]. Williams, however, does not respond to the state habeas court's primary holding: that the trial court cured any error by instructing jurors to disregard that line of argument. Federal courts "presume that jurors understand and follow their instructions, abandoning that presumption only when there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." *United States v. Patino-Prado*, 533 F.3d 304, 313 (5th Cir. 2008) (quotation omitted); *see also Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  Nothing suggests that jurors could not have followed the trial court's instruction to disregard.

The state habeas court also found that the State's argument, notwithstanding, did not violate Williams' rights.  S.H.R. at 776.  The admission of victim-impact testimony does not violate the Fourteenth Amendment unless the evidence introduced "is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 824 (1991).  Even when the State presents victim-impact testimony or argument in the guilt/innocence phase, an inmate must still show fundamental unfairness resulting therefrom.  *See Castillo v. Johnson*, 141 F.3d 218, 223–24 (5th Cir. 1998).  A trial is fundamentally unfair when the prosecutor engages in persistent or pronounced misconduct, or the evidence was so insubstantial that in all probability but for the remarks the jury would not have returned a guilty verdict. *See Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000); *Rushing v. Butler*, 868 F.2d 800, 806 (5th Cir. 1989).

The State's reference to the family's loss was fleeting and isolated.  Respondent observes that "the complained-of remarks were brief–they constitute three short sentences in more than one-hundred pages of jury argument" [Doc. # 20, p. 58].  The evidence of guilt far outweighed the brief mention of victim's family.  Thus, the

alleged improper remarks did not cast serious doubt on the correctness of the jury's verdict. Williams has not shown that the state court's resolution of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## B. Racial Discrimination in the Prosecution's Use of Peremptory Strikes (Claim 4(a))

The State used six peremptory challenges to remove African-American prospective jurors from the panel. No black jurors served at Williams' trial. Williams claims that the prosecution's racially motivated use of peremptory strikes violated his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments [Doc. # 7, pp. 108-11]. The Court will discuss the background of Williams' jury selection before turning to AEDPA review of the state court's resolution of his *Batson* claim.

### 1. Background

The State of Texas tried Williams in 1983 before the law held prosecutors accountable for their use of peremptory strikes against individual jurors. Courts assessed claims of discrimination in the jury selection process under *Swain v. Alabama*, 380 U.S. 202 (1965), which required a defendant to "prove that his prosecutor had a systematic and intentional practice of excluding blacks from traverse juries in criminal trials through the exercise of peremptory challenges, and that this practice continued unabated in petitioner's trial." *Evans v. Cabana*, 821 F.2d 1065, 1068 (5th Cir. 1987). In essence, *Swain* "allowed prosecutors to use peremptory strikes to create an all-white jury in individual cases, as long as they did not systematically keep blacks off juries." *Byrd v. Delo*, 917 F.2d 1037, 1041 (8th Cir. 1990). As a practical matter, lower courts used *Swain* to place "a crippling burden of proof" on defendants. As the Supreme Court later noted, *Swain* "left prosecutors' use of peremptories largely immune from constitutional scrutiny." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005); *see also United States v. Wilson*, 816 F.2d 421, 424 (8th

Cir. 1987) ("Prosecutors seem . . . to have been relying on *Swain*'s evidentiary standard to insulate themselves from being forced by the district court to provide the reasons for their use of peremptory strikes to eliminate black jurors.").

The record is unclear as to the racial demographics of the entire jury venire in this case. The record, however, specifies the race of some jurors that the State removed. Three African-American prospective jurors were dismissed for cause.[15] The prosecutor used peremptory strikes to remove six African-American prospective jurors: Mansfield Nelson (Tr. Vol. 9 at 810); Jennie Henley (Tr. Vol. 9 at 1359); Pearlie Mae Keller (Tr. Vol. 14 at 1790); Gussie Mae Jones (Tr. Vol. 14 at 1804); Wilburn Gibson (Tr. Vol. 16 at 2071); and Nan Roque (Tr. Vol. 18 at 2374).

Framing his objection in the context of the *Swain* requirements, defense counsel moved for a mistrial before the jury was seated because the State had consciously and systematically excluded all blacks from the jury. (Tr. Vol. 23 at 14). The trial court summarily denied the defense's objection, and the law at the time of trial did not require it to do more.

On direct appeal, Williams complained that the prosecutor used five peremptory strikes to remove African-American prospective jurors solely on the basis of race.[16] The Court of Criminal Appeals relied on *Swain* to affirm the lower court's judgment. Specifically, the Court of Criminal Appeals held that "[t]he mere exercise of peremptory challenges is not sufficient to sustain the ground of error; there is no showing of systematic exclusion." *Williams v. State*, 682 S.W.2d 538, 543 (Tex. Crim. App. 1984).

Two years after the Court of Criminal Appeals denied Williams' appeal, but

---

[15]     The following black prospective jurors were removed for cause: Gertrude Jules (Tr. Vol. 5 at 82); Doran Ewing (Tr. Vol. 9 at 922); and Arthelious Goran (Tr. Vol. 21 at 2755).

[16]     Williams' direct appeal did not include Mr. Gibson in the list of jurors against whom the State exercised racially motivated strikes.

during the pendency of his petition for a writ of certiorari, the United States Supreme Court decided *Batson*.  In contrast to the *Swain* framework, *Batson* did not require a criminal defendant to demonstrate a history of discriminatory practices by the prosecution.  *Batson* individualized a criminal defendant's ability to show racial animus, allowing a defendant to "make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection in his case."  *Batson*, 476 U.S. at 95.

*Batson* created the scaffolding that a defendant would need to prove racial discrimination.  When a party raises a *Batson* challenge, courts engage in a three-step burden shifting review:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Rice v. Collins*, 546 U.S. 333, 973-74 (2006) (quotations and citations omitted); *see also Johnson v. California*, 545 U.S. 162, 168 (2005); *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005).  *Batson*'s burden-shifting scheme placed a greater emphasis on development of a factual record, placing primary importance on specific details reflecting the contemporaneous trial events rather than broad arguments that defined effective *Swain* claims.

With *Batson*'s focus on why a prosecutor removed specific individuals, the trial record in this case was insufficient to clarify the intent behind the dismissal of

minority prospective jurors.   After the Supreme Court granted his petition for certiorari review and remanded the case, *Williams v. Texas*, 479 U.S. 1074 (1987),[17] the Texas Court of Criminal Appeals ordered the state trial court to hold a *Batson* hearing, *Williams v. State*, 731 S.W.2d 563 (Tex. Crim. App. 1987).

Five years after jury selection, the trial court held a hearing to discuss the State's reasons for striking each black prospective juror.   Williams called three criminal defense attorneys to discuss the pattern and practices of the Harris County prosecutor's office at the time of trial.   Each testified that the State would not accept African-American jurors in capital cases unless they could not find a way to dismiss them.   The state trial court subsequently did not make any findings regarding the criminal defense attorneys' testimony.

While both prosecutors had participated in voir dire, Assistant District Attorney Keno M. Henderson "had ultimate responsibility for exercising the peremptory strikes. Accordingly Mr. Henderson provided the reasons for the State striking the six black veniremembers."   Supplemental Clerk's Record at 31.   In the 1988 *Batson* hearing, prosecutor Henderson provided narrative testimony about something the law did not require him to do at the time of trial: provide justifications the State's exercise of peremptory challenges that resulted in a jury without any African-American jurors. Courts view an attorney's *post hoc* explanation for peremptory strikes with some suspicion. *See Jones v. Butler*, 864 F.2d 348, 370 (5th Cir. 1988) (finding, in a case with a shorter period between trial and the *Batson* hearing than the instant one, that "[y]ears after trial, the prosecutor cannot adequately reconstruct his reasons for striking a venireman").   Such justifications are "subject to the usual risks of imprecision and distortion from the passage of time." *Miller-El*, 537 U.S. at 243.

The state trial court, nevertheless, found that Mr. Henderson gave justifications

[17]   The Supreme Court vacated the judgment after deciding that *Batson* applied retroactively to all cases not yet final. *See Griffith v. Kentucky*, 479 U.S. 314 (1987).

P:\ORDERS\Prsnr\2013\1714.M&O.Merits   160628.1500                          25

that "were credible, plausible, and legitimate . . . ." S.S.H.R. at 165.  The trial court found that "the State's general strategy for jury selection in a capital case was to accept the first twelve people who could return a death penalty verdict under the unique set of facts presented in the subject case."  S.S.H.R. at 164; *see also* Supplemental Clerk's Record at 29-40.  In this case, the state trial court found that "the State was looking for a juror who was intelligent, capable of understanding the issues, capable of concentrating on the issues without outside interference, capable of making an informed decision based on the evidence, and not prejudiced against either police officers or the State."  S.S.H.R. at 165; *see also Williams*, 804 S.W.2d at 98.

The Court summarizes Mr. Henderson's explanations for each African-American juror who was removed:

- Mr. Nelson did not believe in the death penalty in any circumstance, could not impose a sentence that resulted in death, became agitated during questioning, and changed his answers depending on who was questioning him.

- Ms. Henley preferred a sentence of life imprisonment to death, had difficulty understanding and answering questions, often made no sense, exhibited a lack of concern for the legal process, and expressed no problem with people fighting police officers.

- Ms. Keller possibly had weak ties to the community, had physical difficulties and parental responsibilities that would make it difficult to serve, initially had said that she had never thought about the death penalty but later expressed long-standing concerns about it, said that she could not vote for death, said she would panic if called as a juror, and gave inconsistent answers on cross-examination.

- Ms. Jones vacillated on whether she could answer the special issues, had parental responsibilities that would make it difficult for her to focus on a capital murder case, was confused with questions, and gave inconsistent answers.

- Mr. Gibson said that he had never thought about the death penalty

but later showed a predisposition against capital punishment, said that he could not answer the special issues, would have difficulty providing for his family during jury service, and vacillated in his opinion of the death penalty.

• Ms. Roque had parental responsibilities that would make jury service difficult, was not strongly in favor of the death penalty, would hold the State to a higher burden of proof than required by law, had a bias against law enforcement, and had difficulty understanding legal proceedings.

The trial court also found that Mr. Henderson gave "neutral, unambiguous, and non-racial" reasons for exercising those peremptory challenges . . . ." S.S.H.R. at 165. On those findings, the trial court concluded that "the prosecutor in the instant case did not exercise his peremptory challenges in a discriminatory manner to exclude venirepersons based upon racial considerations, nor did he, in any way, purposefully or deliberately deny jury participation to black persons because of race." Supplemental Clerk's Record at 39.

On appeal, the Texas Court of Criminal Appeals "examine[d] the record to determine whether the explanations provided by the State were indeed race neutral on their face, and if so, whether there is evidence which indicates that, notwithstanding such appearances, the utilization of the jury strikes were nothing more than a pretext for the racially motivated exercise of the peremptory challenge which provided the prosecutor with the opportunity to discriminate." *Williams*, 804 S.W.2d at 102. The Court of Criminal Appeals concluded after its review that the State's reasons for dismissing the prospective jurors were legitimate and there was no evidence that the State put forth mere pretexts to hide its purposeful discrimination. *See id.* at 105.

During the pendency of the state habeas proceedings, the law again changed. In 2005, the United States Supreme Court decided *Miller-El v. Dretke*, 545 U.S. 231 (2005), which recognized that *Batson*'s "individualized focus came with a weakness of its own owing to its very emphasis on the particular reasons a prosecutor might

give.  If any facially neutral reason sufficed to answer a *Batson* challenge, then *Batson* would not amount to much more than *Swain*."  *Miller-El* emphasized that a defendant at the third step of the *Batson* inquiry could "rely on all relevant circumstances to raise an inference of purposeful discrimination."  *Id*. at 240.  *Miller-El* identified various factors that may give rise to an inference of discrimination: a statistical review of stricken black jurors in comparison to the venire; "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve"; "broader patterns of practice during the jury selection" including the general policy and practice of the prosecutor's office; and "contrasting voir dire questions posed respectively to black and nonblack panel members."  *Id*. at 241, 253.

After the advent of *Miller-El*, Williams filed a Supplement to Amended Application for a Writ of Habeas Corpus asking the Texas courts to reconsider the State's peremptory strikes against black jurors.  Williams, however, narrowly focused the arguments in his successive state habeas application.  While briefly mentioning that the "prosecutor used his peremptory challenges to exclude 100 percent of the eligible black veniremen," Williams centered his briefing nearly exclusively on one element of the *Miller-El* analysis, a comparison between one stricken black juror, Ms. Jones, and one white juror the State accepted.  Williams challenged one of the reasons the prosecutor gave for striking Ms. Jones–that she "would have a problem finding someone to take care of her children only if they got sick or the jury were sequestered–because "[t]he prosecutor was willing to accept a white female who had to care for a physically disabled husband . . . ."  S.H.R. at 663.

In a footnote, however, Williams made a broader allegation, but without providing substantiation:

> There were additional indications that the State exercised peremptory challenges based on race.  The prosecutors shuffled several of the venire panels before asking questions.  They questioned blacks differently than non-blacks regarding their views on the death penalty and the minimum

acceptable sentence.  The district attorney's manual also expressed a general policy of excluding blacks from juries.

S.S.H.R. at 11.

The Court of Criminal Appeals found that Williams' supplement to his habeas application satisfied the requirements of Texas Code of Criminal Procedure article 11.071, § 5, for the filing of a subsequent state application.  On remand, the state habeas court held a June 7, 2010, hearing on Williams' *Miller-El* claim.  Williams' arguments in the hearing expounded on the allegations in his successive state habeas application.  Williams discussed more broadly the concerns raised by *Miller-El*, placing greater emphasis on the composition of the venire as a whole in comparison to the stricken jurors.  In addition, Williams extensively discussed a then-recent case in which a federal district court had found *Batson* error in a contemporaneous case in which Mr. Henderson also represented the State.  *Rosales v. Dretke*, H-03-CV-1016, [Doc. # 109] (S.D. Tex. Dec. 12, 2008).  In *Rosales*, the petitioner had used the testimony from criminal defense attorneys adduced in Williams' *Batson* hearing to argue that the Harris County District Attorney's Office had a pattern and practice of removing black jurors at the time of Williams' trial.[18]

---

[18]     The *Rosales* decision said:

Petitioner draws the Court's attention to Mr. Henderson's prosecution against Arthur Lee Williams, Jr.  The defense accused Mr. Henderson of improperly striking all black panel members.  While the Court of Criminal Appeals found that Mr. Henderson provided race neutral justifications for his strikes, testimony in the related evidentiary hearing showed that prosecutors in general, and Mr. Henderson specifically, rarely if ever allowed minorities to sit on capital juries.  Defense attorneys testified that prosecutors used disparate questioning techniques in an effort to disqualify minority jurors.  While the state courts found no error in that case, the testimony given therein proved that few minorities served on Harris County juries.  *See Williams v. State*, 804 S.W.2d 95 (Tex. Crim. App. 1991).

(continued...)

The trial court signed the State's proposed findings and conclusions. The decision extensively compared Ms. Jones' questioning with the white jurors and the entirety of the jury panel. S.S.H.R. at 166-70. With that comparison, the state habeas court again found that "the State's decision to peremptorily excuse prospective juror Jones, resulting, in part, from Jones' hardship in the event of a lengthy trial or sequestration, was not based on race, but was consistent with the State's general, race-neutral strategy for finding jurors . . . ." S.S.H.R. at 170. The state habeas court concluded that Williams failed to show "disparate treatment . . . or that the State's proffered reasons . . . w[ere] a pretext for racial discrimination." S.S.H.R. at 170. The Court of Criminal Appeals adopted the lower court's findings and conclusions and denied relief.

### 2. Williams' Arguments on Federal Review

Williams has renewed his *Batson* claim on federal review. Williams' petition provides two theories to find *Batson* error. First, Williams disputes Mr. Henderson's race-neutral explanation because not all black jurors expressed an inability to consider a death sentence and, contrary to his testimony, did not express difficulty understanding his questions. Second, Williams summarily states that all black jurors "were excluded pursuant to the practice and policy of the Harris County District Attorney's in general and was the regular practice of the prosecutor in this case" [Doc. # 7, p. 110]. Williams' arguments are insufficient for a meritorious *Batson* claim, particularly in light of AEDPA deference owed to the state court findings.[19]

---

[18]      (...continued)
*Rosales v. Dretke*, H-03-CV-1016, [Doc. # 109] (S.D. Tex. Dec. 12, 2008), at 19-20.

[19]      In denying Respondent's first motion for summary judgment, this Court observed that Williams' federal petition "provides only cursory briefing relating to the *Batson* issue . . . and importantly fails to identify how the state court's detailed review of that claim was an unreasonable application of federal law" [Doc. # 26, p. 10]. The Court invited Williams to
(continued...)

"[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief." *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002). A petitioner cannot meet this burden by merely alleging constitutional error in the state courts' factual findings. Given "the importance of demeanor and credibility evidence in making such determinations," federal courts "give strong deference to the determination of the trial judge [in *Batson* claims], consistent with AEDPA." *Woodward v. Epps*, 580 F.3d 318, 336 (5th Cir. 2009); *see also Hernandez v. New York*, 500 U.S. 352, 369 (1991) ("[W]e decline to overturn the state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous."). This Court's role is "to determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 341. Williams' federal briefing must do more than allege error, he must provide clear and convincing evidence that the state court factfindings were incorrect, 28 U.S.C. § 2254(e)(1), and that its decision was unreasonable, 28 U.S.C. § 2254(d)(2). *See Davis v. Ayala*, ___ U.S. ___, 135 S. Ct. 2187, 2199 (2015) (emphasizing AEDPA's impact on *Batson* claims).

Williams first states that "[t]he voir dire of those black jurors does not support a conclusion that Keno Henderson . . . exercised these peremptory challenges for race neutral reasons," specifically because "[t]hree of the black jurors who were excluded

---

[19]     (...continued)
provide "as suggested by the *Miller-El* cases, a side-by-side comparison of peremptorily struck jurors and those empaneled, a review of whether there was disparate questioning by prosecutors, and whether there is historical discrimination by the prosecutorial office or the individual prosecutors themselves." *Id.* The Court also invited the parties to discuss, as the state courts had on habeas review, *Rosales v. Dretke*, H-03-CV-1016,(S.D. Tex. Dec. 12, 2008) [Doc. # 109], a case in which a *Batson* violation was found involving the same attorney who prosecuted Williams. [Doc. # 26, p. 10].

. . . expressed no opposition to the death penalty.  Instead, the prosecutors alleged that all three were excluded because they could not understand his questions" [Doc. # 33, p. 17].  Williams' briefing consists only of broad statements about the State's use of strikes without particularizing his allegations or giving specific examples.  Williams' federal briefing does not identify which stricken jurors did not express opposition to capital punishment.  *See Murphy v. Dretke*, 416 F.3d 427, 436-37 (5th Cir. 2005) (finding that petitioner's reference to "the entire voir dire record" did not show "that the State's individualized reasons for peremptorily striking each African-American venireperson at issue were actually a pretext for racial discrimination or that any alleged disparate questioning did not result from reasons other than race").  This is particularly problematic because prosecutor Henderson gave more than one reason for striking each prospective jurors.

Williams also makes two closely related arguments.  He contends that "[a] comparison to other jurors is unnecessary in light of the record and the findings of the District Court in *Rosales v. Quarterman*,[No. H-03-1016,] 2008 U.S. Dist. LEXIS 125130 (S.D. Tex. Dec. 12, 2008)."[20]  In *Rosales*, the petitioner raised a *Batson* claim on his conviction which occurred  in the same time period as the State's prosecution of Williams.  The federal district court held an evidentiary hearing in which one of the trial prosecutors testified.  After that hearing, and in light of the totality of the circumstances, the federal district court granted relief on the petitioner's *Batson* claim. Williams' recent briefing highlights two factors from the *Rosales* decision: that (1)

---

[20]     Williams further "asserts that all Black jurors were excluded pursuant to the practice and policy of the Harris County District Attorney's [Office] in general and was the regular practice of the prosecutor in this case" [Doc. # 33, p. 17].  Williams contends that the reasons Mr. Henderson gave for striking jurors "cannot be given credence considering his pattern practice and the practice of the Harris County District Attorney's Office. Williams was entitled to a trial free from discrimination" [Doc. #33, p. 18].  Other than reference to the *Rosales* case, however, Williams has presented no evidence that the prosecutor's office had a policy of systemic racial discrimination.

one of the prosecutors in the instant case, Keno Henderson, also tried the defendant in *Rosales*[21] and (2) Mr. Henderson's "pattern practice and the practice of the Harris County District Attorney's Office" to discriminate in jury selection.

The federal district court in *Rosales* discussed those two factors supporting habeas relief. Those, however, were only two of six factors that "while not conclusively proving discrimination, suggest that race was on the prosecutors' minds as they selected the jury." 2008 U.S. Dist. LEXIS 125130, at p. 14. Those factors did "not conclusively prove that the prosecution struck the jurors because of their race," but were "inferences creat[ing] a backdrop against which the Court must evaluate the prosecution's justifications." *Id.* at p. 20-21.

Recognizing that these two factors are significant, the Court concludes Williams' token showing of discriminatory intent is insufficient to merit federal habeas relief. The Supreme Court has not held that a history of discriminatory use of peremptory strikes is sufficient alone to merit *Batson* relief. Under the *Miller-El* decisions, a court must consider all relevant circumstances surrounding jury selection. However, a prosecutor's personal and his office's general prior history of discrimination, while relevant, does not of itself entitle an inmate to habeas relief. *See Miller-El*, 537 at 322 (2003) (discussing the prosecution's questioning where the same prosecutors engaged in disparate questioning in another case where the court found a *Batson* violation); *Reed v. Quarterman*, 555 F.3d 364, 382 (5th Cir. 2009) (engaging in a full *Batson* analysis in a case involving the same prosecutors who tried the defendant in *Miller-El*). The Court must analyze the discrete circumstance of each case, with a focus on individual questioning of the prospective jurors and the reasons

---

[21]   The parties in *Rosales* did not call Mr. Henderson as a witness, though he provided deposition testimony. The federal district court observed that: "Because Mr. Henderson did not testify at the evidentiary hearing, the Court cannot make any credibility finding regarding his justifications beyond that disclosed by the naked record."

given by the prosecutors the strikes, in context of the whole jury selection.

Despite a suspicious pattern in Williams' trial, the Court cannot conclude, even under *Miller-El*, that Williams has met *Batson*'s third step of proving purposeful discrimination.  The state courts extensively reviewed the jury selection and, as to each potential juror, addressed the post-trial explanations given by the trial prosecutor for the use of peremptory strikes.  Williams has consistently made allegations about long-standing racism in the Harris County District Attorneys' Office, but Williams has simply not substantiated his claim that this office pattern was the reason for the strikes in issue.  Williams' arguments are too conclusory to warrant relief on *Batson* grounds.

Federal law requires this Court to defer to the underlying factual findings and the resultant legal conclusions by the state trial court, the habeas court, and the Texas Court of Criminal Appeals.  On post-*Batson* remand from Williams' direct appeal, the state courts found that Mr. Henderson provided credible race-neutral reasons for striking each black juror.  On state habeas review, the state courts found that at least one of the rationales withstood comparison to the questioning of non-minority jurors.  Williams has not met AEDPA's demanding burden to show that the state court was *unreasonable* in its appraisal of the prosecutor's motives.

In conclusion, despite the concerns about whether the prosecutors struck jurors on account of their race, namely, the State's dismissal of all the black jurors, leaving an all-white jury to sentence Williams to death, and one of Williams' prosecutors was already found by a federal court to have taken race into consideration in selecting jurors in another trial, leaving a possibility that race played a factor in jury selection, the Court is constrained to conclude that Williams has not made a persuasive showing of inferences suggesting purposeful discrimination in the use of peremptory strikes as to specific jurors or that the prosecutor actually engaged in discriminatory practices in his case.  Williams, therefore, has not shown an entitlement to federal habeas relief on *Batson* grounds.

### C.     Failure to Excuse Prospective Jurors for Cause (Claims 4(c), 4(f) and 4(g))

Williams raises three claims (4(c), (f), and (g)) alleging that the trial court erred by not excusing three prospective jurors for cause: Patricia Hamilton, Carl Belcher, and William Gene Meador [Doc. # 20, pp. 114, 118-21].  Williams provides reasons for which the defense would wish to excuse each of the challenged jurors.[22]  The trial court denied Williams' challenges for cause with respect to each of these prospective jurors.  Tr. Vol. 13 at 1696; Tr. Vol. 14 at 1747-48; Tr. Vol. 17 at 2212.  Williams then exercised peremptory challenges to remove each from the jury panel.

In all three claims that challenge the trial court's failure to remove prospective jurors for cause, the harm to Williams was the loss of the peremptory strikes.[23]  The

---

[22]    Williams argues that Patricia Hamilton was acquainted with the victim's family (claim 4(c)). Ms. Hamilton testified that she belonged to the same "quite large" church as the victim and his family.  Ms. Hamilton knew who the victim's wife was, but she "did not have a relationship with the wife. I said I knew her. I would not consider myself a close friend or anything to her."  Ms. Hamilton explained that she had never been introduced to the victim. Ms. Hamilton expressed that her relationship would not cause any concern for her ability to serve as a juror.

Williams argues that Carl Belcher had a bias against life imprisonment for capital murder (claim 4(f)).  Mr. Belcher initially stated that he did not think that life imprisonment was a proper punishment for someone convicted of capital murder involving a police officer. Tr. Vol. 14 at 1746-47.  After trial counsel challenged Mr. Belcher for cause, the trial court asked if he could "set that attitude aside and answer those questions based on the evidence." Mr. Belcher answered, "Yes, I could."  Tr. Vol. 14 at 1747-48.

Williams contends that William Gene Meador could not consider the full range of punishment (claim 4(g)).  Mr. Meador initially stated that he could consider the full range of punishment, Tr. Vol. 13 at 1662, he immediately backtracked and said that five years would not be an appropriate sentence for a defendant who had killed someone.  Tr. Vol. 13 at 1662.  Back-and-forth questioning by the prosecution, the defense, and the trial court resulted in different answers, most frequently with Mr. Meador opinion that a five year sentence was too short for murder.  Ultimately, Mr. Meador retreated and stated that: "I can follow the instructions of the Court.  If they say five years is sufficient, I might not agree with it but that is up to the Court."  Tr. Vol. 13 at 1695.

[23]    Texas state law entitles the defense to fifteen peremptory challenges.  *See* TEX. CODE
(continued...)

Supreme Court has "long recognized that peremptory challenges are not of constitutional dimension." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988); *see also Martinez-Salazar*, 528 U.S. 304, 311 (2000) ("[P]eremptory challenges are not of federal constitutional dimension."); *Gray v. Mississippi*, 481 U.S. 648, 663 (1987) ("Peremptory challenges are not of constitutional origin."). The Supreme Court has explained that peremptory challenges are "a means to achieve the end of an impartial jury." *Ross*, 487 U.S. at 88. With the obvious exception of those cases in which peremptory challenges mask racial or gender discrimination, "it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise." *Id.* at 89. Where, as here, the challenged juror was removed by use of a peremptory challenge, federal habeas corpus relief is available only if a petitioner demonstrates that the jury ultimately selected to try the case was not impartial. *Ross*, 487 U.S. at 85–86.

Williams summarily argues that the denial of his challenges for cause "force[d] [him] to accept [at least one] objectionable juror . . . ." [Doc. # 7, p. 114].[24] Courts have recognized that *Ross* establishes a high threshold for demonstrating error. To grant relief, a challenged juror must be "partial," that is, "properly subject to strikes for cause." *Nethery v. Collins*, 993 F.2d 1154, n.20 (5th Cir. 1993); *see also Martinez-Salazar*, 528 U.S. at 313 (finding that error under *Ross* results when a court seats any juror "who should have been excused for cause"); *United States v. Webster*,

---

[23]     (...continued)
CRIM. PRO. art 35.15(a). Texas case law allows a trial court to allocate additional peremptory challenges when the defense expends their original allotment. *See Cooks v. State*, 844 S.W.2d 697, 717 (Tex. Crim. App. 1992) ("It is clearly within the discretion of the trial court to grant additional peremptory challenges upon exhaustion of the statutory number of strikes.").

[24]     Trial counsel informed the trial court that the last two jurors were objectionable to the defense and they would have been removed by peremptory strike, if the defense had any such strikes remaining. Tr. Vol. 18 at 3080.

162 F.3d 308, 341-42 (1998) (distinguishing between an objectionable and partial juror).

Williams' federal briefing does not specify which juror who sat at trial was an "objectionable juror," much less why the trial court should have removed that person for cause.  The Court, therefore, denies relief on this ground.

Alternatively, the state habeas court found that the trial court did not abuse its discretion in denying the challenge for cause with regard to each of the prospective jurors.  In each instance, the state habeas court found that the prospective juror could set aside prior opinions or preconceptions and impartially fulfill their responsibility as a juror.  True, each juror was equivocal or halting on different grounds.  The back-and-forth of *voir dire* questioning left a record in which isolated statements could lead to different conclusions about each challenged juror's impartiality.  Nevertheless, in each instance, the state courts made a factual finding that the trial court did not err in denying the challenge for cause.  S.H.R. at 748-51, 772-74.  Under the deferential review afforded state factual findings by AEDPA, Williams has not shown that the state courts' factual assessment of the prospective jurors' ability to serve impartially was unreasonable.

Because Williams has shown no prejudice aside from the loss of a peremptory strike, he has not identified any objectionable juror who served at trial, and the state courts were not unreasonable in finding that the challenged prospective jurors would have been impartial, Williams has not shown an entitlement to relief on claims 4(c), (f), and (g).

### D.    Improperly Excusing Prospective Juror Dorin Keith Ewing (Claim 4(e))

Williams argues that the trial court erred by dismissing prospective juror Dorin Keith Ewing for cause because of his opinion on the death penalty [Doc. # 7, p. 117].  The trial court and the parties extensively questioned Mr. Ewing who vacillated in his

ability to answer the special issues in a manner resulting in a death sentence.

The trial judge first questioned Mr. Ewing, throughout which he consistently demonstrated an inability to answer the special issue questions because they would result in a death sentence. Tr. Vol. 9 at 887-90. During questioning by the State, Mr. Ewing explained that he did not believe in the death penalty and had always felt that it was "immoral." Tr. Vol. 9 at 892-93. Mr. Ewing agreed that he "just could not sit as a juror in a capital murder case because one of the possible punishments might be 'death.'" Tr. Vol. 9 at 895. Mr. Ewing explained that he could not answer the special issues "yes" because of his feelings about capital punishment, regardless of the evidence or the trial court's instructions. Tr. Vol. 9 at 900, 905.

During the defense's questioning, Mr. Ewing reiterated that he did not believe in the death penalty. Tr. Vol. 9 at 909. Mr. Ewing, however, vacillated as trial counsel asked him questions about whether he would be able to follow the law and, based on the evidence, return a guilty verdict. Tr. Vol. 9 at 911-17.

The trial judge then interrupted the questioning and pointed out to Mr. Ewing that he had "given opposite answers to the same questions." Tr. Vol. 9 at 918. Mr. Ewing acknowledged that he had, but explained: "But I could [answer the special issues], but I couldn't be responsible for somebody's life. That is what I am trying to say. I could be on the jury; but as far as that decision, that to see if someone lives or dies–" Tr. Vol. 9 at 918. The trial judge again interrupted and reminded Mr. Ewing that the jury's answers to the special issues would decide whether the defendant received a death sentence. Tr. Vol. 9 at 918. Mr. Ewing again reiterated that he could not answer the special issues and "be responsible for that." Tr. Vol. 9 at 919. The State then asked Mr. Ewing additional questions to which he again demonstrated an inability to answer the special issue questions. Tr. Vol. 9 at 919-21. The trial court then excused Mr. Ewing over the defense's objection. Tr. Vol. 9 at 922.

Williams argues that the trial court's excusal of Mr. Ewing violated his rights

under *Witherspoon v. State*, 391 U.S. 510, 521 (1968).  In *Witherspoon*, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."  391 U.S. at 522.  The Supreme Court in *Witherspooon* and its progeny established the general rule that "a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath*."  *Adams v. Texas*, 448 U.S. 38, 45 (1980) (emphasis added); *see also Wainwright v. Witt*, 469 U.S. 412, 424 (1984).  Thus, a death sentence may not be imposed by a jury selected on "'any broader basis' than ability to follow the law or abide their oaths."  *Adams*, 448 U.S. at 48 (quoting *Witherspoon*, 391 U.S. 522 n.21).

"This standard . . . does not require that a juror's bias be proved with 'unmistakable clarity,'" particularly because "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Witt*, 469 U.S. at 426. Thus, a reviewing court gives deference to a trial judge who could observe the demeanor of the potential juror.  *Id.* at 424-26.  The exclusion of potential jurors is a question of fact.  *See McCoy v. Lynaugh*, 874 F.2d 954, 960 (5th Cir. 1989); *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

On direct appeal, the Court of Criminal Appeals found that Mr. Ewing was "properly subject to challenge for cause by the state" because he would "automatically vote against the death penalty regardless of the evidence."  *Williams*, 682 S.W.2d at 540.  This Court presumes correct state court factual determinations, and the petitioner has the burden of rebutting these determinations by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).  This Court can grant federal habeas relief only if the state court decision "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *see also Fuller v. Johnson*, 114 F.3d 491, 500-01 (5th Cir. 1997) (holding that a trial court's finding of juror bias is entitled to a presumption of correctness).

Despite vacillation during the defense's questioning, Mr. Ewing repeatedly expressed that his opinion on the death penalty would keep him from answering the special issues in the State's favor, regardless of the evidence.  Even though looking at the defense questioning in isolation may have arguably suggested otherwise, a full review of the record supports the trial court's granting of a challenge for cause to Mr. Ewing.  Williams has not shown that it was unreasonable to uphold his dismissal for cause.  Williams has not met AEDPA's high standard with regard to this claim.

### E.    Conclusion of Guilt/Innocence Claims

Williams has not shown that he merits a new trial under federal law on those grounds that he exhausted in state court.  The Court, therefore, will deny habeas relief with respect to Williams' capital conviction.

## III.   WILLIAMS' *PENRY* CLAIM

Williams' federal petition raises issues that relate to the jury's ability to evaluate and give effect to mitigating evidence (claims 7; 8(b), (d), and (e)) during the punishment phase of his trial.  The core of Williams' mitigating evidence claim finds root in *Penry v. Lynaugh*, 492 U.S. 302 (1989).  Williams' federal petition argues that *Penry* jurisprudence has firmly established that jurors could not consider "mitigating evidence about his character and background and the circumstances of the offense that was either irrelevant to, or relevant beyond the scope of, the special verdict questions" [Doc. # 7, p. 144].

Mitigating evidence played only a minor role at Williams' trial.  Williams' attorneys did not call any witnesses or present mitigating evidence in the punishment

phase.[25]  Some information that would mitigate a death sentence nonetheless came before the jury through the defense's case in the guilt/innocence phase and through cross-examination of the State's punishment witnesses.[26] Williams' briefing specifies the *Penry* evidence that was not fully available for consideration in jury deliberations. In particular, Williams points to the circumstances of the offense, including that he "was extremely shaken and distraught following the shooting"; his remorse for the crime; and background information, such as his young age, the interest in furthering his education during incarceration; and his "redeeming character traits" [Doc. #7, p. 145].

Williams' jury could only consider mitigating evidence through the special issue questions, which in this case asked whether (1) he acted deliberately; (2) he would be a future societal threat; and (3) he acted unreasonably in response to

---

[25]     Trial counsel later explained the defense's actions:

> Before trial I spent all my time preparing for the guilt stage and did not pay any attention to the punishment stage.  Accordingly I did not determine whether there was any mitigating evidence to present.  In 1982 , defense lawyers did not have much if any guidance regarding the type of mitigating evidence that should be offered at the punishment stage of a capital murder trial.  I did not conduct a mitigation investigation because I did not know what it was.
>
> * * * *
>
> After the jury convicted him of capital murder I felt that the jury would sentence him to death no matter what evidence I presented or arguments I made.

S.H.R. at 499-500.

[26]     The relatively small amount of mitigating evidence at trial has no bearing on Williams' *Penry* claim.  Despite its meager role in that proceeding, the Supreme Court has not "suggested that the question whether mitigating evidence could have been adequately considered by the jury is a matter purely of quantity, degree, or immutability." *Brewer*, 550 U.S. at 294.

provocation.  Williams' jury did not have a special issue or jury instruction that specifically told them to consider mitigating evidence.

This Court must decide if the jury could consider and give effect to the mitigating evidence before it.  In doing so, the Court first outlines the Supreme Court and Fifth Circuit law relating to *Penry* claims, then analyzes what evidence comprises Williams' *Penry* claim, and finally discusses whether his jury could fully give it effect. The Fifth Circuit's interpretation of modern *Penry* jurisprudence establishes that the jury in this case could consider and give effect to some, but not all, of Williams' mitigating evidence.  The Court accordingly grants habeas relief on Williams' *Penry* claim.

### A.    *Penry* Jurisprudence

Much has changed in the three decades since Williams' jury considered his sentence.  Federal courts have incrementally developed extensive and detailed jurisprudence involving Texas' method of placing mitigating evidence before capital juries.  Other decisions have elaborately traced the "long and contentious line of cases" in which *Penry* law has evolved.  *Pierce v. Thaler*, 604 F.3d 197, 204 (5th Cir. 2010); *see also McGowen v. Thaler*, 675 F.3d 482, 490-91 (5th Cir. 2012); *Blue v. Thaler*, 665 F.3d 647, 664 (5th Cir. 2011).  The Supreme Court first questioned the absence of a specific mitigation instruction or interrogatory to the jury in 1989.  As a result, the Texas Legislature in 1991 amended the statute regarding the sentencing scheme to ask the jury a new special issue: "whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."  TEX. CODE CRIM. PRO. art. 37.0711, § 2(e)(1).

For the past quarter century, federal courts have grappled with Texas' pre-1992

sentencing scheme that lacked a specific mitigation instruction or question.  The law has coalesced into a constitutional expectation that "sentencing juries must be able to give *meaningful* consideration and effect to *all* mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."  *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) (emphasis added).

In application, the Supreme Court's *Penry* jurisprudence involves a two-part inquiry.  *See Mines v. Quarterman*, 267 F. App'x 356, 361 (5th Cir. 2008) (describing the process by which a court assesses a *Penry* claim); *Coble v. Quarterman*, 496 F.3d 430, 444 (5th Cir. 2007) (same).  A reviewing court first asks whether the complained-of evidence meets a low relevance standard.  *See Tennard v. Dretke*, 542 U.S. 274, 283 (2004).  Second, a court must decide whether the defendant's evidence had "mitigating dimension beyond" the special issue questions actually posed to the jury.  *Tennard*, 542 U.S. at 288; *see also Smith*, 543 U.S. at 43-45 (reaching the same result in a case on certiorari review from the Texas Court of Criminal Appeals).  "[W]hen the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,'" omitting a specific mitigation question amounts to constitutional error.  *Abdul-Kabir*, 550 U.S. at 254 n.14.[27]

Against that background, the Court will consider Williams' claim that his jury

_____

[27]     The Fifth Circuit's recent application of *Penry* jurisprudence has granted relief in nearly all cases in which the petitioner raised a procedurally adequate *Penry* claim. *See Norris v. Davis*, ___ F.3d ___, 2016 WL 3418412 (5th Cir. June 21, 2016); *Jones v. Stephens*, 541 F. App'x 399, 406 (5th Cir. 2013); *McGowen v. Thaler*, 675 F.3d 482, 495-96 (5th Cir. 2012); *Pierce v. Thaler*, 604 F.3d 197, 211-12 (5th Cir. 2010); *Rivers v. Thaler*, 389 F. App'x 360, 361 (5th Cir. 2010); *Mines v. Quarterman*, 267 F. App'x 356, 362 (5th Cir. 2008); *Chambers v. Quarterman*, 260 F. App'x 706, 707 (5th Cir. 2007); *Garcia v. Quarterman*, 257 F. App'x 717, 723 (5th Cir. 2007); *Coble v. Quarterman*, 496 F.3d 430, 433 (5th Cir. 2007); *but see Smith v. Quarterman*, 515 F.3d 392, 414 (5th Cir. 2008).

could not give full effect to the mitigating evidence.  Before applying the law to his *Penry* claim, however, the Court must determine which arguments are fully available for federal review.

### B.    Scope of Federal Review

Williams' federal petition argues that the special issues precluded consideration of "his character and background and the circumstances of the offense . . . ."  [Doc. # 7, p. 44].  In particular, Williams emphasizes that he did not know during the encounter that the victim was a police officer, he had great remorse after the crime and at trial, and his background (his young age, efforts at education, and good character).  Respondent, however, argues that the convoluted state habeas litigation resulted in Williams' abandonment of some *Penry* arguments.

Williams' 1991 application raised a broad *Penry* claim that relied on evidence of his remorse, young age, background, efforts at obtaining an education, early introduction to criminal behavior, and circumstances of the crime exceeded the jury's consideration under the special issues.  Mr. Schaffer renewed the *Penry* claim in the 1993 application, yet included a narrower discussion and only addressed whether "the circumstances surrounding the offense could have warranted a life sentence had an additional special issue given the jury that option."  S.H.R. at 106.  Respondent contends that any argument falling outside the factual basis advanced in the 1993 application is unexhausted and, therefore, procedurally barred.  Specifically, Respondent argues that Williams ultimately focused only on "the supposed failure 'to consider and give effect to the mitigating circumstances surrounding the offense,' and anything beyond that allegation is procedurally defaulted" [Doc. # 34, p. 3].

However, when the Court of Criminal Appeals adjudicated Williams' *Penry* claim, it considered most of the mitigating circumstances described in the 1991

application.  *See Williams*, 2012 WL 2130951, at *12.[28]  The Court of Criminal Appeals', opinion discussed: (1) "the circumstances of the offense" including Williams knowledge "that Detective Shirley was a police officer" and that Williams' "behavior was not reasonable in response to any provocation from him"; (2) "the previous incident in which [Williams] was allegedly robbed by someone who pretended to be a police officer"; (3) that Williams was "remorseful" because he "was upset and apologetic after the incident"; and (4) Williams' "attempts to better himself through education"  *Williams*, 2012 WL 2130951, at *15.[29]

Despite state habeas counsel's vague briefing in the 1993 application, this Court's review of the *Penry* claim will be co-extensive with the issues the Court of Criminal Appeals adjudicated.  It is the Court of Criminal Appeals' review that defines the issues available for federal review.  *See Jones v. Dretke*, 375 F.3d 352, 355 (5th Cir. 2004) (finding that exhaustion satisfied when the state court considers an issue *sua sponte*).[30]  Simply, "[t]here is no better evidence of exhaustion than a state

---

[28]    In a previous order, the Court erroneously observed that "[t]he state habeas courts adjudicated only a narrow *Penry* claim, providing Respondent with his argument that a procedural bar precludes review over the remainder of the issues" [Doc. # 26, p. 11].  This Court intended to refer to the lower habeas court's findings and conclusions.  A closer review of the state court proceedings, however, reveals that the Court of Criminal Appeals adjudicated a broader habeas claim than that discussed in the lower court's findings and conclusions.

[29]    Williams has hinted at other new areas of mitigating evidence.  However, review is not available if not presented to the state courts.  On state habeas review, the Court of Criminal Appeals observed that "[i]n the habeas proceedings, applicant presented some evidence of a troubled childhood, but this evidence was not presented at trial, and so cannot be considered in determining whether he should have obtained a mitigation special issue." *Ex Parte Williams*, No. AP-76,455, 2012 WL 2130951, at *15 (Tex. Crim. App. June 13, 2012).

[30]    Other circuit courts have held that "a state appellate court's *sua sponte* consideration of an issue not only satisfies § 2254's exhaustion requirement, but, more importantly for our purposes, also constitutes an adjudication on the merits that is ripe for federal habeas
(continued...)

court's actual consideration of the relevant constitutional issue." *Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir. 1984). Finding Williams' full federal *Penry* claim to be exhausted comports with modern habeas jurisprudence's focus "on what a state court knew and did." *Pinholster*, 563 U.S. at 182. The Court rejects the contention that those issues adjudicated on the merits by the Court of Criminal Appeals are unexhausted.

The Court, therefore, will decide whether the jury could fully consider the categories of evidence identified by the Court of Criminal Appeals in adjudicating Williams' *Penry* claim: the circumstances of the offense, Williams being the victim of a previous attempted robbery, Williams' youth, remorse, and educational efforts. *Williams*, 2012 WL 2130951, at *12.

### C.    The Circumstances of the Offense and Prior Attempted Robbery

The Court of Criminal Appeals' opinion focused on two features of the guilt/innocence defense that allegedly evaded the jury's consideration in the penalty phase: Williams' "behavior was not reasonable in response to any provocation from

---

30    (...continued)

review." *Alverson v. Workman*, 595 F.3d 1143, 1153 n.3 (10th Cir. 2010); *see also Comer v. Schriro*, 463 F.3d 934, 956 (9th Cir. 2006), *withdrawn on other grounds*, *Comer v. Stewart*, 471 F.3d 1359 (9th Cir. 2006); *Moorman v. Schriro*, 426 F.3d 1044, 1057 (9th Cir. 2005); *Walton v. Caspari*, 916 F.2d 1352, 1356-57 (8th Cir. 1990); *Cooper v. Wainwright*, 807 F.2d 881, 887 (11th Cir. 1986). "In this situation, the purpose of the exhaustion doctrine—to give state courts the first word on a claim—has been satisfied." *Moore v. DiGuglielmo*, 489 F. App'x 618, 623-24 (3d Cir. 2012); *see also Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir. 1984) ("[T]he core of the exhaustion issue lies not in how petitioner's state court pleadings are to be interpreted. Instead, we must look to what the state courts actually considered."); *see also* 2 Randy Hertz & James S. Liebman, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 23.3a (2015) ("If the appropriate state courts have had sufficient opportunity to rule on the claim even though the petitioner did not specifically present it, the presentation requirement will be excused. This exception comes into play, for example, when a state court with the authority to make a final adjudication undertook to decide the claim on its merits *sua sponte*.").

him"[31] and "the previous incident in which [Williams] was allegedly robbed by someone who pretended to be a police officer." *Williams*, 2012 WL 2130951 at *15.

Williams' arguments relating to the events surrounding the murder asked the jury to reconsider its finding of guilt. The jury had a full opportunity to consider the circumstances of the offense and the subsidiary arguments relating to his intent when the jury decided to convict Williams. To a large measure, Williams' argument about the circumstances of the offense is another species of residual-doubt evidence. The Fifth Circuit has recognized that "residual doubt may be a reasonable, even highly beneficial, strategy in a capital case." *Martinez v. Quarterman*, 481 F.3d 249, 256 (5th Cir. 2007) (citing *Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999)). However effective as a strategy, the Supreme Court has not designated residual doubt as a form of mitigating evidence. Even when recognizing that mitigating evidence addresses an "aspect of a defendant's character or record and any of the circumstances of the offense," *Lockett v. Ohio*, 438 U.S. 588, 604 (1978), the Supreme Court has "never held that capital defendants have an Eighth Amendment right to present 'residual doubt' evidence at sentencing[.]" *Abdul-Kabir*, 550 U.S. at 251; *see also Franklin v. Lynaugh*, 487 U.S. 164, 173 n.6 (1988) (finding it "quite doubtful" that a right to present residual doubt exists); *Holland v. Anderson*, 583 F.3d 267, 283 (5th Cir. 2009) ("[T]he Supreme Court has not recognized a constitutional right to argue 'residual doubt' at sentencing.").

Residual doubt–such as whether the circumstances of the offense demonstrate a lack of intent–is not relevant to a jury's deliberations in the punishment phase. The Court of Criminal Appeals correctly observed "nothing in the circumstances of the

---

[31]    Among the special issues submitted by the trial court, jurors were asked if "the conduct of the defendant. . . in killing Daryl Wayne Shirley, the deceased, [was] unreasonable in response to the provocation if any by the deceased?" Clerk's Record at 210. Williams' briefing does not elaborate on his evidence that touches on provocation and does not explain why the provocation special issue failed to provide full review of that evidence.

offense . . . has meaningful mitigating relevance to [Williams'] moral culpability." *Williams*, 2012 WL 2130951, at *15.  For that reason, the Supreme Court has never found a constitutional right to punishment-phase jury instructions revisiting questions of guilt.  *See Franklin*, 487 U.S. at 172-73; *see also United States v. Jackson*, 549 F.3d 963, 981 (5th Cir. 2008) (finding that a criminal defendant has no right to a sentencing instruction on residual doubt).  To the extent that the jury would reconsider its finding of guilt, Williams fails to explain how the deliberateness and provocation special issues did not encompass any mitigating features of his chosen defense.  In particular, Williams has not explained how the jury could not fully consider the prior attempted robbery of Williams in deciding whether his action was "unreasonable in response to the provocation, if any, by the deceased?"  Thus, Williams has not shown that his circumstances-of-the-crime argument exceeded the jury's purview in the penalty phase.

### D.     Youth

Williams argues that "he was only twenty-two years old when the capital offense occurred.  Williams' young age at the time of the offense, standing alone, is a factor entitled to consideration in mitigating of punishment beyond the scope of the special issues" [Doc. # 7, p. 145].  The discussion of the mitigation effects of Williams' youth is the only portion of his federal *Penry* claim that exceeds that adjudicated by the Court of Criminal Appeals.  Williams argued in the 1991 application and on federal review that the special issues did not allow consideration of his age.  The Court of Criminal Appeals included Williams' "youth" when describing the "good-person evidence" he presented at trial, but did not include that factor in the subsequent discussion of his *Penry* claim.  *Williams*, 2012 WL 2130951, at *13.  The portion of Williams' *Penry* claim addressing youth is not properly before the Court.

Even if the Court of Criminal Appeals had considered whether the jury could

consider and give effect to evidence of "the transient immaturity of youth," *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 734 (2016), the Supreme Court has found that "[e]vidence of youth . . . has special relevance to the question of future dangerousness." *Abdul-Kabir*, 550 U.S. at 261; *see also Johnson v. Texas*, 509 U.S. 350, 370-72 (1993). The Supreme Court has explained that the future dangerousness issue provided "ample room . . . for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination." *Johnson*, 509 U.S. at 368. Williams has not shown that he merits a new trial because the special issues did not allow the jury to consider his youth at the time of the incident.

### E.    Good Character Through Remorse and Education

Williams also argues that his jury had no vehicle to consider mitigating evidence that he was "remorseful" because he "was upset and apologetic after the incident" and that he had "attempt[ed] to better himself through education"[32] *Williams*, 2012 WL 2130951, at *15. During the guilt/innocence phase, the defense adduced testimony that, when leaving the premises after the shooting, Williams was crying. Tr. Vol. 27 at 736. Hours after the killing, Williams was still "crying . . . and apologizing. He was just really upset." Tr. Vol. 26 at 642. Williams was "was very emotionally upset. He was crying uncontrollably. He apologized." Tr. Vol. 26 at 634, 648. Williams also expressed remorse during his testimony at trial. Tr. Vol. 27 at 792-93.

Trial counsel's questioning of Williams also focused on other areas of mitigating evidence. Williams had obtained his G.E.D. before committing the murder. Tr. Vol. 27 at 696. Williams tried to enroll in college when he arrived in Houston but

---

[32]    The Court of Criminal Appeals also observed that "[i]n the habeas proceedings, applicant presented some evidence of a troubled childhood, but this evidence was not presented at trial, and so cannot be considered in determining whether he should have obtained a mitigation special issue." *Ex Parte Williams*, No. AP-76,455, 2012 WL 2130951, at *15 (Tex. Crim. App. June 13, 2012).

did not have the records he needed to do so.  Tr. Vol. 27 at 699.[33]  He obtained college credits while in prison.  Tr. Vol. 27 at 697-98.

Testimony about remorse and of educational pursuits are both species of good-character evidence.[34]  On direct appeal, the Court of Criminal Appeals succinctly found that Williams' jury could consider whether his character would mitigate his sentence:

> That [Williams] was upset and apologetic after the incident could be relevant to show that he was remorseful, which can impact a jury's determination of future dangerousness, but [his] reaction after the incident does not make him less blameworthy for what occurred. Likewise, [Williams'] attempts to better himself through education was relevant to future dangerousness but did not impact his moral culpability.

---

[33]    Also, as described by the state habeas court, trial counsel elicited testimony

> that [Williams] knew that he committed a technical violation by leaving the halfway house; that he came to Houston from Minnesota to get away from the environment in Minnesota; that he attempted to enroll in college in Houston but did not have all his records; that he was using a different name to avoid arrest for his parole violation; that he did not hold a steady job in Houston but went on job interviews; and that he was receiving money from his family and friends to help him.

S.H.R. at 781.

[34]    In precedent from two decades ago, the Fifth Circuit found that evidence of remorse could be considered in the context of the deliberateness and future dangerousness issues. *See Callins v. Collins*, 998 F.2d 269, 275 (5th Cir. 1993); *James v. Collins*, 987 F.2d 1116, 1122 (5th Cir. 1993); *Wilkerson v. Collins*, 950 F.2d 1054, 1062 (5th Cir. 1992).  In doing so, the Fifth Circuit treated evidence of remorse as a form of good character evidence. *See Briddle v. Scott*, 63 F.3d 364, 377 (5th Cir. 1995) (citing case law involving good character evidence when denying claim involving remorse); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993) ("James also presented 'good character evidence,' consisting of evidence that he cooperated with police, showed signs of remorse over his actions, and possessed redeeming character traits.").  The Fifth Circuit has also considered testimony about a defendant "furthering his education" to be "good character" evidence. *Pierce v. Thaler*, 604 F.3d 197, 208 (5th Cir. 2010).

*Williams*, No. AP-76,455, 2012 WL 2130951, at *15.

Recent authority establishes that the state court's adjudication was an unreasonable application of Supreme Court precedent.  Initially, the Court finds that Williams' good-character evidence was plainly relevant, the first step of a *Penry* analysis.  "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."  *Tennard*, 542 U.S. at 284.  The Court of Criminal Appeals seemed to recognize that the good-character evidence had mitigation relevance, but it nevertheless concluded that a jury could fully consider and give effect to it under the future-dangerousness special issue.  In doing so, the Court of Criminal Appeals specifically found the future-dangerousness issue broad enough to comprehend remorse evidence:

> Remorse can be mitigating because it shows that the defendant has changed—which is a core issue in the future-dangerousness inquiry. And a jury could have believed that applicant's distress was caused by remorse rather than by fear for himself. But it is not apparent how any such remorse could have mitigating impact beyond its relevance to the future-dangerousness issue, and the dissent does not explain how it could.

*Williams*, 2002 WL 2130951, at *15 n.76.  "Likewise, [Williams'] attempts to better himself through education was relevant to future dangerousness but did not impact his moral culpability."  *Id.* at *15.

Under the second *Penry* factor, Williams must show that his jury could not "give meaningful consideration and effect to all [his] mitigating evidence . . . ."  *Abdul-Kabir*, 550 U.S. at 246.  Evidence of remorse and educational efforts have mitigating value because they "might serve as a basis for a sentence less than death," *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986), as jurors could find the defendant "less culpable than defendants who have no such excuse," *Franklin*, 487 U.S. at 184.  Supreme Court authority has "establish[ed] that good character evidence has

meaningful relevance to moral culpability . . . ." *Pierce v. Thaler*, 604 F.3d 197, 210 (5th Cir. 2010); *see also Norris v. Davis*, ___ F.3d ___, 2016 WL 3418412 (5th Cir. June 21, 2016); *McGowen*, 675 F.3d at 495.  Specifically, the Fifth Circuit in *Pierce* recognized that an inmate's attempts at personal betterment–in that case that the defendant "matured in prison by furthering his education, improving his reading skills, and developing his talent for art and woodworking"–implicated the defendant's moral culpability.  *Pierce*, 604 F.3d at 208; *see also Norris*, 2016 WL 3418412, at * 6 (considering evidence that the defendant "was active at church, had been a good student, was a good father to his daughter, and had maintained regular employment); *McGowen*, 675 F.3d at 492 (addressing similar evidence including that the defendant "had graduated from a vocational school").  The Fifth Circuit in *Pierce* found that good-character evidence "is not encompassed by the [pre-1991] special issues." *Pierce*, 604 F.3d at 210 (citing *Franklin*, 487 U.S. at 185); *see also McGowen*, 675 F.3d at 495 (reversing a district court's finding that the pre-1991 special issues adequately allowed consideration of good character evidence).[35]  Williams' evidence of educational efforts is similar to the evidence presented by the defendant in *Pierce*, and requires federal habeas relief for the same reasons.

---

[35]     Respondent acknowledges that the State's briefing relies on cases decided before *Abdul-Kabir*, but states that "there is no Fifth Circuit precedent post-*Abdul-Kabir* and *Brewer* holding that remorse cannot be fully considered through the future-dangerousness special issue" [Doc. # 20, p. 154].  While no case explicitly relies on evidence of remorse to find *Penry* error, as discussed above, the jurisprudence leads to that conclusion.  Additionally, the Fifth Circuit granted *Penry* relief in a case involving evidence of remorse without any extensive discussion.  In a claim involving a stopgap instruction to consider mitigating evidence used by trial courts after *Penry*, but before the Texas legislature created a mitigation special issue, the Fifth Circuit in *Chambers v. Quarterman*, 191 F. App'x 290, 301 (5th Cir. 2006), found that the special issues allowed the jury to consider evidence of remorse.  The Supreme Court, however, granted certiorari review and vacated the judgment in light of *Abdul-Kabir*.  *Chambers v. Quarterman*, 550 U.S. 915 (2007).  The subsequent opinion granting relief, however, did not mention evidence of remorse.  *Chambers v. Quarterman*, 260 F. App'x 706 (5th Cir. 2007).

Similarly, Williams' evidence of remorse required a specific instruction or special issue on mitigating evidence. Respondent argues that the Court of Criminal Appeals found that remorse may have mitigating value in showing that a defendant has changed his behavior, but "had no relevance to moral culpability" [Doc. # 20, p. 146]. The special issues presented in 1983 only gave the jury the ability to consider remorse in context of Williams' future danger, his response to provocation, or deliberateness. The question of whether Williams' acted deliberately or in response to provocation possibly provided a limited context to consider some, but not all, mitigating features of his remorse. Remorse by definition follows action, which lessens its impact on the question of whether he acted in just response to provocation or acted deliberately. Questions relating to what happened before and during Williams' crime cannot explain the full measure of how Williams felt afterward.

The Supreme Court, since at least 2000, has observed that a defendant "expressing remorse for his actions" is a factor that "might well have influenced the jury's appraisal of [an inmate's] moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000). Aside from merely forecasting future behavior, remorse "is something commonly thought to lessen or excuse a defendant's culpability." *Brown v. Payton*, 544 U.S. 133, 142-43 (2005). A trial attorney may rely on evidence of remorse to humanize his client in a manner which exceeds the inquiry used in deciding whether he may act violently in the future.[36] Remorse may provide insight into humanizing qualities that do not necessarily relate to what an inmate has done or what he may do.

The special issues currently used by Texas would have allowed the jury to

---

[36]     In the guilt/innocence phase trial counsel asked jurors: "Is this the demeanor of a cold-blooded killer? Is this the demeanor? A tearful cry full [sic] man, who loves to kill cops who has no remorse? . . . If you can walk around and kill somebody and not have one bit of remorse, that would be a sick man." Tr. Vol. 28 at 48. While trial counsel told jurors that testimony showing that Williams "he was crying, he was visibly upset" would "show you what his frame of mind was at the time of the killing," trial counsel also argued that it "is not the demeanor of a cold-hearted killer. It is just not." Tr. Vol. 24 at 49.

consider fully any evidence of remorse.  Specifically, the current special issue asking jurors to take "into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant" would allow jurors to give effect to evidence of remorse. Like evidence of educational efforts, testimony about remorse speaks to an inmate's moral character for which the special issues in 1983 at Williams' trial provided no meaningful avenue for consideration.

As the Supreme Court concluded in *Abdul-Kabir*, even if Williams' "mitigating evidence may not have been as persuasive as Penry's, it was relevant to the question of [his] moral culpability . . . [because it] did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence." *Abdul-Kabir*, 550 U.S. at 259.  Had the current punishment phase questions been put before the jury, an effectual vehicle would have existed for the consideration of mitigating evidence.  Because of the constitutional defect in the jury's ability to consider and give effect to all Williams' mitigating evidence, an additional special issue was required.  *See Pierce*, 604 F.3d at 210.  The omission of a mitigating question requires federal habeas corpus relief.

### F.    Harmlessness of the Constitutional Error

Respondent argues that, even if the jury could not consider Williams' mitigating evidence, any resulting error would be harmless.  Fifth Circuit precedent "forecloses any argument that a *Penry* error can be subject to harmless error review." *Mines v. Quarterman*, 267 F. App'x 356, 362 n.3 (5th Cir. 2008); *see also Nelson v. Quarterman*, 472 F.3d 287, 314-15 (5th Cir. 2006).  The Fifth Circuit has repeatedly noted that "the Supreme Court has *never* applied a harmless-error analysis to a *Penry* claim or given any indication that harmless error might apply in its long line of post-*Furman* cases addressing the jury's ability to give full effect to a capital defendant's

mitigating evidence." *Nelson*, 472 F.3d at 314.[37]  Indeed, the Fifth Circuit has held that "it would be wholly inappropriate for an appellate court, in effect, to substitute its own moral judgment for the jury's in these cases." *Id.* at 315.

This Court follows Fifth Circuit law and does not apply a harmless error analysis to Williams' *Penry* claim.  Accordingly, more than three decades after Williams' trial, Texas must either hold a new punishment hearing or commute his sentence to life imprisonment.

## IV.    REMAINING PUNISHMENT PHASE CLAIMS

Williams raises other claims relating to the penalty phase of trial.  This Court's grant of habeas relief on Williams' *Penry* claim renders moot his other punishment phase claims.  In the interests of judicial economy, the Court will not address their merits.

### CERTIFICATE OF APPEALABILITY

AEDPA prevents appellate review of a petitioner's claims unless the district or circuit courts certify specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED. R. APP. PRO. 22(b).  The State, however, does not need judicial authorization to appeal.  FED. R. APP. PRO. 22(b)(3) ("A certificate of appealability is not required when a state or its representative or the United States or its representative appeals.").  Williams has not yet requested that this Court grant him a Certificate of Appealability ("COA") on his guilt/innocence claims, though this Court is permitted to consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

A certificate of appealability will not issue unless the petitioner makes "a

---

[37]     "[T]he question whether some types of *Penry* error might be subject to harmless error review has not been squarely decided by and remains unresolved by the United States Supreme Court."  *Garcia v. Quaterman*, 257 F. App'x 717, 724 (5th Cir. 2007); *see also Smith v. Texas*, 550 U.S. 297, 316 (2007) (Souter, J., concurring) ("In some later case, we may be required to consider whether harmless error review is ever appropriate in a case with error as described in *Penry*[.]  We do not and need not address that question here.").

substantial showing of the denial of a constitutional right,"  28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Applying governing standards, Williams' guilt/innocence phase claims do not justify appellate consideration.  This Court declines to issue a COA.

## CONCLUSION AND ORDER

For the reasons set forth above, it is hereby

**ORDERED** that a writ of habeas corpus is **GRANTED conditionally** on Williams' *Penry* claim.  It is therefore

**ORDERED** that a writ of habeas corpus shall issue unless, within 180 days of judgment in this proceeding becoming final, the State of Texas either begins new sentencing proceedings against Williams or commutes his sentence to life imprisonment.  It is further

**ORDERED** that the Court **DENIES** certification of any issue for appellate consideration.

The Clerk will deliver a copy of this Memorandum and Order to the parties.

**SIGNED** this <u>28th</u> day of <u>June</u>, 2016, at Houston, Texas.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE